## IN THE  UNITED  STATES  DISTRICT COURT
## FOR THE  EASTERN  DISTRICT OF MICHIGAN

NATIONAL  WILDLIFE FEDERATION,           Case No. _____

            Plaintiff,

    v.                                                      Judge

SECRETARY  OF THE UNITED STATES           Magistrate Judge
DEPARTMENT  OF TRANSPORTATION,
in his official capacity,

_____Defendant._____/

_____

## COMPLAINT  FOR DECLARATORY  AND INJUNCTIVE  RELIEF

### INTRODUCTION

1.    This is an action for declaratory and injunctive relief to compel Defendant Secretary of the United  States Department of Transportation ("DOT") to take long-overdue nondiscretionary action required by § 311 of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), Pub. L. No. 92-500, 86 Stat. 816 (1972), as amended by the Oil Pollution  Act of 1990 ("OPA"), Pub. L. No. 101-380, § 4202(a)(6), (b)(4)(A), 104 Stat. 484 (1990) (codified in part at 33 U.S.C. § 1321(j)), and by Executive Order 12777, 56 Fed. Reg. 54757 (Oct. 18, 1991).

2.      The OPA prohibits handling, storing, or transporting oil until owners or operators of certain facilities prepare, submit to the President, and comply with a spill response plan reviewed and approved by the President. The OPA requires a spill response plan to ensure that an owner or operator has ensured the availability of resources necessary to remove, to the maximum extent practicable, a worst case discharge, and to mitigate or prevent a substantial threat of such a discharge, of oil or a hazardous substance. "Remove" means "containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches." CWA § 311(a)(8), 33 U.S.C. § 1321(a)(8).

3.      The OPA imposed on the President a nondiscretionary duty to issue regulations implementing the OPA's spill response plan requirement no later than August 18, 1992. The OPA also imposed on the President a nondiscretionary duty to review and approve spill response plans, if they meet the OPA's requirements, no later than August 18, 1993, subject to a discretionary, one-time 2-year extension until August 18, 1995. Congress thus provided that no facility subject to the OPA's spill response plan requirement may handle, store, or transport oil after August 18,

1993, or possibly August 18, 1995, at the latest, without a Presidentially-approved spill response plan.

4. On February 3, 1994, pursuant to Executive Order 12777, DOT was authorized to assume and did assume the responsibility (a) to issue the regulations implementing the OPA's spill response plan requirement and (b) to review and approve spill response plans of transportation-related facilities, including pipelines, landward of the coast line located in, on, or under any navigable waters of the United States ("transportation-related inland offshore facilities"), if the plans meet the OPA's requirements. However, DOT has not issued the regulations implementing the OPA's spill response plan requirement for transportation-related inland offshore facilities or reviewed any such spill response plans to determine if they meet the OPA's requirements. As a result, DOT has not approved any spill response plans for transportation-related inland offshore facilities that may have been prepared by owners or operators of such facilities.

5. DOT's 20-year plus continuing failure to carry out its nondiscretionary duties described above has left the nation's public health, fish and wildlife, public and private property, shorelines, and beaches vulnerable to worst case discharges of oil or hazardous substances. This exposure is contrary to Congress's declared policy that there be no discharges of oil or hazardous substances into or upon the navigable waters of the United States or adjoining

shorelines. DOT's failure to carry out its nondiscretionary duties described above by the deadlines set in the OPA constitutes agency action unlawfully withheld or unreasonably delayed.

