# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

NATIONAL WILDLIFE FEDERATION,              Case No. 15-cv-13535

               Plaintiff,

     v.                                                      Judge Goldsmith

SECRETARY OF THE UNITED STATES              Magistrate Judge Whalen
DEPARTMENT OF TRANSPORTATION,
in his official capacity,

               Defendant.          /

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff National Wildlife Federation ("NWF") moves for summary judgment against Defendant Secretary of the United States Department of Transportation ("the Secretary"). Pursuant to Local Rule 7.1(a), the undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel thereafter expressly denied concurrence.

NWF moves for summary judgment on the grounds that the Secretary has failed and is failing to carry out discrete action the Oil Pollution Act of 1990, Pub.

1

L. No. 101-380, 104 Stat. 484 (1990), and Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991), required and require him to take. Specifically, the Secretary has failed and is failing to carry out his statutory nondiscretionary duties to review and approve plans submitted to him for transportation-related pipelines located in, on, or under navigable waters landward of the coast. The Secretary has failed and is failing to determine that these plans ensure the availability of resources necessary both to mitigate or prevent a substantial threat of a worst case discharge of oil and to remove, to the maximum extent practicable, a worst case discharge of oil.

NWF asks the Court to grant this motion for summary judgment in its favor based upon the brief and exhibits accompanying this motion, as well as any further written or oral argument properly submitted to the Court.

LOCAL RULE CERTIFICATION: I, Neil S. Kagan, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

WHEREFORE, the Court should grant NWF's motion for summary judgment.

Respectfully submitted,

s/ Neil S. Kagan
Neil S. Kagan
National Wildlife Federation
625 South State Street
745 Legal Research
Ann Arbor, Michigan 48109
(734) 763-7087
kagan@nwf.org
P58948

Dated May 4, 2016

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

NATIONAL WILDLIFE FEDERATION,               Case No. 15-cv-13535

            Plaintiff,

     v.                                      Judge Goldsmith

SECRETARY OF THE UNITED STATES              Magistrate Judge Whalen
DEPARTMENT OF TRANSPORTATION,
in his official capacity,

_____ Defendant. _____/

_____

### PLAINTIFF'S BRIEF IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

_____

## ISSUE PRESENTED

Should the Court grant summary judgment for Plaintiff National Wildlife

Federation ("NWF") against Defendant Secretary of the United States Department

of Transportation ("the Secretary") on the grounds that he has failed and is failing

to carry out discrete action the Oil Pollution Act of 1990, Pub. L. No. 101-380, 104

Stat. 484 (1990), and Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18,

1991), required and require him to take?

## **MOST CONTROLLING OR APPROPRIATE AUTHORITY**

1. *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004)

2. *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999)

3. *In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000)

4. *In re Paralyzed Veterans of Am.*, 392 F. App'x 858 (Fed. Cir. 2010)

5. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)

6. *Telecommunications Research & Action Ctr. v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984)

7. 5 U.S.C. § 706(1)

8. 33 U.S.C. § 1321

9. Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 (1990)

10. 49 C.F.R. § 1.97(c)(2)

11. Implementation of Section 311 of the Federal Water Pollution Control Act of October 18, 1972, as Amended, and the Oil Pollution Act of 1990, Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991)

12. Response Plans for Onshore Oil Pipelines, 58 Fed. Reg. 244 (Jan. 5, 1993)

# **TABLE OF CONTENTS**

STATEMENT OF MATERIAL FACTS .................................................................... 1

STANDING ................................................................................................................ 2

STATUTORY AND REGULATORY BACKGROUND ......................................... 4

  I.  THE OIL POLLUTION ACT OF 1990 .............................................................. 4

  II. EXECUTIVE ORDER 12,777 ............................................................................ 7

  III. THE MEMORANDUM OF UNDERSTANDING ........................................... 7

  IV. THE SECRETARY ............................................................................................ 9

STANDARD OF REVIEW ....................................................................................... 10

ARGUMENT .............................................................................................................. 12

  I.  THE SECRETARY HAS VIOLATED AND IS VIOLATING THE OIL
      POLLUTION ACT OF 1990 ............................................................................. 12

   A.  The Secretary Violated and Is Violating the Oil Pollution Act Following
        His Consent to Carry Out the Nondiscretionary Duties to Review and
        Approve Response Plans for Inland Offshore Pipelines. ........................... 12

    1.  The Secretary has unlawfully withheld and is unlawfully withholding, or
        he has unreasonably delayed, the review and approval of response plans
        submitted by operators for inland offshore pipelines ............................... 12

    2.  The Secretary frivolously contends that he has reviewed and approved
        response plans submitted by operators for inland offshore pipelines and
        that such response plans are governed by regulations issued in 1993. ... 15

      a)    The Secretary has not reviewed or approved any response plans for
          inland offshore pipelines. ...…………………………………………16

      b)    The 1993 regulations do not govern inland offshore pipelines. …….18

   B.  The Secretary Continues to Violate the Oil Pollution Act by Failing to
        Periodically Review and Approve Response Plans for Inland Offshore
        Pipelines ...................................................................................................... 21

  II. THE SECRETARY HAS VIOLATED AND IS VIOLATING EXECUTIVE
      ORDER 12,777 ................................................................................................... 22

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Air Brake Sys., Inc. v. Mineta*, 202 F. Supp. 2d 705 (E.D. Mich. 2002), *aff'd,* 357 F.3d 632 (6th Cir. 2004) ................................................................... 10

