## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

NATIONAL WILDLIFE FEDERATION,                  Case No. 15-cv-13535

              Plaintiff,

      v.                                              Judge Goldsmith

SECRETARY OF THE UNITED STATES                  Magistrate Judge Whalen
DEPARTMENT OF TRANSPORTATION,
in his official capacity,

_____Defendant._____/

_____

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
_____

Plaintiff National Wildlife Federation ("NWF") moves for summary judgment against Defendant Secretary of the United States Department of Transportation ("the Secretary"). Pursuant to Local Rule 7.1(a), the undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel thereafter expressly denied concurrence.

NWF moves for summary judgment on the grounds that the Secretary has failed and is failing to carry out discrete action the Oil Pollution Act of 1990

("OPA"), Pub. L. No. 101-380, 104 Stat. 484 (1990), and Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991), required and require him to take. Specifically, the Secretary has failed and is failing to carry out his statutory nondiscretionary duties to review and, if they meet the OPA's requirements, approve facility response plans submitted to him by owners or operators for transportation-related pipelines located in, on, or under navigable waters landward of the coast. The Secretary has failed and is failing to determine, among other things, that these plans ensure the availability of resources necessary both to mitigate or prevent a substantial threat of a worst case discharge of oil and to remove, to the maximum extent practicable, a worst case discharge of oil.

NWF asks the Court to grant this motion for summary judgment based upon the brief and exhibits accompanying this motion, as well as any further written or oral argument properly submitted to the Court.

LOCAL RULE CERTIFICATION: I, Neil S. Kagan, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3); *Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.*, No. 15-CV-13535 (E.D. Mi. Jun. 21, 2016) (order granting leave

to file excess pages).

WHEREFORE, the Court should grant NWF's motion for summary judgment.

Respectfully submitted,


s/ Neil S. Kagan_____
Neil S. Kagan
National Wildlife Federation
625 South State Street
745 Legal Research
Ann Arbor, Michigan 48109
(734) 763-7087
kagan@nwf.org
P58948


Dated June 22, 2016

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

NATIONAL WILDLIFE FEDERATION,      Case No. 15-cv-13535

        Plaintiff,

   v.                         Judge Goldsmith

SECRETARY OF THE UNITED STATES      Magistrate Judge Whalen
DEPARTMENT OF TRANSPORTATION,
in his official capacity,

_____Defendant._____/

_____

## PLAINTIFF'S BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

_____

## ISSUE PRESENTED

Should the Court grant summary judgment for Plaintiff National Wildlife

Federation ("NWF") against Defendant Secretary of the United States Department

of Transportation ("the Secretary") on the grounds that he has failed and is failing

to carry out discrete action the Oil Pollution Act of 1990, Pub. L. No. 101-380, 104

Stat. 484 (1990), and Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18,

1991), required and require him to take? Specifically, has the Secretary failed and

is he failing to carry out his statutory nondiscretionary duties to review and, if they

meet the OPA's requirements, approve facility response plans submitted to him by owners or operators for transportation-related pipelines located in, on, or under navigable waters landward of the coast?

## <u>MOST CONTROLLING OR APPROPRIATE AUTHORITY</u>

1. *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004)

2. *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999)

3. *In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000)

4. *In re Paralyzed Veterans of Am.*, 392 F. App'x 858 (Fed. Cir. 2010)

5. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)

6. *Telecommunications Research & Action Ctr. v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984)

7. 5 U.S.C. § 706(1)

8. 33 U.S.C. § 1321

9. Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 (1990)

10. Water Quality Improvement Act of 1970, Pub. L. No. 91-224, § 102, 84 Stat. 91 (1970)

11. 49 C.F.R. § 1.97(c)(2)

12. Implementation of Section 311 of the Federal Water Pollution Control Act of October 18, 1972, as Amended, and the Oil Pollution Act of 1990, Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991)

13. Response Plans for Onshore Oil Pipelines, 58 Fed. Reg. 244 (Jan. 5, 1993)

# **TABLE OF CONTENTS**

STATEMENT OF MATERIAL FACTS ............................................................ 1

STANDING ....................................................................................................... 2

STATUTORY AND REGULATORY BACKGROUND ...................................... 4

I.   THE OIL POLLUTION ACT OF 1990 ........................................................ 4

II.  EXECUTIVE ORDER 12,777 ...................................................................... 7

III. THE MEMORANDUM OF UNDERSTANDING.......................................... 7

IV. THE SECRETARY ....................................................................................... 9

STANDARD OF REVIEW.................................................................................. 10

ARGUMENT ...................................................................................................... 12

II.  THE SECRETARY HAS VIOLATED AND IS VIOLATING THE OIL
     POLLUTION ACT OF 1990........................................................................ 12

   A.   The Secretary Violated and Is Violating the Oil Pollution Act Following
        His Consent to Carry Out the Nondiscretionary Duties to Review and
        Approve Response Plans for Inland Offshore Pipelines. ........................... 12

      1.   The Secretary has unlawfully withheld and is unlawfully withholding, or
           he has unreasonably delayed, the review and approval of response plans
           submitted by operators for inland offshore pipelines............................. 12

      2.   The Secretary erroneously contends that he has reviewed and approved
           response plans submitted by operators for inland offshore pipelines and
           that such response plans are governed by regulations issued in 1993. ... 16

         a)   The Secretary has not reviewed or approved any response plans for
              inland offshore pipelines. ...……………………………………………17

         b)   The 1993 regulations do not govern inland offshore pipelines. .…….19

            (1)   The plain language and purpose of the law preclude the application
                  of the 1993 regulations for onshore pipelines to inland offshore
                  pipelines. …………………………………………………………20

            (2)   The purpose and scope of the 1993 regulations do not extend to
                  inland offshore pipelines. ………………………………………27

            (3)   Neither the Secretary nor RSPA had authority over inland offshore
                  pipelines when RSPA issued the 1993 regulations. ………………29

iv

B.   The Secretary Continues to Violate the Oil Pollution Act by Failing to Periodically Review and Approve Response Plans for Inland Offshore Pipelines .................................................................................... 29

III.  THE SECRETARY HAS VIOLATED AND IS VIOLATING EXECUTIVE ORDER 12,777 ................................................................................... 30

CONCLUSION ................................................................................... 33

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Air Brake Sys., Inc. v. Mineta*, 202 F. Supp. 2d 705 (E.D. Mich. 2002), *aff'd,* 357 F.3d 632 (6th Cir. 2004) .................................................................................. 11

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) ..................... 29

*City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004) . 31, 32

*Ctr. For Biological Diversity v. Lueckel*, 417 F.3d 532 (6th Cir. 2005).................. 4

*Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987) ................................................... 12

*Dial v. Holder*, No. 12-13452, 2013 WL 607836 (E.D. Mich. Feb. 19, 2013) ...... 11

*Donaldson v. United States*, 268 F. Supp. 2d 812 (E.D. Mich. 2003), *aff'd,* 109 F. App'x 37 (6th Cir. 2004) .................................................................................. 11

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ........................ 11, 14

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .................................................................................................................. 3