6.      Plaintiff National Wildlife Federation ("NWF") seeks the following relief from this Court:

a.      a declaratory judgment that DOT has a nondiscretionary duty to issue regulations implementing the OPA's requirement that owners and operators of transportation-related inland offshore facilities prepare, submit to DOT, and comply with a spill response plan, reviewed and approved by DOT, that ensures the availability of resources necessary to remove, to the maximum extent practicable, a worst case discharge, and to mitigate or prevent a substantial threat of such a discharge, of oil or a hazardous substance;

b.      a declaratory judgment that DOT has a nondiscretionary duty to review spill response plans prepared and submitted by transportation-related inland offshore facilities and approve them, if the plans meet the OPA's requirements;

c.      a declaratory judgment that DOT has failed to issue the regulations described above, and has failed to review or approve spill response plans prepared and submitted by transportation-related inland offshore facilities;

d.      a declaratory judgment that DOT's continuing failure to issue the regulations described above, and review and approve spill response plans prepared and submitted by transportation-related inland offshore facilities, if they meet the OPA's requirements, constitutes a violation of DOT's nondiscretionary duties;

e.      a declaratory judgment that DOT's violation of its nondiscretionary duties described above constitutes agency action unlawfully withheld or unreasonably delayed;

f.      an injunction compelling DOT to carry out its nondiscretionary duties described above;

g.      an order setting a schedule for submission, review, and approval of oil spill response plans for transportation-related inland offshore facilities;

h.      an order retaining jurisdiction to ensure that DOT issues the regulations described above and complies with the schedule ordered by this Court;

i.      an order granting NWF costs of litigation (including reasonable attorney and expert witness fees) incurred in prosecuting this action, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

j.      such other relief as this Court determines just and appropriate.

### JURISDICTION AND VENUE

7.      On July 28, 2015, NWF voluntarily sent DOT a letter notifying DOT of NWF's intent to sue the agency for failing to perform its nondiscretionary duty under CWA § 311(j), 33 U.S.C. § 1321(j), and Executive Order 12777, to implement the OPA's spill response plan requirement. A copy of the notice-of-intent letter is attached to this complaint and incorporated by this reference as "Exhibit A." More than sixty days have passed since NWF provided DOT with notice. DOT has not performed its nondiscretionary duty under CWA § 311(j), 33 U.S.C. § 1321(j), and Executive Order 12777, to implement the OPA's spill response plan requirement.

8.      An actual, substantial, and continuing controversy exists between the parties. A declaration of NWF's rights and other legal relations is necessary.

9.      This Court has jurisdiction over this controversy pursuant to OPA § 1017(b) (codified at 33 U.S.C. § 2717(b)). This Court is also vested with original jurisdiction over federal questions pursuant to 28 U.S.C. § 1331. This Court additionally has jurisdiction over actions to compel an officer of the United States

to perform his or her duties pursuant to 28 U.S.C. § 1361. This Court also has jurisdiction to grant declaratory relief and further necessary or proper relief under 28 U.S.C. §§ 2201 and 2202. NWF is entitled to this Court's review of DOT's action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. The APA provides in 5 U.S.C. § 706(1) that the Court shall compel agency action unlawfully withheld or unreasonably delayed.

10.     Venue is proper in this district pursuant to the OPA, which provides that "[v]enue shall lie in any district in which the discharge or injury or damages occurred." OPA § 1017(b) (codified at 33 U.S.C. § 2717(b)). In the alternative, venue is proper in this district under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to NWF's claims occurred here. Venue is proper under both provisions because owners or operators of transportation-related inland offshore facilities handle, transport, or store oil or a hazardous substance without a spill response plan approved by DOT, as required by the OPA, in, on, or under navigable waters within this district, specifically (a) the St. Clair River, adjoining St. Clair County; and (b) the Straits of Mackinac, adjoining Cheboygan County.

## PARTIES

11.     Plaintiff National Wildlife Federation is the nation's largest not-for-profit conservation advocacy and education organization. NWF has more than

750,000 members nationwide, including more than 26,000 members in Michigan. NWF's mission includes inspiring Americans to protect wildlife and natural resources for our children's future. NWF's mission includes protecting wildlife and natural resources from the impacts of spills of oil or hazardous substances. NWF is a District of Columbia nonprofit corporation with its principal office located in Virginia and a Great Lakes office headquartered at 213 West Liberty Street, Second Floor, Ann Arbor, Michigan, 48104.