*City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004) ....  23, 24, 25

*Ctr. For Biological Diversity v. Lueckel*, 417 F.3d 532 (6th Cir. 2005)................... 4

*Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987) ..................................................... 11

*Dial v. Holder*, No. 12-13452, 2013 WL 607836 (E.D. Mich. Feb. 19, 2013) ...... 10

*Donaldson v. United States*, 268 F. Supp. 2d 812 (E.D. Mich. 2003), *aff'd,* 109 F. App'x 37 (6th Cir. 2004) ........................................................................... 10

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ........................ 11, 13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................................................................................................................ 3

*Haitian Centers Council, Inc. v. Sale*, 823 F. Supp. 1028 (E.D.N.Y. 1993) .......... 18

*In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000).............................. 13, 14

*In re Paralyzed Veterans of Am.*, 392 F. App'x 858 (Fed. Cir. 2010)................... 13

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)..................................................... 4

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ................................................ 4

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ......................................... 11

*Taco Especial v. Napolitano*, 696 F. Supp. 2d 873 (E.D. Mich. 2010) ................. 10

*Telecommunications Research & Action Ctr. v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984) ................................................................................................................ 11

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992) ................................................................................................................ 18

## STATUTES

5 U.S.C. § 551(13) ................................................................................................. 10

5 U.S.C. § 706(1) ............................................................................................. 10, 11

33 U.S.C. § 1321(a)(8) ........................................................................................... 5

33 U.S.C. § 1321(a)(10) ......................................................................................... 6

33 U.S.C. § 1321(a)(11) .............................................................................. 5, 18, 19

33 U.S.C. § 1321(a)(24)(B) .................................................................................... 5

33 U.S.C. § 1321(b)(1) ......................................................................................... 14

33 U.S.C. § 1321(j)(5)(C)(iii) .............................................................................. 19

33 U.S.C. § 1321(j)(5)(C)(iv) .............................................................................. 19

33 U.S.C. § 1321(j)(5)(D)(iii) ................................................................................ 5

33 U.S.C. § 1321(j)(5)(E) .......................................................................... 6, 19, 20

33 U.S.C. § 1321(j)(5)(E)(iv) .............................................................................. 22

33 U.S.C. § 1321(j)(5)(F) ....................................................................................... 5

33 U.S.C. § 1321(j)(5)(G) ...................................................................................... 6

33 U.S.C. § 1321(l) .................................................................................... 7, 23, 24

Oil Pollution Act of 1990, Pub. L. No. 101-380, § 4202(a)(6), 104 Stat. 484 (1990) ...................................................................................................................... 6, 24

Oil Pollution Act of 1990, Pub. L. No. 101-380, § 4202(b)(4)(B), 104 Stat. 484 (1990) ............................................................................................................... 4

## REGULATIONS

33 C.F.R. § 155.1030-1052 ............................................................................... 21

33 C.F.R. § 155.5035 ........................................................................................ 21

40 C.F.R. § 112.11 ............................................................................................ 21

40 C.F.R. § Pt. 112, App. B .......................................................................... 8, 21

49 C.F.R. § 1.97(c)(2) .................................................................................... 9, 17

49 C.F.R. § 194.119(d) (1993) ....................................................................... 2, 17

49 C.F.R. § 194.119(d) (2015) ....................................................................... 2, 17

49 C.F.R. § 194.121(a)(2) ................................................................................. 22

## FEDERAL REGISTER

Implementation of Section 311 of the Federal Water Pollution Control Act of October 18, 1972, as Amended, and the Oil Pollution Act of 1990, Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991) ................................. 7, 23, 24

Organization and Delegation of Powers and Duties, 57 Fed. Reg. 62,483 (Dec. 31, 1992) ......................................................................................... 9, 17, 21

Response Plans for Onshore Oil Pipelines, 58 Fed. Reg. 244 (Jan. 5, 1993) . 1, 9, 20

## LEGISLATIVE MATERIALS

136 Cong. Rec. H6935 (daily ed. Aug. 3, 1990) ...................................................... 4

H.R. Conf. Rep. No. 101-653, *reprinted in* 1990 U.S.C.C.A.N. 779 ............ 5, 6, 24

## <u>STATEMENT OF MATERIAL FACTS</u>

1.  On January 5, 1993, the Research and Special Programs Administration ("RSPA"), an agency of the U.S. Department of Transportation, issued regulations implementing the requirements of the Oil Pollution Act of 1990 ("OPA"), Pub. L. No. 101-380, 104 Stat. 484 (1990), as they apply to response planning for discharges from onshore oil pipelines. Response Plans for Onshore Oil Pipelines, 58 Fed. Reg. 244, 245 (Jan. 5, 1993).

2.  Beginning in 1993, owners or operators (collectively, "operators") of transportation-related pipelines located in, on, or under navigable waters landward of the coast ("inland offshore pipelines") submitted to the Secretary plans to ensure the availability of resources necessary both to mitigate or prevent a substantial threat of a worst case discharge of oil and to remove, to the maximum extent practicable, a worst case discharge of oil ("response plans"). Def.'s Memo 4-5, ECF No. 16; Def.'s Reply 1, ECF No. 19.