*Haitian Centers Council, Inc. v. Sale*, 823 F. Supp. 1028 (E.D.N.Y. 1993) .......... 19

*In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000)............................. 14, 15

*In re Paralyzed Veterans of Am.*, 392 F. App'x 858 (Fed. Cir. 2010).................... 14

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)........................................................ 4

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ................................................. 4

*New York v. E.P.A.*, 443 F.3d 880 (D.C. Cir. 2006) ............................................... 21

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) .......................................... 11

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ....................................................20

*Sabine Towing & Transp. Co. v. United States*, 666 F.2d 561 (Ct. Cl. 1981)........26

*Scott v. City of Hammond, Ind.*, 741 F.2d 992 (7th Cir. 1984) ...............................26

*Taco Especial v. Napolitano*, 696 F. Supp. 2d 873 (E.D. Mich. 2010) .................11

*Telecommunications Research & Action Ctr. v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984) ......................................................................................................... 11, 12

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992) ........................................................................................................... 19

*United States v. Gonzales*, 520 U.S. 1 (1997) .......................................................21

*United States v. Warner Bros. Well Drilling*, No. 89-5494, 899 F.2d 15, 1990 WL 37610 (6th Cir. Apr. 3, 1990) .............................................................................26

*White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ...............20

## STATUTES

5 U.S.C. § 551(13)....................................................................................................10

5 U.S.C. § 706(1)......................................................................................................11

5 U.S.C. § 706(2)(C) ................................................................................................19

33 U.S.C. § 1321(a)(1) ...............................................................................................5

33 U.S.C. § 1321(a)(8) ...............................................................................................5

33 U.S.C. § 1321(a)(10) .........................................................................................6, 20

33 U.S.C. § 1321(a)(11) ..............................................................................................6

33 U.S.C. § 1321(a)(24)(B)........................................................................................5

33 U.S.C. § 1321(b)(1) ......................................................................... 15, 22

33 U.S.C. § 1321(b)(3) ............................................................................... 22

33 U.S.C. § 1321(j)(5)(C)(iii) ..................................................................... 24

33 U.S.C. § 1321(j)(5)(C)(iv) ..................................................................... 24

33 U.S.C. § 1321(j)(5)(D)(iii) ....................................................................... 5

33 U.S.C. § 1321(j)(5)(E) .................................................................. 6, 24, 27

33 U.S.C. § 1321(j)(5)(E)(iv) ..................................................................... 30

33 U.S.C. § 1321(j)(5)(F) ....................................................................... 5, 19

33 U.S.C. § 1321(j)(5)(G) ............................................................................ 6

33 U.S.C. § 1321(l) ............................................................................ 7, 30, 31

42 U.S.C. § 7135(a)(2) ............................................................................... 13

Oil Pollution Act of 1990, Pub. L. No. 101-380, § 1004(a)(3), 104 Stat. 484 (1990)
.................................................................................................................. 24

Oil Pollution Act of 1990, Pub. L. No. 101-380, § 1004(a)(4), 104 Stat. 484 (1990)
.................................................................................................................. 24

Oil Pollution Act of 1990 , Pub. L. No. 101-380, § 1004(d)(1), 104 Stat. 484
(1990) ...................................................................................................... 24

Oil Pollution Act of 1990, Pub. L. No. 101-380, § 4202(a)(6), 104 Stat. 484 (1990)
.................................................................................................................... 4

Oil Pollution Act of 1990, Pub. L. No. 101-380, § 4202(b)(4)(B), 104 Stat. 484
(1990) ................................................................................................... 6, 32

Water Quality Improvement Act of 1970, Pub. L. No. 91-224, § 102, 84 Stat. 91
(1970) ............................................................................................... 22, 23

## REGULATIONS

30 C.F.R. § 138.230(c) ......................................................... 24

30 C.F.R. § 553.702 ............................................................ 24

33 C.F.R. § 155.1030-1052 .................................................. 28

33 C.F.R. § 155.5035 ........................................................... 28

40 C.F.R. § 112.11 .............................................................. 28

40 C.F.R. § Pt. 112, App. B ........................................... 8, 29

49 C.F.R. § 1.97(c)(2) ..................................................... 9, 18

49 C.F.R. § 194.119(d) (1993) ........................................ 2, 18

49 C.F.R. § 194.119(d) (2015) ........................................ 2, 18

49 C.F.R. § 194.121(a)(2) ................................................... 30

## FEDERAL REGISTER

Implementation of Section 311 of the Federal Water Pollution Control Act of October 18, 1972, as Amended, and the Oil Pollution Act of 1990, Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991) ....................................... 7, 31

Organization and Delegation of Powers and Duties, 57 Fed. Reg. 62,483 (Dec. 31, 1992) ................................................................... 9, 18, 29

Response Plans for Onshore Oil Pipelines, 58 Fed. Reg. 244 (Jan. 5, 1993) . 1, 9, 27

## LEGISLATIVE MATERIALS

136 Cong. Rec. H6935 (daily ed. Aug. 3, 1990) ...................................... 4

Conf. Rep. No. 91-940 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2712 ................. 22

H.R. Conf. Rep. No. 101-653 (1990), *reprinted in* 1990 U.S.C.C.A.N. 779 ..... 5, 6, 32

**OTHER AUTHORITIES**

U.S. Energy Information Administration ("EIA"), *Today in Energy: EIA's new map layers provide more detailed information on petroleum infrastructure* (Oct. 31, 2013), http://www.eia.gov/todayinenergy/detail.cfm?id=13611 .................. 13

U.S. Energy Information Administration, U.S. Energy Mapping System, Crude Oil and Petroleum Product Pipelines, http://www.eia.gov/state/maps.cfm ............... 13

William L. Andreen, *The Evolution of Water Pollution Control in the United States-State, Local, and Federal Efforts, 1789-1972: Part II*, 22 Stan. Envtl. L.J. 215, 257 (2003) ................................................................................................. 22

## STATEMENT OF MATERIAL FACTS

1.  On January 5, 1993, the Research and Special Programs Administration

("RSPA"), an agency of the U.S. Department of Transportation, issued regulations

implementing the requirements of the Oil Pollution Act of 1990 ("OPA" or "the

Act"), Pub. L. No. 101-380, 104 Stat. 484 (1990), as they apply to response

planning for discharges from onshore oil pipelines. Response Plans for Onshore

Oil Pipelines, 58 Fed. Reg. 244, 245 (Jan. 5, 1993).

2.  Beginning in 1993, owners or operators (collectively, "operators") of

transportation-related pipelines located in, on, or under navigable waters landward

of the coast ("inland offshore pipelines") submitted to the Secretary plans to,

among other things, ensure the availability of resources necessary both to mitigate

or prevent a substantial threat of a worst case discharge of oil and to remove, to the

maximum extent practicable, a worst case discharge of oil ("response plans").

Def.'s Memo 4-5, ECF No. 16; Def.'s Reply 1, ECF No. 19.

3.  Beginning in 1993, response plans for transportation-related onshore

pipelines and inland offshore pipelines submitted by the operators of such pipelines

to the Secretary have been reviewed and approved pursuant to regulations codified

at 49 C.F.R. Part 194, which is titled "Response Plans for Onshore Oil Pipelines."