12.     Defendant Secretary of the United States Department of Transportation ("DOT") is sued in his official capacity. The Secretary of Transportation is the head of the department, and the office of the Secretary itself, rather than any operating administration within the department, is responsible for implementing the OPA's spill response plan requirement for transportation-related inland offshore facilities.

## STANDING

13.     NWF files this action on behalf of itself and its members.

14.     One or more of NWF's members have standing in this action because they reside or have a residence or residences in the United States near navigable waters of the United States where transportation-related inland offshore facilities are located. These members include members in Michigan who reside or have residences near the St. Clair River or the Straits of Mackinac.

15.     One or more of NWF's members have standing in this action because they use or enjoy the Straits of Mackinac or other navigable waters of the United States near where transportation-related inland offshore facilities are located, for swimming, boating, kayaking, canoeing, sport fishing (and fish consumption), hunting, beach walking, snorkeling, scuba diving, or other recreational or aesthetic pursuits. These members intend to continue these pursuits on a regular, ongoing basis now and in the future and to continue to derive these recreational or aesthetic benefits from these waters.

16.     One or more of NWF's members have been, are, and will be adversely affected or aggrieved by DOT's failure to timely carry out its duty to ensure that owners or operators of transportation-related inland offshore facilities handling, transporting, or storing oil or a hazardous substance are prepared with a spill response plan, reviewed and approved by DOT, pursuant to regulations issued by DOT, that ensures the availability of resources necessary to remove, to the maximum extent practicable, a worst case discharge, and to mitigate or prevent a substantial threat of such a discharge, of oil or a hazardous substance. Contrary to the OPA and Executive Order 12777, DOT's failure to timely carry out these duties injures one or more of NWF's members by failing to secure their interests, exposing them to the injuries from a worst case discharge, or a substantial threat of such a discharge, of oil or a hazardous substance that would otherwise be removed,

mitigated, or prevented. This adversely affects or aggrieves their use or enjoyment of their residences, recreation, or aesthetic pursuits.

17.     For instance, Enbridge Energy, LLP, and Enbridge Inc. (collectively "Enbridge") own and operate, respectively, a pipeline known as "Line 5," which extends from Superior, Wisconsin, through Michigan, to Sarnia, Ontario, Canada. Line 5 handles, stores, or transports up to 22.7 million gallons per day of crude oil or natural gas liquids. Segments of Line 5 are located in, on, or under the St. Clair River and the Straits of Mackinac, which are both navigable waters. The Straits of Mackinac connect Lakes Michigan and Huron. The segment of Line 5 crossing the Straits of Mackinac is more than four miles long. Other segments of Line 5 may cross other navigable waters.

18.     The segments of Line 5 located in, on, or under the St. Clair River and the Straits of Mackinac are examples of transportation-related inland offshore facilities operating without a spill response plan reviewed or approved by DOT, pursuant to regulations issued by DOT, as required by the OPA. Consequently, even if Enbridge has prepared a spill response plan for these segments, DOT has not determined, as required by the OPA, that any such spill response plan ensures the availability of resources necessary to remove, to the maximum extent practicable, a worst case discharge or to mitigate or prevent a substantial threat of such discharge in the St. Clair River or the Straits of Mackinac.

19.    Those of NWF's members who reside or have residences near the Straits of Mackinac, or who use or enjoy the Straits of Mackinac, therefore have been, are, and will be adversely affected or aggrieved by DOT's failure to timely carry out its duty to ensure that Enbridge is prepared with a spill response plan, reviewed and approved by DOT, pursuant to regulations issued by DOT, that ensures the availability  of resources necessary to remove, to the maximum extent practicable, a worst case discharge, and to mitigate a substantial threat of such a discharge, of oil or a hazardous substance in the Straits of Mackinac. Contrary to the OPA and Executive Order 12777, DOT's failure to timely carry out these duties injures one or more of NWF's members by failing to secure their interests, exposing them to the injuries from a worst case discharge, or a substantial threat of such a discharge, of oil or a hazardous substance that would otherwise be removed, mitigated, or prevented. This adversely affects or aggrieves their use or enjoyment of their residences, recreation, or aesthetic pursuits.