3.  Beginning in 1993, response plans for transportation-related onshore pipelines and inland offshore pipelines submitted by the operators of such pipelines to the Secretary have been reviewed and approved pursuant to regulations codified at 49 C.F.R. Part 194, which is titled "Response Plans for Onshore Oil Pipelines." Def.'s Memo 4-5, ECF No. 16; Def.'s Reply 1, ECF No. 19.

4.  RSPA or its successor, the Pipeline and Hazardous Materials Safety

1

Administration ("PHMSA"), are the entities that have reviewed and approved response plans pursuant to regulations codified at 49 C.F.R. Part 194. PHMSA, *Analysis of Facility Response Plan Review Finding: Final Report* (Apr. 30, 1999), http://phmsa.dot.gov/portal/site/PHMSA/menuitem.6f23687cf7b00b0f22e4c6962d 9c8789/?vgnextoid=69da57c3eee3d110VgnVCM1000009ed07898RCRD&vgnext channel=78a47fd9b896b110VgnVCM1000009ed07898RCRD&vgnextfmt=print (Ex. 1); *e.g.*, Letter from John C. Hess, Director, Emergency Support and Security Division, Office of Pipeline Safety, PHMSA, to Stephen Lloyd, Enbridge Pipelines Inc. (July 11, 2013) (Ex. 2); *see also* 49 C.F.R. § 194.119(d) (1993); 49 C.F.R. § 194.119(d) (2015).

5.  The Secretary himself has never reviewed or approved any response plans for inland offshore pipelines submitted by the operators of such pipelines. The Secretary has not kept any record of his inaction.

## STANDING

Operators are transporting oil through inland offshore pipelines without response plans determined by the Secretary himself both to prevent a substantial threat of a worst case discharge of oil and to remove, to the maximum extent practicable, a worst case discharge of oil. As a result, the Secretary has not fulfilled his statutory nondiscretionary duty, which is his alone, to ensure that operators have taken steps necessary to prevent such a discharge and are prepared to remove

2

such a discharge from the water and shorelines to the extent necessary to prevent, minimize, or mitigate damage to the public health or welfare, including fish, shellfish, wildlife, and public and private property, shorelines, and beaches.

The transportation of oil without response plans reviewed and approved by the Secretary harms or threatens to harm NWF's members' use and enjoyment of their property or natural resources. The harm occurs because, as the oil flows, their property, recreational activities, or aesthetic appreciation of natural resources (1) are more exposed to a worst case discharge of oil and (2) would be more impacted by a worst case discharge than they would be if the pipelines were operating with plans determined to meet the requirements of the OPA. The Secretary reasonably could have avoided the harm by complying with his nondiscretionary duties to review and, if they meet the OPA's requirements, approve the plans.

For these reasons, as demonstrated by the declarations of Bruce Wallace (Ex. 3); Norman Ritchie (Ex. 4); David Hargett (Ex. 5); Charles Borgsdorf (Ex. 6); and David Schwab (Ex. 7), NWF has standing to bring this action. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."); *Lujan*

3

*v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992) ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (harm occurs when it "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for … [the] complaint"); *Ctr. For Biological Diversity v. Lueckel*, 417 F.3d 532, 537, 538, 539 (6th Cir. 2005) (a plaintiff has standing if a person engages in activity that harms or threatens to harm the plaintiff's protected interests; the harm is linked to an agency's inaction, which is linked in turn to the agency's procedural omissions; and the harm reasonably could have been avoided had the agency complied with its statutory duties).

## STATUTORY AND REGULATORY BACKGROUND

## I.    THE OIL POLLUTION ACT OF 1990

On August 18, 1990, galvanized by the catastrophic 1989 *Exxon Valdez* oil spill and other oil spills, Congress enacted the OPA, amending Clean Water Act ("CWA") § 311(j), 33 U.S.C. § 1321(j). OPA, Pub. L. No. 101-380, § 4202(a)(6), 104 Stat. 484 (1990); 136 Cong. Rec. H6935 (daily ed. Aug. 3, 1990) (statement of Rep. Jones). Congress was intent on ensuring operators are prepared with an effective and immediate response to oil spills to prevent a repetition of the disaster caused by the *Exxon Valdez* in Prince William Sound. H.R. Conf. Rep. No. 101-

653, at 158, *reprinted in* 1990 U.S.C.C.A.N. 779, 837. Congress was not willing to gamble that operators would prevent or respond to oil spills without government oversight.

Accordingly, the OPA amended CWA § 311(j) to prohibit the handling, storage, or transport of oil until operators of offshore facilities and certain onshore facilities receive a determination from the President that they have an adequate plan to prevent and respond to a discharge of oil. 33 U.S.C. § 1321(j)(5)(F). This plan must ensure the availability of resources necessary both to mitigate or prevent a substantial threat of a worst case discharge of oil and to remove, to the maximum extent practicable, a worst case discharge of oil. *Id.* at § 1321(j)(5)(D)(iii). "Remove" means "containment and removal of the oil … from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches." *Id.* at § 1321(a)(8). "Worst case discharge" means "the largest foreseeable discharge in adverse weather conditions." *Id.* at § 1321(a)(24)(B).

The CWA explicitly distinguishes offshore facilities from onshore facilities. It defines an "offshore facility" as "any facility of any kind located in, on, or under, any of the navigable waters of the United States." *Id.* at § 1321(a)(11). It defines an

"onshore facility" as "any facility … of any kind located in, on, or under, any land within the United States other than submerged land." *Id.* at § 1321(a)(10).