Def.'s Memo 4-5, ECF No. 16; Def.'s Reply 1, ECF No. 19.

4.  RSPA or its successor, the Pipeline and Hazardous Materials Safety

1

Administration ("PHMSA"), are the entities that have reviewed and approved

response plans pursuant to regulations codified at 49 C.F.R. Part 194. PHMSA,

*Analysis of Facility Response Plan Review Finding: Final Report* (Apr. 30, 1999),

http://phmsa.dot.gov/portal/site/PHMSA/menuitem.6f23687cf7b00b0f22e4c6962d

9c8789/?vgnextoid=69da57c3eee3d110VgnVCM1000009ed07898RCRD&vgnext

channel=78a47fd9b896b110VgnVCM1000009ed07898RCRD&vgnextfmt=print

(Ex. 1); *see, e.g.*, Letter from John C. Hess, Director, Emergency Support and

Security Division, Office of Pipeline Safety, PHMSA, to Stephen Lloyd, Enbridge

Pipelines Inc. (July 11, 2013) (Ex. 2); *see also* 49 C.F.R. § 194.119(d) (1993); 49

C.F.R. § 194.119(d) (2015).

   5.  The Secretary himself has never reviewed or approved any response plans

for inland offshore pipelines submitted by the operators of such pipelines. The

Secretary has not kept any record of his inaction.

## STANDING

     Operators are transporting oil through inland offshore pipelines without

response plans determined by the Secretary himself both to prevent a substantial

threat of a worst case discharge of oil and to remove, to the maximum extent

practicable, a worst case discharge of oil. As a result, the Secretary has not fulfilled

his statutory nondiscretionary duty, which is his alone, to ensure that operators

have taken steps necessary to prevent such a discharge and are prepared to remove

2

such a discharge from the water and shorelines to the extent necessary to prevent, minimize, or mitigate damage to the public health or welfare, including fish, shellfish, wildlife, and public and private property, shorelines, and beaches.

The transportation of oil without response plans reviewed and approved by the Secretary harms or threatens to harm NWF's members' use and enjoyment of their property or natural resources. The harm occurs because, as the oil flows, their property, recreational activities, or aesthetic appreciation of natural resources (1) are more exposed to a worst case discharge of oil and (2) would be more impacted by a worst case discharge than they would be if the pipelines were operating with plans determined to meet the requirements of the OPA. The Secretary reasonably could have avoided the harm by complying with his nondiscretionary duties to review and, if they meet the OPA's requirements, approve the plans.

For these reasons, as demonstrated by the declarations of Bruce Wallace (Ex. 3); Norman Ritchie (Ex. 4); David Hargett (Ex. 5); Charles Borgsdorf (Ex. 6); and David Schwab (Ex. 7), NWF has standing to bring this action. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."); *Lujan*

3

*v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992) ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (harm occurs when it "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for … [the] complaint"); *Ctr. For Biological Diversity v. Lueckel*, 417 F.3d 532, 537, 538, 539 (6th Cir. 2005) (a plaintiff has standing if a person engages in activity that harms or threatens to harm the plaintiff's protected interests; the harm is linked to an agency's inaction, which is linked in turn to the agency's procedural omissions; and the harm reasonably could have been avoided had the agency complied with its statutory duties).

## STATUTORY AND REGULATORY BACKGROUND

### I.   THE OIL POLLUTION ACT OF 1990

On August 18, 1990, galvanized by the catastrophic 1989 *Exxon Valdez* oil spill and other oil spills, Congress enacted the OPA, amending the Federal Water Pollution Control Act ("the Clean Water Act" or "CWA") § 311(j), 33 U.S.C. § 1321(j). OPA, Pub. L. No. 101-380, § 4202(a)(6), 104 Stat. 484 (1990); 136 Cong. Rec. H6935 (daily ed. Aug. 3, 1990) (statement of Rep. Jones). Congress was intent on ensuring operators are prepared with an effective and immediate response to oil spills to prevent a repetition of the disaster caused by the *Exxon Valdez* in

Prince William Sound. H.R. Conf. Rep. No. 101-653, at 158 (1990), *reprinted in*

1990 U.S.C.C.A.N. 779, 837. Congress was not willing to gamble that operators

would prevent or respond to oil spills without government oversight.

Accordingly, the OPA amended CWA § 311(j) to prohibit the handling,

storage, or transport of oil[1] until operators of offshore facilities and certain onshore

facilities receive a determination from the President that they have an adequate

plan to prevent and respond to a discharge of oil. 33 U.S.C. § 1321(j)(5)(F). This

plan must ensure the availability of resources necessary both to mitigate or prevent

a substantial threat of a worst case discharge of oil and to remove, to the maximum

extent practicable, a worst case discharge of oil. *Id.* at § 1321(j)(5)(D)(iii).

"Remove" means "containment and removal of the oil … from the water and

shorelines or the taking of such other actions as may be necessary to prevent,

minimize, or mitigate damage to the public health or welfare, including, but not

limited to, fish, shellfish, wildlife, and public and private property, shorelines, and

beaches." *Id.* at § 1321(a)(8). "Worst case discharge" means "the largest

foreseeable discharge in adverse weather conditions." *Id.* at § 1321(a)(24)(B).

The CWA explicitly distinguishes offshore facilities from onshore facilities.

It defines an "offshore facility" as "any facility of any kind located in, on, or under,

---

[1] "'[O]il' means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil." 33 U.S.C. § 1321(a)(1).

any of the navigable waters of the United States." *Id.* at § 1321(a)(11). It defines an "onshore facility" as "any facility … of any kind located in, on, or under, any land within the United States other than submerged land." *Id.* at § 1321(a)(10).

The OPA imposed on the President nondiscretionary duties to review submitted response plans and, if they meet the OPA's requirements, to approve them not later than August 18, 1993. *Id.* at § 1321(j)(5)(E) ("[W]ith respect to each response plan submitted … , the President shall … promptly review such response plan … [and] approve any plan that meets the requirements of this paragraph."); OPA, Pub. L. No. 101-380, § 4202(b)(4)(B) (the President's obligation to review and approve response plans "shall take effect 36 months from the date of the enactment of this Act"), 104 Stat. 484 (1990).

The OPA empowered the President to give a one-time, 2-year authorization to an offshore facility or onshore facility to operate without an approved response plan, until August 18, 1995. 33 U.S.C. § 1321(j)(5)(G); H.R. Conf. Rep. 101-653, at 151 (1990), *reprinted in* 1990 U.S.C.C.A.N. 779, 830 (Aug. 1, 1990). The President could give this authorization only if the operator certified "that the owner or operator has ensured … the availability of private personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or a substantial threat of such a discharge." 33 U.S.C. § 1321(j)(5)(G).

In sum, the OPA mandates that no facility may handle, store, or transport oil

after August 18, 1993 without appropriate federal approval.