20.    The interests of NWF and its members fall within the zone of interests protected under the CWA and the OPA.

21.    For the reasons stated above, DOT's failure to timely carry out its nondiscretionary duties under the OPA and Executive Order 12777 to implement the OPA's spill response plan requirement for transportation-related inland

offshore facilities causes NWF and its members injury for which they have no adequate remedy at law.

22. The relief NWF seeks will redress the injuries to NWF and its members caused by DOT's failure to timely carry out its nondiscretionary duties under the OPA and Executive Order 12777 to implement the OPA's spill response plan requirement for transportation-related inland offshore facilities.

## STATEMENT OF THE CASE

### Statutory and Regulatory Background

23. The purpose of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

24. Congress declared "that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States, [or] adjoining shorelines." 33 U.S.C. § 1321(b)(1).

25. The CWA defines an "onshore facility" as "any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land." 33 U.S.C. § 1321(a)(10).

26.     The CWA defines an "offshore facility," in part, as "any facility of any kind located in, on, or under, any of the navigable waters of the United States." 33 U.S.C. § 1321(a)(11).

27.     On August 18, 1990, Congress enacted the OPA, amending § 311(j) of the CWA, 33 U.S.C. § 1321(j). OPA, Pub. L. No. 101-380, § 4202(a)(6), (b)(4)(A), 104 Stat. 484 (1990). Congress intended the requirements of § 311(j) to ensure an effective and immediate response to an oil spill to prevent a repetition of an oil spill such as the Exxon *Valdez* oil spill in Alaska's Prince William Sound on March 23, 1989.

28.     The OPA amended §311(j) of the CWA to prohibit handling, storing, or transporting oil until owners or operators of all offshore facilities and certain onshore facilities prepare, submit to the President, and comply with a spill response plan reviewed and approved by the President that ensures the availability of resources necessary to remove, to the maximum extent practicable, a worst case discharge, and to mitigate or prevent a substantial threat of such a discharge, of oil or a hazardous substance. OPA, Pub. L. No. 101-380, § 4202(a)(6) (adding subparagraph (F) to § 311(j)(5), which provides that § 311(j) requires all offshore facilities and certain onshore facilities to prepare a spill response plan, and prohibits them from handling, storing, or transporting oil unless the plan has been reviewed and approved by the President and the plan is followed) (codified at 33

13

U.S.C. § 1321(j)(5)(F)), § 4202(b)(4)(B) (providing that § 311(j)(5) requires

offshore facilities, among others, to prepare a spill response plan), 104 Stat. 484

(1990).

29.    The OPA imposed on the President a nondiscretionary duty to issue

regulations implementing the OPA's spill response plan requirement not later than

August 18, 1992. OPA, Pub. L. No. 101-380, § 4202(a)(6) (adding subparagraphs

(A)(i) and (C)(iii) to § 311(j)(5), which provide that "[t]he President shall issue

regulations which require an owner or operator of a[n offshore] … facility … to

prepare and submit to the President a plan for responding, to the maximum extent

practicable, to a worst case discharge, and to a substantial threat of such a

discharge, of oil or a hazardous substance") (codified at 33 U.S.C. §

1321(j)(5)(A)(i), (C)(iii)), § 4202(b)(4)(A) ("Not later than 24 months after the

date of the enactment of this Act, the President shall issue regulations for …

facility response plans under section 311(j)(5) of the Federal Water Pollution

Control Act, as amended by this Act.").

30.    The OPA imposed on the President a nondiscretionary duty to review

spill response plans and, if they meet the OPA's requirements, to approve them not

later than August 18, 1993. OPA, Pub. L. No. 101-380, § 4202(a)(6) (adding

subparagraph (F) to § 311(j)(5), which provides that § 311(j) requires all offshore

facilities and certain onshore facilities to prepare a spill response plan, and

14

prohibits such facilities from handling, storing, or transporting oil unless the plan has been reviewed and approved by the President pursuant to subparagraph (E) and the plan is followed) (codified at 33 U.S.C. § 1321(j)(5)(F)), § 4202(b)(4)(B) (providing that the President's obligation to review and approve spill response plans that meet the OPA's requirements "shall take effect 36 months from the date of the enactment of this Act"), 104 Stat. 484 (1990).