The OPA imposed on the President nondiscretionary duties to review submitted response plans and, if they meet the OPA's requirements, to approve them not later than August 18, 1993. *Id.* at § 1321(j)(5)(E) ("[W]ith respect to each response plan submitted … , the President shall … promptly review such response plan … [and] approve any plan that meets the requirements of this paragraph."); OPA, Pub. L. No. 101-380, § 4202(b)(4)(B) (the President's obligation to review and approve response plans "shall take effect 36 months from the date of the enactment of this Act"), 104 Stat. 484 (1990).

The OPA empowered the President to give a one-time, 2-year authorization to an offshore facility or onshore facility to operate without an approved response plan, until August 18, 1995. 33 U.S.C. § 1321(j)(5)(G); H.R. Conf. Rep. 101-653, 151, *reprinted in* 1990 U.S.C.C.A.N. 779, 830 (Aug. 1, 1990). The President could give this authorization only if the operator certified "that the owner or operator has ensured … the availability of private personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or a substantial threat of such a discharge." 33 U.S.C. § 1321(j)(5)(G).

In sum, the OPA mandates that no facility may handle, store, or transport oil after August 18, 1993 without appropriate federal approval.

## II.    EXECUTIVE ORDER 12,777

Congress authorized the President to delegate the administration of CWA §
311(j) "to the heads of those Federal departments, agencies, and instrumentalities
which he determines to be appropriate." 33 U.S.C. § 1321(l). Pursuant to this
authorization, the President divided his nondiscretionary duties under CWA §
311(j) among different agencies. On October 18, 1991, he issued Executive Order
12,777, delegating to the Secretary of the Interior ("Interior") the nondiscretionary
duties to review and approve response plans submitted by *offshore* facilities.
Implementation of Section 311 of the Federal Water Pollution Control Act of
October 18, 1972, as Amended, and the Oil Pollution Act of 1990, Executive Order
12,777 ("EO"), § 2(d)(3), 56 Fed. Reg. 54,757, 54,761 (Oct. 18, 1991). The
President delegated to the Secretary the nondiscretionary duties to review and
approve response plans submitted by transportation-related *onshore* facilities
subject to the OPA. *Id.* at § 2(d)(2).

## III.    THE MEMORANDUM OF UNDERSTANDING

The EO authorized the President's delegate to re-delegate his duties "to the
head of any Executive department or agency with his or her consent." EO § 2(i), 56
Fed. Reg. at 54,763. Pursuant to this authorization, on February 3, 1994, the
Administrator of the U.S. Environmental Protection Agency ("EPA"), Interior, and
the Secretary signed a Memorandum of Understanding ("MOU") "establish[ing]

the jurisdictional responsibilities for offshore facilities, including pipelines, pursuant to section … [311](j)(5) … of the Clean Water Act (CWA), as amended by the Oil Pollution Act of 1990." 40 C.F.R. § Pt. 112, App. B.

The Secretary accepted jurisdictional responsibility for transportation-related inland offshore facilities, recognizing that CWA § 311(a)(11)'s definition of "offshore facility" expanded Interior's "traditional … role of regulating facilities on the Outer Continental Shelf … to include inland lakes, rivers, streams, and any other inland waters." *Id.* He then consented to Interior's re-delegation to him the "responsibility [under EO § 2(d)(3)] for transportation-related facilities, including pipelines, landward of the coast line." *Id.* He also acknowledged that the term "coast line" "mean[s] 'the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters.'" *Id.*

In short, the Secretary consented to carry out the duties imposed by the OPA to review and approve response plans submitted by transportation-related inland offshore pipelines. Since the President had previously delegated to the Secretary the duties to review and approve response plans submitted by transportation-related inland *onshore* facilities, his consent to carry out the same duties for transportation-related inland *offshore* facilities represents his acknowledgment that onshore and offshore facilities are distinct from one another.

8

## IV.   THE SECRETARY

More than a year before consenting to carry out the nondiscretionary duties to review and approve response plans for inland offshore pipelines, the Secretary re-delegated his nondiscretionary duties to review and approve plans for *onshore* pipelines to RSPA. Organization and Delegation of Powers and Duties, 57 Fed. Reg. 62,483, 62,484 (Dec. 31, 1992) (authorizing RSPA to carry out the functions and exercise the authority delegated to the Secretary in EO § 2(d)(2)). The Secretary has since re-delegated his nondiscretionary duties to review and approve plans for onshore pipelines to PHMSA. 49 C.F.R. § 1.97(c)(2) (delegating the Secretary's authority under EO § 2(d)(2)).

On January 5, 1993, RSPA issued regulations for onshore oil pipelines subject to the OPA. 58 Fed. Reg. 244, 245. Consistent with the definition of an "onshore facility" in CWA § 311(a)(10), these regulations define "onshore oil pipeline facilities" to mean "pipe … used in the transportation of oil located in, on, or under, any land within the United States other than submerged land." *Id.* at 254 (codified at 49 C.F.R. § 194.5).

Consistent also with CWA § 311(j)(5)(C)(iii), the regulations "appl[y] to an operator of an onshore oil pipeline that, because of its location, could reasonably be expected to cause substantial harm, or significant and substantial harm to the environment by discharging oil into or on any navigable waters of the United

9

States or adjoining shorelines." *Id.* at 253 (codified at 49 C.F.R. § 194.3). In other

words, the regulations apply to a pipeline in, on, or under any land (other than land

submerged by water) that could discharge oil into navigable waters because of the

pipeline's terrestrial location in relation to such waters.