## II.   EXECUTIVE ORDER 12,777

Congress authorized the President to delegate the administration of CWA § 311(j) "to the heads of those Federal departments, agencies, and instrumentalities which he determines to be appropriate." 33 U.S.C. § 1321(l). Pursuant to this authorization, the President divided his nondiscretionary duties under CWA § 311(j) among different agencies. On October 18, 1991, he issued Executive Order 12,777, delegating to the Secretary of the Interior ("Interior") the nondiscretionary duties to review and approve response plans submitted by *offshore* facilities. Implementation of Section 311 of the Federal Water Pollution Control Act of October 18, 1972, as Amended, and the Oil Pollution Act of 1990, Executive Order 12,777 ("EO"), § 2(d)(3), 56 Fed. Reg. 54,757, 54,761 (Oct. 18, 1991). The President delegated to the Secretary the nondiscretionary duties to review and approve response plans submitted by transportation-related *onshore* facilities subject to the OPA. *Id.* at § 2(d)(2).

## III.   THE MEMORANDUM OF UNDERSTANDING

The EO authorized the President's delegate to re-delegate his duties "to the head of any Executive department or agency with his or her consent." EO § 2(i), 56 Fed. Reg. at 54,763. Pursuant to this authorization, on February 3, 1994, the Administrator of the U.S. Environmental Protection Agency ("EPA"), Interior, and

7

the Secretary signed a Memorandum of Understanding ("MOU") "establish[ing] the jurisdictional responsibilities for offshore facilities, *including pipelines*, pursuant to section … [311](j)(5) … of the Clean Water Act (CWA), as amended by the Oil Pollution Act of 1990." 40 C.F.R. § Pt. 112, App. B (emphasis added).

The Secretary accepted jurisdictional responsibility for transportation-related inland offshore facilities, recognizing that CWA § 311(a)(11)'s definition of "offshore facility" expanded Interior's "traditional … role of regulating facilities on the Outer Continental Shelf … to include inland lakes, rivers, streams, and any other inland waters." *Id.* He consented to Interior's re-delegation to him the "responsibility [under EO § 2(d)(3)] for [offshore] transportation-related facilities, *including pipelines*, landward of the coast line." *Id.* (emphasis added). He also acknowledged that the term "coast line" "mean[s] 'the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters.'" *Id.*

In short, the Secretary acknowledged that pipelines located in, on, or under inland navigable waters are offshore facilities as defined in the CWA. In addition, the Secretary consented to carry out the duties imposed by the OPA to review and approve response plans submitted by transportation-related inland offshore pipelines. The President had previously delegated to the Secretary the duties to review and approve response plans submitted by transportation-related inland

*onshore* facilities. Therefore, the Secretary's consent to carry out the same duties for transportation-related inland *offshore* facilities, including pipelines, represents his acknowledgment that the duties to review and approve response plans for inland offshore pipelines is distinct from the duties to review and approve response plans for onshore pipelines.

## IV.   THE SECRETARY

More than a year before consenting to carry out the nondiscretionary duties to review and approve response plans for inland offshore pipelines, the Secretary re-delegated his nondiscretionary duties to review and approve plans for *onshore* pipelines to RSPA. Organization and Delegation of Powers and Duties, 57 Fed. Reg. 62,483, 62,484 (Dec. 31, 1992) (authorizing RSPA to carry out the functions and exercise the authority delegated to the Secretary in EO § 2(d)(2)). The Secretary has since re-delegated his nondiscretionary duties to review and approve plans for onshore pipelines to PHMSA. 49 C.F.R. § 1.97(c)(2) (delegating the Secretary's authority under EO § 2(d)(2)).

On January 5, 1993, RSPA issued regulations for onshore oil pipelines subject to the OPA. 58 Fed. Reg. 244, 245. Consistent with the definition of an "onshore facility" in CWA § 311(a)(10), these regulations define "onshore oil pipeline facilities" to mean "pipe … used in the transportation of oil located in, on,

9

or under, any land within the United States other than submerged land." *Id.* at 254

(codified at 49 C.F.R. § 194.5).

Consistent also with CWA § 311(j)(5)(C)(iii), the regulations "appl[y] to an

operator of an onshore oil pipeline that, because of its location, could reasonably

be expected to cause substantial harm, or significant and substantial harm to the

environment by discharging oil into or on any navigable waters of the United

States or adjoining shorelines." *Id.* at 253 (codified at 49 C.F.R. § 194.3). In other

words, the regulations apply by their terms to a pipeline in, on, or under any land

(other than land submerged by water) that could discharge oil into navigable

waters because of the pipeline's terrestrial location in relation to such waters. The

regulations do not apply to a pipeline located in, on, or under any of the inland

navigable waters of the United States.

The Secretary has retained his nondiscretionary duties to review and approve

response plans for inland offshore pipelines. He has not delegated these duties to

RSPA, PHMSA, or any other unit within the Department of Transportation.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") establishes the standard of

review for a motion for summary judgment in a case involving the review of

"agency action," which the APA defines to include "failure to act." 5 U.S.C. §

551(13); *Dial v. Holder*, No. 12-13452, 2013 WL 607836, at *3 (E.D. Mich. Feb.

19, 2013); *Taco Especial v. Napolitano*, 696 F. Supp. 2d 873, 877 (E.D. Mich. 2010); *Donaldson v. United States*, 268 F. Supp. 2d 812, 816 (E.D. Mich. 2003), *aff'd*, 109 F. App'x 37 (6th Cir. 2004); *Air Brake Sys., Inc. v. Mineta*, 202 F. Supp. 2d 705, 710 (E.D. Mich. 2002), *aff'd*, 357 F.3d 632 (6th Cir. 2004).

In this case, NWF seeks an order from the Court "compel[ling] agency action unlawfully withheld or unreasonably delayed" pursuant to 5 U.S.C. § 706(1). In order for the Court to grant such relief, the Secretary must have failed to take a discrete action that he is required to take, such as "the failure to … take some decision by a statutory deadline." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63, 64 (2004). Once the Court deems that agency action has been unlawfully withheld or unreasonably delayed, it must compel agency action. 5 U.S.C. § 706(1) ("The reviewing court shall … compel agency action unlawfully withheld or unreasonably delayed."); *see Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191 (10th Cir. 1999).

The Court's review is not limited to an administrative record because no record is created where an agency fails to act. *Telecommunications Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*") ("[C]reation of a record will not be realized if the agency never takes action.").

In the absence of an administrative record, the Court should evaluate a claim of agency action unreasonably delayed using a 6-factor test:

11

(1) The time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*TRAC,* 750 F.2d at 80. The burden is on the agency to justify its delay to the

Court's satisfaction. *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987).

## ARGUMENT

## II.   THE SECRETARY HAS VIOLATED AND IS VIOLATING THE OIL POLLUTION ACT OF 1990

### A.   The Secretary Violated and Is Violating the Oil Pollution Act Following His Consent to Carry Out the Nondiscretionary Duties to Review and Approve Response Plans for Inland Offshore Pipelines.

#### 1.   The Secretary has unlawfully withheld and is unlawfully withholding, or he has unreasonably delayed, the review and approval of response plans submitted by operators for inland offshore pipelines.