31.     The OPA empowered the President to authorize an offshore facility or onshore facility subject to the OPA's spill response plan requirement to operate without a spill response plan until not later than August 18, 1995. 33 U.S.C. § 1321(j)(5)(F). The President may give this authorization only if the owner or operator certified "that the owner or operator has ensured … the availability of private personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or a substantial threat of such a discharge." *Id.*

32.     No facility subject to the OPA's spill response plan requirement may handle, store, or transport oil after August 18, 1993, or August 18, 1995, at the latest, without a federally-approved spill response plan.

33.     The CWA authorizes the President to delegate the administration of CWA § 311(j) "to the heads of those Federal departments, agencies, and instrumentalities which he determines to be appropriate." 33 U.S.C. § 1321(l).

34.     On October 18, 1991, President George H.W. Bush issued Executive Order 12777, delegating to DOT the President's responsibilities under CWA § 311(j)(5) and OPA § 4202(b)(4) to (a) issue regulations requiring transportation-related onshore facilities to prepare and submit spill response plans, and (b) review and approve such spill response plans. Exec. Order No. 12777 § 2(d)(2), 56 Fed. Reg. 54757, 54761 (1991).

35.     Section 2(d)(3) of Executive Order 12777 delegated to the Secretary of the Interior ("DOI") the President's responsibilities under CWA § 311(j)(5) and OPA § 4202(b)(4) to (a) issue regulations requiring offshore facilities to prepare and submit spill response plans, and (b) review and approve such spill response plans. Exec. Order No. 12777 § 2(d)(3), 56 Fed. Reg. 54757, 54761 (1991).

36.     Executive Order 12777 provided that a recipient of the delegation of the President's responsibilities under CWA § 311(j)(5) or OPA § 4202(b)(4) may redelegate those responsibilities "to the head of any Executive department or agency with his or her consent." Exec. Order No. 12777 § 2(i), 56 Fed. Reg. 54757, 54763 (1991).

37.     On February 3, 1994, pursuant to § 2(i) of Executive Order 12777, the U.S. Environmental Protection Agency ("EPA"), the Department of the Interior ("DOI"), and DOT signed a Memorandum of Understanding ("MOU") "establish[ing] the jurisdictional responsibilities for offshore facilities, including

16

pipelines, pursuant to section … [311](j)(5) … of the Clean Water Act (CWA), as amended by the Oil Pollution Act of 1990." 40 C.F.R. § Pt. 112, App. B.

38.     DOT and the other parties to the MOU acknowledged that CWA §311(a)(11)'s definition of "offshore facility" expanded DOI's traditional role of regulating facilities on the Outer Continental Shelf … to include inland lakes, rivers, streams, and any other inland waters." 40 C.F.R. § Pt. 112, App. B.

39.     In the MOU, DOI redelegated to DOT, and DOT agreed to assume, the "responsibility [under § 2(d)(3) of Executive Order 12777] for transportation-related facilities, including pipelines, landward of the coast line." 40 C.F.R. § Pt. 112, App. B. DOT and the other parties to the MOU defined the term "coast line" "to mean 'the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters.'" *Id.*

40.     In other words, DOT agreed to assume the President's responsibilities under CWA § 311(j)(5) and OPA § 4202(b)(4) to (a) issue regulations requiring transportation-related inland offshore facilities – those facilities located in, on, or under, any of the navigable waters of the United States landward of the coast line – to prepare and submit spill response plans, and (b) review and approve such spill response plans.

41.    In so agreeing, DOT acknowledged the existence of and need to regulate transportation-related inland offshore facilities, including pipelines, as required by the OPA.