The Secretary has retained his nondiscretionary duties to review and approve

response plans for inland offshore pipelines. He has not delegated these duties to

RSPA, PHMSA, or any other unit within the Department of Transportation.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") establishes the standard of

review for a motion for summary judgment in a case involving the review of

"agency action," which the APA defines to include "failure to act." 5 U.S.C. §

551(13); *Dial v. Holder*, No. 12-13452, 2013 WL 607836, at *3 (E.D. Mich. Feb.

19, 2013); *Taco Especial v. Napolitano*, 696 F. Supp. 2d 873, 877 (E.D. Mich.

2010); *Donaldson v. United States*, 268 F. Supp. 2d 812, 816 (E.D. Mich. 2003),

*aff'd,* 109 F. App'x 37 (6th Cir. 2004); *Air Brake Sys., Inc. v. Mineta*, 202 F. Supp.

2d 705, 710 (E.D. Mich. 2002), *aff'd,* 357 F.3d 632 (6th Cir. 2004).

In this case, NWF seeks an order from the Court "compel[ling] agency

action unlawfully withheld or unreasonably delayed" pursuant to 5 U.S.C. §

706(1). In order for the Court to grant such relief, the Secretary must have failed to

take a discrete action that he is required to take, such as "the failure to … take

some decision by a statutory deadline." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63, 64 (2004). Once the Court deems that agency action has been unlawfully withheld or unreasonably delayed, it must compel agency action. 5 U.S.C. § 706(1) ("The reviewing court shall … compel agency action unlawfully withheld or unreasonably delayed."); *see Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191 (10th Cir. 1999).

The Court's review is not limited to an administrative record because no record is created where an agency fails to act. *Telecommunications Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*") ("[C]reation of a record will not be realized if the agency never takes action.").

In the absence of an administrative record, the Court should evaluate a claim of agency action unreasonably delayed using a 6-factor test:

> (1) The time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*TRAC,* 750 F.2d at 80. The burden is on the agency to justify its delay to the Court's satisfaction. *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987).

<u>**ARGUMENT**</u>

**II.  THE SECRETARY HAS VIOLATED AND IS VIOLATING THE OIL POLLUTION ACT OF 1990**

    **A.  The Secretary Violated and Is Violating the Oil Pollution Act Following His Consent to Carry Out the Nondiscretionary Duties to Review and Approve Response Plans for Inland Offshore Pipelines.**

        **1.  The Secretary has unlawfully withheld and is unlawfully withholding, or he has unreasonably delayed, the review and approval of response plans submitted by operators for inland offshore pipelines.**

The Secretary has violated and is violating the OPA by failing to take discrete action the law requires him to take. Despite his acceptance of the responsibility to carry out the Act's nondiscretionary duties to review and approve response plans submitted by operators for inland offshore pipelines, he, himself, has never executed these duties. Immediately upon his acceptance of this responsibility, he failed to meet the OPA's statutory deadline of August 18, 1993, for conducting the reviews and granting the approvals of the plans. Even if the Secretary (or Interior before him) had granted the one-time, 2-year extension for the operation of inland offshore pipelines without an approved plan until August 18, 1995, he failed to meet that deadline for reviewing and approving the submitted plans as well.

The Secretary's dereliction of duty is genuinely one of epic proportions. Hazardous liquid pipelines, which include oil pipelines, cross inland waters at

18,136 locations and at 5,100 locations the water bodies have a width greater than or equal to 100 feet. PHMSA, *Report to Congress, Results of Hazardous Liquid Incidents at Certain Inland Water Crossings Study* 3 (Aug. 23, 2013), http://phmsa.dot.gov/staticfiles/PHMSA/DownloadableFiles/Report%20to%20Congress%20-%20Water%20Crossings%20Study.pdf (Ex. 8).

In failing to meet either of the OPA's date-certain deadlines for reviewing and approving response plans for inland offshore pipelines, and in failing to review or approve them since, the Secretary has unlawfully withheld and is unlawfully withholding discrete action the OPA required him to take. *See Forest Guardians*, 174 F.3d at 1190 ("[W]hen an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action."); *cf. In re Paralyzed Veterans of Am.*, 392 F. App'x 858, 860 (Fed. Cir. 2010) (where Congress clearly imposes a date-certain deadline to issue a regulation, an agency has no discretion to withhold or delay the regulation, and the agency's failure to comply is unlawful).

In the alternative, the Secretary's failure to timely review and approve response plans for inland offshore pipelines is an unreasonable delay of discrete action the OPA required him to take. *See In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000). In *Bluewater*, the U.S. Coast Guard ("Coast Guard") failed to issue regulations establishing minimum compliance standards and use

requirements for tank level and pressure monitoring devices by August 18, 1991,

as the OPA commanded. *Id.* at 1307, 1315.