The Secretary has violated and is violating the OPA by failing to take

discrete action the law requires him to take. Despite his acceptance of the

responsibility to carry out the Act's nondiscretionary duties to review and approve

response plans submitted by operators for inland offshore pipelines, he, himself,

has never executed these duties. Immediately upon his acceptance of this

12

responsibility, he failed to meet the OPA's statutory deadline of August 18, 1993, for conducting the reviews and granting the approvals of the plans. Even if the Secretary (or Interior before him) had granted the one-time, 2-year extension for the operation of inland offshore pipelines without an approved plan until August 18, 1995, he failed to meet that deadline for reviewing and approving the submitted plans as well.

The Secretary's dereliction of duty is genuinely one of epic proportions. In 2012, crude oil and petroleum product pipelines crisscrossing the United States totaled almost 121,000 miles. U.S. Energy Information Administration ("EIA"),[2] *Today in Energy: EIA's new map layers provide more detailed information on petroleum infrastructure* (Oct. 31, 2013), http://www.eia.gov/todayinenergy/detail.cfm?id=13611; EIA, U.S. Energy Mapping System, Crude Oil and Petroleum Product Pipelines, http://www.eia.gov/state/maps.cfm (click on "Layers/Legend" tab; then uncheck all map layers except "Crude Oil Pipeline" and "Petroleum Product Pipeline" under "Pipelines and Transmission" heading) (Ex. 11). Hazardous liquid pipelines, which include oil pipelines, cross inland waters at 18,136 locations and at 5,100 of these locations the water bodies have a width greater than or equal to 100 feet.

---

[2] Placed by Congress within the Department of Energy, the EIA is "responsible for carrying out a central, comprehensive, and unified energy data and information program." 42 U.S.C. § 7135(a)(2).

PHMSA, *Report to Congress, Results of Hazardous Liquid Incidents at Certain Inland Water Crossings Study* 3 (Aug. 23, 2013), http://phmsa.dot.gov/staticfiles/PHMSA/DownloadableFiles/Report%20to%20Congress%20-%20Water%20Crossings%20Study.pdf (Ex. 8). Each of these oil pipelines is transporting oil without a response plan reviewed and approved by the Secretary.

In failing to meet either of the OPA's date-certain deadlines for reviewing and approving response plans for inland offshore pipelines, and in failing to review or approve them since, the Secretary has unlawfully withheld and is unlawfully withholding discrete action the OPA required him to take. *See Forest Guardians*, 174 F.3d at 1190 ("[W]hen an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action."); *cf. In re Paralyzed Veterans of Am.*, 392 F. App'x 858, 860 (Fed. Cir. 2010) (where Congress clearly imposes a date-certain deadline to issue a regulation, an agency has no discretion to withhold or delay the regulation, and the agency's failure to comply is unlawful).

In the alternative, the Secretary's failure to timely review and approve response plans for inland offshore pipelines is an unreasonable delay of discrete action the OPA required him to take. *See In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000). In *Bluewater*, the U.S. Coast Guard ("Coast Guard") failed

14

to issue regulations establishing minimum compliance standards and use requirements for tank level and pressure monitoring devices by August 18, 1991, as the OPA commanded. *Id.* at 1307, 1315.

The court held that the Coast Guard's failure to comply with the OPA constituted unreasonable delay by applying the *TRAC* test. *Id.* at 1315. "[A] nine-year delay is unreasonable given a clear one-year time line and the Coast Guard's admission that it will do no more [rulemaking]; the delayed regulations implicate important environmental concerns; and the Coast Guard has not shown that expedited rulemaking here will interfere with other, higher priority activities." *Id.* at 1316. The court directed the Coast Guard to undertake prompt rulemaking. *Id.*

Applying the *TRAC* factors warrants a finding of unreasonable delay in this OPA case, too. The Secretary's 22-year (and counting) delay in reviewing and approving response plans for inland offshore pipelines is far more unreasonable than the 9-year delay in *Bluewater*. In addition, the Secretary's delay implicates the same important environmental concern implicated in *Bluewater*: the concern that no oil be discharged into or upon navigable waters or adjoining shorelines. *See* 33 U.S.C. § 1321(b)(1) ("The Congress hereby declares that it is the policy of the United States that there should be no discharges of oil … into or upon the navigable waters of the United States, [or] adjoining shorelines."); *Bluewater*, 234 F.3d at 1307 ("Congress responded [to the *Exxon Valdez* incident] with the Oil

15

Pollution Act of 1990.").

In enacting the OPA, Congress struck a balance between the Nation's need for the movement of oil and the environmental integrity of the Nation's navigable waters. Congress conditioned operators' continued transport of oil through inland offshore pipelines on the President prior determination that operators are prepared with plans both to prevent oil spills from occurring and to ensure the removal of oil that is spilled. In failing to review and approve these plans, the Secretary, as the President's delegate, has upset this balance just as the Coast Guard did in *Bluewater*. He has nullified the primacy Congress gave to the protection of the Nation's waters, adjoining shorelines, and the resources and uses dependent on them. The Secretary cannot show that other activities have a higher priority than obeying Congress's mandate that he promptly carry out his nondiscretionary duties to review and approve the plans no later than August 18, 1993.

For these reasons, the Secretary has unlawfully withheld and is unlawfully withholding, or he has unreasonably delayed, the review and approval of response plans submitted by operators for inland offshore pipelines.

> **2.      The Secretary erroneously contends that he has reviewed and approved response plans submitted by operators for inland offshore pipelines and that such response plans are governed by regulations issued in 1993.**

The Secretary makes the implausible contention that he, himself, has reviewed and approved response plans for inland *offshore* pipelines, and that his

16

reviews and approvals of such pipelines were proper because they were carried out

pursuant to regulations governing *onshore* pipelines.

> The [Secretary of the] Department [of Transportation] maintains that
> the[] 1993 regulations [codified at 49 C.F.R. Part 194] governing
> onshore pipelines include within their scope the entirety of oil
> pipelines located landward of the coast, including the segments that
> cross rivers, lakes and other inland waters of the United States.
> Following promulgation of the regulations and for the last 22 years,
> the [Secretary] … has reviewed and approved response plans
> submitted by the operators of these pipelines. Approved plans address
> the possibility of spills from operators' entire pipelines, both segments
> on land and segments that cross on or under water.

Def.'s Memo 4-5, ECF No. 16; *accord* Def.'s Reply 1, ECF No. 19 ("The

[Secretary] contends that … pipeline segments [that cross inland navigable

waters] are covered by plans that it has reviewed and approved pursuant to

its existing regulations.").

> a)   **The Secretary has not reviewed or approved
>       any response plans for inland offshore
>       pipelines.**

There is no record of the Secretary himself reviewing or approving response

plans for inland offshore pipelines. The reviews and approvals the Secretary refers

to are those given by RSPA and PHMSA. *See, e.g.*, Letter from John C. Hess,

Director, Emergency Support and Security Division, Office of Pipeline Safety,

PHMSA, to Stephen Lloyd, Enbridge (U.S.) Inc. (July 11, 2013) (approving the

plan for Line 5, which has segments located in, on, or under at least two navigable

17

waters: the Straits of Mackinac and the St. Clair River[3]) (Ex. 2); *see also* 49 C.F.R.