42.    DOT has delegated to the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), an Operating Administration within the Department of Transportation, the responsibility to exercise the authority delegated to DOT in § 2(d)(2) of Executive Order 12777. 49 C.F.R. §§ 1.2(b)(8), 1.97(c)(2). That authority is the authority to carry out the President's responsibilities under CWA § 311(j)(5) and OPA § 4202(b)(4) to (a) issue regulations requiring transportation-related onshore facilities to prepare and submit spill response plans, and (b) review and approve such spill response plans. Exec. Order No. 12777 § 2(d)(2), 56 Fed. Reg. 54757, 54761 (1991).

43.    DOT has not delegated to PHMSA or any other Operating Administration within the Department of Transportation the responsibility to exercise the authority redelegated to and assumed by DOT in the MOU, namely, a subset of the authority that had been delegated to DOI in § 2(d)(3) of Executive Order 12777. That authority is the authority to carry out the President's responsibilities under CWA § 311(j)(5) and OPA § 4202(b)(4) to (a) issue regulations requiring transportation-related inland offshore facilities to prepare and submit spill response plans, and (b) review and approve such spill response plans.

Exec. Order No. 12777 § 2(d)(3), 56 Fed. Reg. 54757, 54761 (1991). Thus, DOT retains the nondiscretionary duty to issue such regulations and review and approve such plans.

<u>Factual Background</u>

44.     Transportation-related inland offshore facilities are found throughout the United States. In a report to Congress, PHMSA determined that pipelines transporting petroleum, a petroleum product, or a hazardous liquid cross inland bodies of water greater than or equal to 100 feet wide at 5,110 locations.

45.     For instance, Enbridge owns and operates a pipeline known as "Line 5," which extends from Superior, Wisconsin, through Michigan, to Sarnia, Ontario, Canada. Line 5 handles, stores, or transports up to 22.7 million gallons per day of crude oil or natural gas liquids. Segments of Line 5 are located in, on, or under the St. Clair River, adjoining St. Clair County, Michigan, and the Straits of Mackinac, which separates the Lower and Upper Peninsulas of Michigan. The Straits of Mackinac connect Lakes Michigan and Huron. The segment of Line 5 crossing the Straits of Mackinac is more than four miles long. Both the St. Clair River and the Straits of Mackinac are navigable waters of the United States. Other segments of Line 5 may cross other navigable waters.

46.     Over the past fifteen years, pipelines owned or operated by Enbridge and related companies have been responsible for hundreds of spills of oil or a

hazardous substance, releasing millions of gallons of hydrocarbons into the environment.

47.    In 2010, Enbridge was responsible for the largest inland oil spill in the history of the United States: a spill from an Enbridge pipeline of almost a million gallons of heavy crude oil in the Kalamazoo River, near Marshall, Michigan. This spill adversely affected public health, damaged or destroyed private and public property, forced the permanent relocation of more than 100 families, adversely affected several thousand acres of in-stream, floodplain, and upland habitats, killed or oiled hundreds of birds, mammals, reptiles, amphibians, fish, and benthic invertebrates, and caused the loss of approximately 100,000 recreational user-days, including recreational fishing and boating, as well as shoreline park and trail use.

48.    The St. Clair River and its associated shoreline in Michigan supports public health (including the public health benefits of many forms of recreation and aesthetic enjoyment), fish and wildlife, or public or private property.

49.    The Straits of Mackinac and the associated shorelines of islands in or near the Straits or the associated shorelines of the Lower and Upper Peninsula support public health (including the public health benefits of many forms of recreation and aesthetic enjoyment), fish and wildlife (including species protected under the federal Endangered Species Act and their critical habitat), or public or private property.

50.    Transportation-related inland offshore facilities have spilled oil or a hazardous substance in navigable waters of the United States over the last 20-plus years. For instance, in the last four years, transportation-related inland offshore facilities crossing the Yellowstone River have twice ruptured, spilling more than 100,000 gallons of oil into a river that supports endangered and threatened species, fishing, and recreational rafting.

51.    Neither the Secretary of the United States Department of Transportation himself nor the Office of the Secretary of the United States Department of Transportation has issued regulations implementing the OPA's spill response plan requirement for transportation-related inland offshore facilities.