The court held that the Coast Guard's failure to comply with the OPA

constituted unreasonable delay by applying the *TRAC* test. *Id.* at 1315. The court

said, "a nine-year delay is unreasonable given a clear one-year time line and the

Coast Guard's admission that it will do no more [rulemaking]; the delayed

regulations implicate important environmental concerns; and the Coast Guard has

not shown that expedited rulemaking here will interfere with other, higher priority

activities." *Id.* at 1316. The court directed the Coast Guard to undertake prompt

rulemaking. *Id.*

Applying the *TRAC* factors warrants a finding of unreasonable delay in this

OPA case, too. The Secretary's 22-year (and counting) delay in reviewing and

approving response plans for inland offshore pipelines is far more unreasonable

than the 9-year delay in *Bluewater*. In addition, the Secretary's delay implicates the

same important environmental concern implicated in *Bluewater*: the concern that

no oil be discharged into or upon navigable waters or adjoining shorelines. *See* 33

U.S.C. § 1321(b)(1) ("The Congress hereby declares that it is the policy of the

United States that there should be no discharges of oil or hazardous substances into

or upon the navigable waters of the United States, adjoining shorelines.");

*Bluewater*, 234 F.3d at 1307 ("Congress responded [to the *Exxon Valdez* incident]

14

with the Oil Pollution Act of 1990.").

In enacting the OPA, Congress struck a balance between the Nation's need for the movement of oil and the environmental integrity of the Nation's navigable waters. Congress allowed operators to transport oil through inland offshore pipelines, but only if the President first determined that operators were prepared with plans both to prevent oil spills from occurring and to ensure the removal of oil that is spilled. In failing to review and approve these plans, the Secretary, as the President's representative, has upset this balance, just as the Coast Guard did in *Bluewater*. He has nullified the primacy Congress gave to the protection of the Nation's waters, adjoining shorelines, and the resources and uses dependent on them. The Secretary cannot show that other activities have a higher priority than obeying Congress's mandate that he promptly carry out his nondiscretionary duties to review and approve the plans no later than August 18, 1993.

For these reasons, the Secretary has unlawfully withheld and is unlawfully withholding, or he has unreasonably delayed, the review and approval of response plans submitted by operators for inland offshore pipelines.

> **2.    The Secretary frivolously contends that he has reviewed and approved response plans submitted by operators for inland offshore pipelines and that such response plans are governed by regulations issued in 1993.**

The Secretary makes the utterly implausible contention that he, himself, has reviewed and approved response plans for inland *offshore* pipelines, and that his

reviews and approvals of such pipelines were proper because they were carried out

pursuant to regulations governing *onshore* pipelines.

> The [Secretary of the] Department [of Transportation] maintains that
> the[] 1993 regulations [codified at 49 C.F.R. Part 194] governing
> onshore pipelines include within their scope the entirety of oil
> pipelines located landward of the coast, including the segments that
> cross rivers, lakes and other inland waters of the United States.
> Following promulgation of the regulations and for the last 22 years,
> the [Secretary] … has reviewed and approved response plans
> submitted by the operators of these pipelines. Approved plans address
> the possibility of spills from operators' entire pipelines, both segments
> on land and segments that cross on or under water.

Def.'s Memo 4-5, ECF No. 16; *accord* Def.'s Reply 1, ECF No. 19 ("The

[Secretary] contends that … pipeline segments [that cross inland navigable

waters] are covered by plans that it has reviewed and approved pursuant to

its existing regulations.").

### a)    The Secretary has not reviewed or approved any response plans for inland offshore pipelines.

There is no record of the Secretary himself reviewing or approving response

plans for inland offshore pipelines. The reviews and approvals the Secretary refers

to are those given by RSPA and PHMSA. *E.g.*, Letter from John C. Hess, Director,

Emergency Support and Security Division, Office of Pipeline Safety, PHMSA, to

Stephen Lloyd, Enbridge Pipelines Inc. (July 11, 2013) (approving the response

plan for Enbridge's Line 5, which is partially located in, on, or under at least one

navigable water: the Straits of Mackinac[1]) (Ex. 2); *see also* 49 C.F.R. § 194.119(d) (1993) ("For those response zones of pipelines … that could reasonably be expected to cause significant and substantial harm, *RSPA* will approve the response plan if RSPA determines that the response plan meets all requirements of this part.") (emphasis added); 49 C.F.R. § 194.119(d) (2015) (essentially the same, except substituting the Office of Pipeline Safety within PHMSA for RSPA).

After the 1994 MOU, the Secretary could have delegated to RSPA or PHMSA his authority under EO § 2(d)(3) to review and approve response plans for inland offshore pipelines. But the only authority he delegated to these units of the Department of Transportation is his authority under EO § 2(d)(2) to review and approve response plans for *onshore* pipelines. 49 C.F.R. § 1.97(c)(2); 57 Fed. Reg. at 62,484. The Secretary never delegated either to RSPA or PHMSA the authority to review and approve response plans for inland *offshore* pipelines.

Consequently, RSPA's and PHMSA's reviews and approvals of response plans for inland offshore pipelines do not cure the Secretary's failure to carry out his nondiscretionary duties to review and approve such plans. Those duties were

---

[1] Enbridge Pipelines, Inc., *Integrated Contingency Plan: Superior Region (#866) Response Zone*, Version #1, Revision #3 at A1-15,  A1-18 (Table 1.3) (Jan. 2014), http://www.phmsa.dot.gov/pipeline/oil-spill-response-plan (Ex. 9.).

his and his alone.[2]

### b) The 1993 regulations do not govern inland offshore pipelines.

The Secretary's position that the regulations governing *onshore* pipelines govern inland *offshore* pipelines is patently absurd. His position is completely inconsistent with the plain language of the OPA, the stated purpose and scope of the regulations, and the scope of his authority when RSPA issued the regulations.