§ 194.119(d) (1993) ("For those response zones of pipelines … that could

reasonably be expected to cause significant and substantial harm, *RSPA* will

approve the response plan if RSPA determines that the response plan meets all

requirements of this part.") (emphasis added); 49 C.F.R. § 194.119(d) (2015)

(essentially the same, except substituting the Office of Pipeline Safety within

PHMSA for RSPA).

After the 1994 MOU, the Secretary could have delegated to RSPA or

PHMSA his authority under EO § 2(d)(3) to review and approve response plans for

inland offshore pipelines. But the only authority he delegated to these units of the

Department of Transportation is his authority under EO § 2(d)(2) to review and

approve response plans for *onshore* pipelines. 49 C.F.R. § 1.97(c)(2); 57 Fed. Reg.

at 62,484. The Secretary never delegated either to RSPA or PHMSA the authority

to review and approve response plans for inland *offshore* pipelines.

Therefore, RSPA's and PHMSA's reviews and approvals of response plans

---

[3] Enbridge (U.S.) Inc., *Integrated Contingency Plan: Superior Region (#866) Response Zone*, Version #1, Revision #3 at 406 (A1-15), 409 (A1-18) (Table 1.3)) (Jan. 2014), http://www.phmsa.dot.gov/pipeline/oil-spill-response-plan (click on tab "E"; then click on "Enbridge Superior Region Response Zone") (Ex. 9); *see* Enbridge (U.S.) Inc., *Integrated Contingency Plan: Chicago Region (#867) Response Zone*, Version #1, Revision #4 at 399 (A1-8), 407 (A1-16) (Jan. 2014), http://www.phmsa.dot.gov/pipeline/oil-spill-response-plan (click on tab "E"; then click on "Enbridge Chicago Region Response Zone") (Ex. 10).

for inland offshore pipelines were in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. *See Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) ("It is 'central to the real meaning of "the rule of law," [and] not particularly controversial' that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so.") (quoting Edward L. Rubin, *Law and Legislation in the Administrative State,* 89 Colum.L.Rev. 369, 402 (1989)); *Haitian Centers Council, Inc. v. Sale*, 823 F. Supp. 1028, 1046 (E.D.N.Y. 1993) (same). As such, RSPA's and PHMSA's approvals were *ultra vires* and, if asked, a court must set them aside. 5 U.S.C. § 706(2)(C); *see Transohio Sav. Bank*, 967 F.2d at 621; *Haitian Centers Council*, 823 F. Supp. at 1046. Meanwhile, owners or operators are under no obligation to operate their inland offshore pipelines in compliance with the response plans approved by RSPA and PHMSA. *See* 33 U.S.C. § 1321(j)(5)(F) (requiring a facility to operate in compliance with a *duly* approved plan).

Consequently, the Secretary's failure to carry out his nondiscretionary duties to review and approve response plans for inland offshore pipelines is not cured by RSPA's and PHMSA's reviews and approvals of such plans. Those duties were his and his alone.

### b)      The 1993 regulations do not govern inland offshore pipelines.

The Secretary's position that the regulations governing *onshore* pipelines

also govern inland *offshore* pipelines is absurd. His position is completely inconsistent with the plain language and purpose of the CWA and the OPA; the purpose and scope of the 1993 regulations; and the scope of his authority when RSPA issued the regulations.

### (1) The plain language and purpose of the law preclude the application of the 1993 regulations for onshore pipelines to inland offshore pipelines.

When interpreting a statute, a court must confine its interpretation to the statute itself if its language is plain and unambiguous as "determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see also White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 809 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

In the CWA, Congress explicitly drew a sharp distinction between onshore and offshore facilities. An "onshore facility" is one "located in, on, or under, any *land* within the United States *other than submerged land*." 33 U.S.C. § 1321(a)(10) (emphasis added). Congress's exclusion of a facility located in, on, or under land submerged by water emphasizes that the term "onshore facility" is restricted to facilities that are not in, on, or under water.

Only an "offshore facility" is one "located in, on, or under, any of the

20

navigable waters of the United States." 33 U.S.C. § 1321(a) (11). "Any" such facility is an offshore facility. *Id.* "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting International Dictionary 97 (1976)). In keeping with the cardinal rule of statutory construction that courts must give effect to each word of a statute, the court in *New York v. E.P.A.*, 443 F.3d 880, 887 (D.C. Cir. 2006), interpreted Congress's use of the word "any" broadly, to expand the phrase "physical change" in the Clean Air Act. Otherwise, the word "any" would be insignificant or superfluous. *Id.*

To give "any" the broad effect it requires in the definition of an "offshore facility," the word must be read to expand the phrase "located in, on, or under, any of the navigable waters." That is the key to a facility's classification as an "offshore facility": its location. Consequently, whatever part of a pipeline is located in, on, or under navigable waters is an "offshore facility" – whether that part forms the entirety of the pipeline or one segment of a pipeline whose other segments are located in, on, or under land. Any part of a pipeline located in, on, or under navigable waters cannot be "onshore," just as any part of a pipeline located in, on, or under land cannot be "offshore." A contrary reading would render Congress's use of "any" insignificant or superfluous – just as in *New York v. E.P.A. Cf.* 443 F.3d at 887.

21

This reading also reflects Congress's purpose in amending the Federal Water Pollution Control Act in 1970. Congress added "a new Section 11 … [to] deal[] solely with the control of pollution [of water] by oil." Conf. Rep. No. 91-940 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2712, 2721. Congress's goal was "to strengthen the federal government's ability to combat oil pollution [of water]." William L. Andreen, *The Evolution of Water Pollution Control in the United States-State, Local, and Federal Efforts, 1789-1972: Part II*, 22 Stan. Envtl. L.J. 215, 257 (2003).

Accordingly, Congress established a policy and a prohibition that still prevail today: "there should be no discharges of oil into or upon the navigable waters of the United States, [or] adjoining shorelines," and "the discharge of oil into or upon the navigable waters of the United States, [or] adjoining shorelines … in harmful quantities … is prohibited." Water Quality Improvement Act of 1970 ("WQIA"), Pub. L. No. 91-224, § 102, 84 Stat. 91, 92 (adding § 11(b)(1)-(2)) (1970); 33 U.S.C. § 1321(b)(1), (3).

The WQIA authorized the President to clean up discharges of oil and made the owners or operators of the offending facilities responsible for the costs of removal. Andreen, *supra*, at 257. This is where the significance of a facility's classification as "offshore" becomes apparent, and why classifying a segment of a pipeline located in, on, or under navigable waters as an "offshore facility" is

22

crucial to realizing Congress's goal of combating water pollution by oil.