52.    Neither the Secretary of the United States Department of Transportation himself nor the Office of the Secretary of the United States Department of Transportation has reviewed any oil spill response plans for transportation-related inland offshore facilities to determine if they meet the OPA's spill response plan requirements.

53.    Neither the Secretary of the United States Department of Transportation himself nor the Office of the Secretary of the United States Department of Transportation has approved any oil spill response plans for transportation-related inland offshore facilities as meeting the OPA's spill response plan requirements.

Case 2:15-cv-13535-MAG-RSW   ECF No. 1, PageID.22   Filed 10/08/15   Page 22 of 25


## CLAIMS FOR RELIEF

### First Claim for Relief

54.     NWF re-alleges and incorporates by reference all the allegations set forth above.

55.     DOT's failure to carry out its nondiscretionary duties under CWA § 311(j)(5), 33 U.S.C. § 1321(j)(5), and OPA § 4202(b)(4) to (a) issue regulations requiring transportation-related inland offshore facilities to prepare and submit spill response plans, and (b) review and approve such spill response plans, by the deadlines set in the OPA, constitutes agency action unlawfully withheld or unreasonably delayed.

### Second Claim for Relief

56.     NWF re-alleges and incorporates by reference all the allegations set forth above.

57.     DOT's failure to carry out its nondiscretionary duties under Executive Order 12777 to (a) issue regulations requiring transportation-related inland offshore facilities to prepare and submit spill response plans, and (b) review and approve such spill response plans, by the deadlines set in the OPA, constitutes agency action unlawfully withheld or unreasonably delayed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff National Wildlife Federation respectfully requests that the Court grant the following relief:

A.      a declaratory judgment that DOT has a nondiscretionary duty (1) under CWA § 311(j)(5), 33 U.S.C. § 1321(j)(5), and OPA § 4202(b)(4) or (2) under Executive Order 12777, or under both, to issue regulations implementing the OPA's requirement that owners and operators of transportation-related inland offshore facilities prepare, submit to DOT, and comply with a spill response plan, reviewed and approved by DOT, that ensures the availability of resources necessary to remove, to the maximum extent practicable, a worst case discharge, and to mitigate or prevent a substantial threat of such a discharge, of oil or a hazardous substance;

B.      a declaratory judgment that DOT has a nondiscretionary duty (1) under CWA § 311(j)(5), 33 U.S.C. § 1321(j)(5), and OPA § 4202(b)(4) or (2) under Executive Order 12777, or under both, to review spill response plans prepared and submitted by transportation-related inland offshore facilities and approve them, if the plans meet the OPA's requirements;

C.      a declaratory judgment that DOT has failed to issue the regulations described above, or to review or approve spill response plans prepared and submitted by transportation-related inland offshore facilities;

23

D.      a declaratory judgment that DOT's continuing failure to issue the regulations described above, and review and approve spill response plans prepared and submitted by transportation-related inland offshore facilities, if they meet the OPA's requirements, constitutes a violation of DOT's nondiscretionary duties;

E.      a declaratory judgment that DOT's violation of its nondiscretionary duties described above constitutes agency action unlawfully withheld or unreasonably delayed;

F.      an injunction compelling DOT to carry out its nondiscretionary duties described above;

G.      an order setting a schedule for submission, review, and approval of oil spill response plans for transportation-related inland offshore facilities;

H.      an order retaining jurisdiction to ensure that DOT issues the regulations described above and complies with the schedule ordered by this Court;

I.      an order granting NWF costs of litigation (including reasonable attorney and expert witness fees) incurred in prosecuting this action, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

J.      such other relief as this Court determines just and appropriate.

Respectfully submitted,

s/ Neil S. Kagan_____
Neil S. Kagan
National Wildlife Federation
625 South State Street
745 Legal Research
Ann Arbor, Michigan 48109
(734) 763-7087
kagan@nwf.org
P58948

Dated: October 8, 2015