As explained above, Congress explicitly drew a sharp distinction between "offshore" and "onshore" facilities in the CWA. An offshore facility is "located in, on, or under, any of the navigable *waters* of the United States," while an "onshore facility" is "located in, on, or under, any *land* within the United States other than submerged land." 33 U.S.C. § 1321(a)(10) & (11) (emphases added).

Thus, a pipeline located in, on, or under land cannot be an offshore pipeline any more than a pipeline located in, on, or under water can be an onshore pipeline.

---

[2] RSPA's and PHMSA's reviews and approvals were in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. *See Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) ("It is 'central to the real meaning of "the rule of law," [and] not particularly controversial' that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so.") (quoting Edward L. Rubin, *Law and Legislation in the Administrative State,* 89 Colum.L.Rev. 369, 402 (1989)); *Haitian Centers Council, Inc. v. Sale*, 823 F. Supp. 1028, 1046 (E.D.N.Y. 1993) (same). As such, RSPA's and PHMSA's approvals were *ultra vires* and, if asked, a court must set them aside. 5 U.S.C. § 706(2)(C); *see Transohio Sav. Bank*, 967 F.2d at 621; *Haitian Centers Council*, 823 F. Supp. At 1046.

Nor is a single pipeline located in, on, or under land along part of its length and in, on, or under water along other parts of its length either solely an onshore pipeline or solely an offshore pipeline. Because Congress unambiguously defined an offshore facility to be one "located in, on, or under, any of the navigable waters of the United States," a pipeline located in, on, or under water simply cannot be an onshore pipeline, even if it is connected to an onshore pipeline. 33 U.S.C. § 1321(a)(11). If an onshore pipeline enters the water, it becomes an offshore pipeline, by definition.

Congress preserved its distinction between offshore and onshore facilities in the OPA when it mandated the preparation and review of response plans. In clause (iii) of CWA § 311(j)(5)(C), Congress required a facility located in, on, or under navigable waters to have a response plan and, in clause (iv), it required the other type of facility – located in, on, or under land – to have a response plan also. 33 U.S.C. § 1321(j)(5)(C)(iii) & (iv). It then required the review of a response plan submitted for an offshore facility, as well as the review of a response plan for an onshore facility. *Id.* at § 1321(j)(5)(E).

Congress actually required response plans only for a certain type of onshore facility: "[a]n onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters or adjoining shorelines." *Id.* at § 1321(j)(5)(C)(iv). Further,

Congress required the review of a response plan for "an offshore facility that, because of its location, could reasonably be expected to cause significant and substantial harm to the environment by discharging into or on the navigable waters or adjoining shorelines." *Id.* at 1321(j)(5)(E).

RSPA gave effect to the OPA's requirement of response plans for these particular subsets of *onshore* facilities when it issued its regulations in 1993. It expressly provided that the regulations "appl[y] to an operator of an onshore oil pipeline that, because of its location, could reasonably be expected to cause substantial harm, or significant and substantial harm to the environment by discharging oil into or on any navigable waters of the United States or adjoining shorelines." 58 Fed. Reg. at 253 (codified at 49 C.F.R. § 194.3). Consistent with the OPA, then, the regulations apply only to a pipeline in, on, or under land that could discharge oil into the water, not to a pipeline in, on, or under the water. This is underscored by the regulations' definition of an onshore oil pipeline facility as "new and existing pipe … located in, on, or under, any land within the United States other than submerged land." *Id.* at 254 (codified at 49 C.F.R. § 194.5).

The limitation of RSPA's regulations to onshore pipelines is also evident from their failure to require response plans to address submerged discharges, which are unique to offshore pipelines, and the attendant conditions that would hinder the removal of oil in open water, such as ice, storms, and waves. The Coast

20

Guard and EPA regulations, in contrast, require facilities operating in water –tank vessels, non-tank vessels, and non-transportation related offshore facilities – to address discharges of oil while operating in water. 33 C.F.R. § 155.1030-1052 (tank vessel response plan requirements), 155.5035 (non-tank vessel response plan requirements); 40 C.F.R. § 112.11 (spill prevention, control, and countermeasure plan requirements for offshore oil drilling, production, or workover facilities).

RSPA's limitation of its regulations to onshore pipelines makes sense for two reasons. First, the Secretary only delegated authority to RSPA to regulate onshore pipelines. 57 Fed. Reg. at 62,484. Second, when the Secretary delegated this authority to RSPA in 1993, he had no authority to delegate anything else. In 1993, he only had authority to regulate onshore pipelines. EO § 2(d)(2). He did not receive the authority to regulate inland offshore pipelines until later, when the MOU was signed in 1994. 40 C.F.R. § Pt. 112, App. B.

To sum up, the Secretary himself has not reviewed or approved response plans for any inland offshore facilities. In reviewing and approving such plans, RSPA and PHMSA exceeded their authority.

## B.   The Secretary Continues to Violate the Oil Pollution Act by Failing to Periodically Review and Approve Response Plans for Inland Offshore Pipelines

In addition to missing the OPA's date-certain deadlines for the initial review and approval of response plans for inland offshore pipelines, and failing to review

or approve them since, the Secretary has failed to comply with another nondiscretionary duty imposed by the OPA. Namely, the Secretary has failed to comply with the Act's unambiguous, perpetual mandate that he review plans periodically after his first reviews and approvals were due. 33 U.S.C. § 1321(j)(5)(E)(iv) ("[W]ith respect to each response plan submitted … for a[n] … offshore facility, the President shall … review each plan periodically [after the initial review].").