First, Congress created the terms "onshore facility" and "offshore facility," defining them in pertinent part exactly as they are defined today. WQIA, Pub. L. No. 91-224, § 102, 84 Stat. at 91-92 (1970), (adding § 11(a)(10)-(11)). Then, Congress imposed greater liability for discharges of oil on owners and operators of offshore facilities than on owners and operators of onshore facilities. It made the owner or operator of an onshore facility liable for the actual costs of removal of an illegal discharge of oil up to $8 million. WQIA, Pub. L. No. 91-224, § 102, 84 Stat. at 94 (adding Section 11(f)(2)) (1970). However, it authorized the federal government "to establish reasonable and equitable classifications of those onshore facilities having a total fixed storage capacity of 1,000 barrels or less which … [the government] determines because of size, type, and location do not present a substantial risk of the [illegal] discharge of oil." *Id.*, 84 Stat. at 95. It then authorized the government to "apply with respect to such classifications differing limits of liability which may be less than" $8 million. *Id.*

Congress authorized no lesser limits of liability for offshore facilities. Rather, it made the owner or operator of an offshore facility liable for the actual costs of removal of an illegal discharge of oil up to the full $8 million, regardless of the offshore facility's capacity. WQIA, Pub. L. No. 91-224, § 102, 84 Stat. at 95 (adding Section 11(f)(3)) (1970).

23

In enacting the OPA, Congress preserved and built upon the distinction between offshore and onshore facilities it had created in the WQIA. In keeping with its particular concern about the discharge of oil from a facility actually in, on, or under a navigable water, it mandated the preparation of response plans specific to offshore facilities. 33 U.S.C. § 1321(j)(5)(C)(iii). It separately mandated the preparation of response plans for onshore facilities. *Id.* at § 1321(j)(5)(C)(iv). It then required the review both of a response plan submitted for an offshore facility and of a response plan for an onshore facility. *Id.* at § 1321(j)(5)(E).

Congress also maintained the disparate treatment of onshore and offshore facilities regarding liability. The OPA places no cap on the removal costs for a discharge of oil from an offshore facility, including an offshore pipeline, and imposes liability for $133.65 million *in addition* to the total of all removal costs. OPA, Pub. L. No. 101-380, § 1004(a)(3) (codified at 33 U.S.C. § 2704(a)(3)); 30 C.F.R. § 553.702. In contrast, the OPA caps the removal costs for a discharge of oil from an onshore facility, including an onshore pipeline, at $633.85 million and authorizes the federal government to establish a limit of liability of less than that amount for any class or category of onshore facility depending on various factors. OPA, Pub. L. No. 101-380, § 1004(a)(4), (d)(1) (codified at 33 U.S.C. § 2704((a)(4), (d)(1)); 30 C.F.R. § 138.230(c).

Congress's disparate treatment of onshore and offshore facilities in the

24

CWA and the OPA manifests a critical policy determination: that the discharge of oil from a facility actually in, on, or under a navigable water as intrinsically more damaging than the discharge of oil from a facility in, on, or under land that flows over land into water. Congress's decision to impose liability for all removal costs from the owner or operator of an offshore facility – plus $133.65 million – reflects a judgment that a discharge of oil from any such facility is far more serious and far more difficult to remedy than a discharge of oil from an onshore facility.

In light of Congress's judgment that offshore and onshore facilities be treated differently, lumping a segment of a pipeline located in, on, or under a navigable water together with a segment located in, on, or under land as a single "onshore facility" would frustrate the purpose and requirements of the CWA and the OPA. It would mean the owner or operator of such a facility would be exposed to less liability. The effect would be to shunt the balance of the actual removal costs onto the federal treasury and blunt the deterrent effect on discharges of oil from an offshore facility that exposure to full liability creates.

Lumping the segments together as an "onshore facility" would also mean that the owner or operator would not be obligated to prepare a response plan that addresses the unique challenges associated with a discharge of oil from within a navigable water. For example, the owner or operator would not have to provide for the prevention or removal of such a discharge under the daunting, if not impossible

conditions created by seasonal high flows, flooding, currents, waves, storms, and ice. But a plan deficient in these respects would nevertheless be approvable under the 1993 regulations for onshore pipelines so long as it addresses the discharge of oil on land that flows into water.

Rather than defeat Congress's objectives, the Court should liberally construe § 1321 to achieve those objectives. *See United States v. Warner Bros. Well Drilling*, No. 89-5494, 899 F.2d 15, 1990 WL 37610, at *3 (6th Cir. Apr. 3, 1990) ("Section 1321(f)(2) is a remedial provision that creates strict liability for the discharge of oil into our nation's navigable waters. As such, it must be liberally construed to achieve its purposes."); *see also Scott v. City of Hammond, Ind.*, 741 F.2d 992, 998 (7th Cir. 1984) ("[T]he CWA should be liberally construed to achieve its objectives."); *Sabine Towing & Transp. Co. v. United States*, 666 F.2d 561, 566 (Ct. Cl. 1981) ("[S]ection 1321 … is remedial and … should be construed liberally.")

Specifically, the Court should liberally construe the term "offshore facility" to include a segment of a pipeline located in, on, or under a navigable water, whether or not that segment is connected to a pipeline with other segments located in, on, or under land.

### (2)   The purpose and scope of the 1993 regulations do not extend to inland offshore pipelines.

Congress required response plans only for a certain type of onshore facility: "[a]n onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters or adjoining shorelines." *Id.* at § 1321(j)(5)(C)(iv). Further, Congress required the review of a response plan for "an onshore facility that, because of its location, could reasonably be expected to cause significant and substantial harm to the environment by discharging into or on the navigable waters or adjoining shorelines." *Id.* at 1321(j)(5)(E).

RSPA gave effect to the OPA's requirement of response plans for these particular subsets of *onshore* facilities when it issued regulations in 1993. Parroting the statutory language, it expressly provided that the regulations "appl[y] to an operator of an onshore oil pipeline that, because of its location, could reasonably be expected to cause substantial harm, or significant and substantial harm to the environment by discharging oil into or on any navigable waters of the United States or adjoining shorelines." 58 Fed. Reg. at 253 (codified at 49 C.F.R. § 194.3).

Consistent with the OPA, then, the 1993 regulations apply only to a pipeline in, on, or under land that could discharge oil into the water, not to a pipeline or a segment of a pipeline in, on, or under the water. This is underscored by the

27

regulations' definition of an onshore oil pipeline facility as "new and existing pipe

… located in, on, or under, any land within the United States other than submerged

land." *Id.* at 254 (codified at 49 C.F.R. § 194.5).

The limitation of the 1993 regulations to onshore pipelines is also evident

from their failure to require response plans to address discharges within water

(including submerged discharges, which are unique to offshore pipelines), or the

attendant conditions that would hinder the removal of oil in open water, such as

seasonal high flows, flooding, currents, waves, storms, and ice. The Coast Guard

and EPA regulations, in contrast, require facilities operating in water – tank

vessels, non-tank vessels, and non-transportation related offshore facilities – to

address discharges of oil while operating in water. 33 C.F.R. § 155.1030-1052

(tank vessel response plan requirements), 155.5035 (non-tank vessel response plan

requirements); 40 C.F.R. § 112.11 (spill prevention, control, and countermeasure

plan requirements for offshore oil drilling, production, or workover facilities).