Congress did not set a date-certain deadline for carrying out the periodic-review requirement. However, the regulations for onshore pipelines implementing the OPA's mandate for those facilities provide a rule of thumb. The regulations require operators to submit their response plans for review and approval every five years from the last approval date. 49 C.F.R. § 194.121(a)(2).

By this measure, the Secretary's delinquency is at least a matter of unreasonable delay, if not a matter of unlawful withholding. For this and the other reasons the Secretary's review and approval of the initial response plans is unreasonably delayed, his periodic review and approval of plans is also being unlawfully withheld or unreasonably delayed.

## III.   THE SECRETARY HAS VIOLATED AND IS VIOLATING EXECUTIVE ORDER 12,777

The OPA authorized the President to delegate to the heads of federal departments his statutory duties, including his nondiscretionary duties, under CWA

22

1321. 33 U.S.C. § 1321(l). By virtue of the OPA's authorization, the President's delegation to Interior in EO 12,777, and Interior's re-delegation pursuant to EO 12,777, the Secretary for more than twenty years has had, but has never carried out, the statutory nondiscretionary duties to review and approve response plans for inland offshore facilities.

The EO, in its own right, required the Secretary to carry out these identical duties. Therefore, the Secretary's violation of the OPA necessarily means that he has violated the EO.

The Secretary's failure to comply with the EO's dictates is both reviewable under the APA and enforceable because (1) it has a specific statutory foundation in the OPA, (2) neither the OPA nor the EO preclude judicial review, and (3) the EO incorporates from the OPA objective standards the Court can use to judge the Secretary's actions. *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 913-14 (10th Cir. 2004).

The EO has a statutory foundation because it was issued under "the authority vested in … [the] President by … Section 311 of the Federal Water Pollution Control Act, … (33 U.S.C. 1321), as amended by the Oil Pollution Act of 1990 (Public Law 101-380)." EO 12,777, 56 Fed. Reg. at 54,757. *See City of Albuquerque*, 379 F.3d at 914. As mentioned, the OPA expressly gave the President power "to delegate the administration of this section [§ 311] to the heads

23

of those Federal departments, agencies, and instrumentalities which he determines to be appropriate." 33 U.S.C. § 1321(l). The President exercised this power to wholly delegate to Interior a specific "function" that the OPA vested in him: the obligation to review and approve response plans for offshore facilities no later than August 18, 1993, and periodically afterwards, as well as to authorize Interior's eventual re-delegation of this function for inland offshore facilities to the Secretary. EO 12,777, § 2(d)(3) & (i), 56 Fed. Reg. at 54,761, 54,763; *see* 33 U.S.C. § 1321(j)(5)(E), (G); OPA, Pub. L. No. 101-380, § 4202(b)(4)(B); H.R. Conf. Rep. 101-653, 151, *reprinted in* 1990 U.S.C.C.A.N. 779, 830 (Aug. 1, 1990).

Nothing either in the OPA nor the EO precludes judicial review of the Secretary's failure to comply with the EO, and the Court should not infer such preclusion. *See City of Albuquerque*, 379 F.3d at 916. Rather, the Court should follow the presumption of reviewability because no intent to preclude judicial review is fairly discernible either in the OPA or the EO. *Id.*

Finally, the EO incorporates from the OPA's objective standards: namely, the statutory deadline for reviewing and approving the initial response plans and the directive that the Secretary periodically review and approve plans afterwards. This deadline and directive are objective standards. In applying them the Court should determine that the Secretary unlawfully withheld and is unlawfully withholding, or that he has unreasonably delayed discrete agency action he was

24

required to take. *See City of Albuquerque*, 379 F.3d at 917.

## CONCLUSION

For the foregoing reasons, the Court should grant NWF's motion for summary judgment, holding that the Secretary has failed and is failing to carry out discrete action the Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 (1990), and Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991), required and require him to take, specifically, his nondiscretionary duties to review and approve response plans for inland offshore facilities that handle, store, or transport oil.

Respectfully submitted,

s/ Neil S. Kagan_____
Neil S. Kagan
National Wildlife Federation
625 South State Street
745 Legal Research
Ann Arbor, Michigan 48109
(734) 763-7087
kagan@nwf.org
P58948

Dated May 4, 2016

## CERTIFICATE OF SERVICE

I certify that on May 4, 2016, I electronically filed the foregoing Plaintiff's

Motion for Summary Judgment and Plaintiff's Brief in Support of

Plaintiff's Motion for Summary Judgment, including the exhibits, with the Clerk of

the Court using the electronic filing system, which will send notification of such

filing to the registered CM/ECF users at the following e-mail addresses:

Alan D. Greenberg
alan.greenberg@usdoj.gov

David H. Coburn
dcoburn@steptoe.com

Joshua H. Runyan
jrunyan@steptoe.com
rjohn@steptoe.com

Kathleen A. Lang
klang@dickinsonwright.com
ahelms@dickinsonwright.com

> s/ Neil S. Kagan_____
> Neil S. Kagan
> National Wildlife Federation
> 625 South State Street
> 745 Legal Research
> Ann Arbor, Michigan 48109
> (734) 763-7087
> kagan@nwf.org
> P58948

Dated May 4, 2016