RSPA said nothing that so much as hints that the 1993 regulations are meant

to apply to operators of offshore pipelines – to the distinct category of pipelines

located in, on, or under navigable waters. The Secretary's contention to the

contrary is inconsistent with the regulations, unpersuasive, a *post hoc*

rationalization advanced to defend the Secretary's inaction, and plainly erroneous.

The Court should reject the Secretary's contention for any or all of these reasons.

*See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012).

### (3) Neither the Secretary nor RSPA had authority over inland offshore pipelines when RSPA issued the 1993 regulations.

The Secretary only delegated authority to RSPA to regulate onshore pipelines. 57 Fed. Reg. at 62,484. When the Secretary delegated this authority to RSPA in 1993, he had no authority to delegate anything else. In 1993, he only had authority to regulate onshore pipelines. EO § 2(d)(2). He did not receive the authority to regulate inland offshore pipelines until later, when the MOU was signed in 1994. 40 C.F.R. § Pt. 112, App. B. He has never delegated that authority.

To sum up, the Secretary himself has not reviewed or approved response plans for any inland offshore pipelines. In reviewing and approving such plans, RSPA and PHMSA exceeded their authority.

### B. The Secretary Continues to Violate the Oil Pollution Act by Failing to Periodically Review and Approve Response Plans for Inland Offshore Pipelines

In addition to missing the OPA's date-certain deadlines for the initial review and approval of response plans for inland offshore pipelines – and failing to review or approve them since – the Secretary has failed to comply with another nondiscretionary duty imposed by the OPA. Namely, the Secretary has failed to comply with the Act's unambiguous, perpetual mandate that he review plans

29

periodically after his first reviews and approvals were due. 33 U.S.C. §

1321(j)(5)(E)(iv) ("[W]ith respect to each response plan submitted … for a[n] …

offshore facility, the President shall … review each plan periodically [after the

initial review].").

Congress did not set a date-certain deadline for carrying out the periodic-

review requirement. However, the regulations for onshore pipelines implementing

the OPA's mandate for those facilities provide a rule of thumb. The regulations

require operators to submit their response plans for review and approval every five

years from the last approval date. 49 C.F.R. § 194.121(a)(2).

By this measure, the Secretary's delinquency is at least a matter of

unreasonable delay, if not a matter of unlawful withholding. For this and the other

reasons the Secretary's review and approval of the initial response plans is

unreasonably delayed, his periodic review and approval of plans is also being

unlawfully withheld or unreasonably delayed.

## III.   THE SECRETARY HAS VIOLATED AND IS VIOLATING EXECUTIVE ORDER 12,777

The OPA authorized the President to delegate to the heads of federal

departments his statutory duties, including his nondiscretionary duties, under CWA

1321. 33 U.S.C. § 1321(l). By virtue of the OPA's authorization, the President's

delegation to Interior in EO 12,777, and Interior's re-delegation pursuant to EO

12,777, the Secretary for more than twenty years has had, but has never carried

out, the statutory nondiscretionary duties to review and approve response plans for inland offshore pipelines.

The EO, in its own right, required the Secretary to carry out these identical duties. Therefore, the Secretary's violation of the OPA necessarily means that he has violated the EO.

The Secretary's failure to comply with the EO's dictates is both reviewable under the APA and enforceable because (1) it has a specific statutory foundation in the OPA, (2) neither the OPA nor the EO preclude judicial review, and (3) the EO incorporates from the OPA objective standards the Court can use to judge the Secretary's actions. *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 913-14 (10th Cir. 2004).

The EO has a statutory foundation because it was issued under "the authority vested in … [the] President by … Section 311 of the Federal Water Pollution Control Act, … (33 U.S.C. 1321), as amended by the Oil Pollution Act of 1990 (Public Law 101-380)." EO 12,777, 56 Fed. Reg. at 54,757. *See City of Albuquerque*, 379 F.3d at 914. As mentioned, the OPA expressly gave the President power "to delegate the administration of this section [§ 311] to the heads of those Federal departments, agencies, and instrumentalities which he determines to be appropriate." 33 U.S.C. § 1321(l). The President exercised this power to wholly delegate to Interior a specific "function" that the OPA vested in him: the

31

obligation to review and approve response plans for offshore facilities no later than August 18, 1993, and periodically afterwards, as well as to authorize Interior's eventual re-delegation of this function for inland offshore facilities, including pipelines, to the Secretary. EO 12,777, § 2(d)(3) & (i), 56 Fed. Reg. at 54,761, 54,763; *see* 33 U.S.C. § 1321(j)(5)(E), (G); OPA, Pub. L. No. 101-380, § 4202(b)(4)(B); H.R. Conf. Rep. 101-653, at 151 (1990), *reprinted in* 1990 U.S.C.C.A.N. 779, 830 (Aug. 1, 1990).

Nothing in the OPA or the EO precludes judicial review of the Secretary's failure to comply with the EO, and the Court should not infer such preclusion. *See City of Albuquerque*, 379 F.3d at 916. Rather, the Court should follow the presumption of reviewability because no intent to preclude judicial review is fairly discernible either in the OPA or the EO. *Id.*

Finally, the EO incorporates from the OPA's objective standards: namely, the statutory deadline for reviewing and approving the initial response plans and the directive that the Secretary periodically review and approve plans afterwards. In applying these objective standards, the Court should determine that the Secretary unlawfully withheld and is unlawfully withholding, or that he has unreasonably delayed, discrete agency action he was required to take. *See City of Albuquerque*, 379 F.3d at 917.

## **CONCLUSION**

The Court should grant NWF's motion for summary judgment, holding that the Secretary has failed and is failing to carry out discrete action that the Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 (1990), and Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991), required and require him to take: his nondiscretionary duties to review and approve submitted response plans for inland offshore pipelines that handle, store, or transport oil.

Respectfully submitted,                    s/ Neil S. Kagan
                                           Neil S. Kagan
                                           National Wildlife Federation
                                           625 South State Street
                                           745 Legal Research
                                           Ann Arbor, Michigan 48109
                                           (734) 763-7087
                                           kagan@nwf.org
                                           P58948

Dated June 22, 2016

## CERTIFICATE OF SERVICE

I certify that on June 22, 2016, I electronically filed the foregoing Plaintiff's

Motion for Summary Judgment and Plaintiff's Brief in Support of

Plaintiff's Motion for Summary Judgment, including the exhibits, with the Clerk of

the Court using the electronic filing system, which will send notification of such

filing to the registered CM/ECF users at the following e-mail addresses:

Alan D. Greenberg
alan.greenberg@usdoj.gov

David H. Coburn
dcoburn@steptoe.com

Joshua H. Runyan
jrunyan@steptoe.com
rjohn@steptoe.com

Kathleen A. Lang
klang@dickinsonwright.com
ahelms@dickinsonwright.com

s/ Neil S. Kagan
Neil S. Kagan
National Wildlife Federation
625 South State Street
745 Legal Research
Ann Arbor, Michigan 48109
(734) 763-7087
kagan@nwf.org
P58948

Dated June 22, 2016