# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

_____

)
NATIONAL WILDLIFE                )
FEDERATION,                      )
                                 )
  Plaintiff,           )  Case No. 15-cv-13535
                                 )
  v.                    )
                                 )
SECRETARY OF THE UNITED          )  Judge Mark A. Goldsmith
STATES DEPARTMENT OF             )
TRANSPORTATION,                  )  Magistrate Judge R. Steven Whalen
in his official capacity,        )
                                 )
  Defendant.            )
_____)

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant Secretary of the United States Department of Transportation (the "Secretary") moves, in accordance with Fed. R. Civ. P. 56, for summary judgment against the National Wildlife Federation ("NWF") on both claims for relief asserted in the second amended complaint.  This Court lacks subject matter jurisdiction over NWF's claims for two reasons.  First, the Secretary's recent ratification of the Pipeline and Hazardous Materials Safety Administration's ("PHMSA") prior review and approval of spill response plans moots both of NWF's claims.  Second, NWF lacks standing to assert its claims, as it does not

show that its members have been injured by the Secretary's lack of personal review of the spill response plans reviewed and approved by PHMSA.

Even if the Court finds that it possesses jurisdiction over NWF's claims, the Court should still grant summary judgment to the Secretary because the Secretary properly delegated authority to administrations within the Department of Transportation to review and approve the spill response plans identified by NWF.

As required by E.D. Mich. LR 7.1(a), the undersigned counsel for the Secretary certifies that he communicated in writing with counsel for NWF and counsel for the Tribes, explained the nature of the relief to be sought in this cross-motion and sought concurrence in the relief.  Counsel for NWF and the Tribes expressly denied concurrence.

LOCAL RULE CERTIFICATION: I, Alan D. Greenberg, certify that this document and the accompanying supporting brief comply with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 14 point (for proportional fonts). I also certify that the brief does not exceed 43 pages, which is the length to which the parties stipulated, subject to Court approval, in a stipulation lodged with the Court on August 18, 2016.

WHEREFORE, the Court should grant summary judgment to the Secretary on the two claims asserted in NWF's second amended complaint.

Respectfully submitted this 22nd day of August, 2016.

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources
  Division

/s/ Alan D. Greenberg

_____
ALAN D. GREENBERG
Environmental Defense Section
U.S. Department of Justice
999 18th St., Suite 370
Denver, Colorado  80202
Phone: (303) 844-1366
E-mail:  alan.greenberg@usdoj.gov
Colorado Bar. No. 14110

Of Counsel:

PAUL M. GEIER
  Assistant General Counsel
CHARLES E. ENLOE
  Trial Attorney
*U.S. Department of Transportation*

TERESA GONSALVES
  Chief Counsel
AMELIA SAMARAS
  Senior Attorney
*Pipeline and Hazardous Materials*
  *Safety Administration*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, | Case No. 2:15-cv-13535-MAG-RSW |
|      Plaintiff, | |
| v. | |
| SECRETARY OF THE UNITED STATES DEPARTMENT OF TRANSPORTATION, in his official capacity, | |
|      Defendant. | |
| _____ | |
| NATIONAL WILDLIFE FEDERATION, | Case No. 2:16-cv-11727-MAG-RSW |
|      Plaintiff, | |
| and | |
| GRAND TRAVERSE BAND OF OTTAWA AND CHIPPEWA INDIANS and SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS, | |
|      Plaintiff-Intervenors, | |
|      v. | |
| ADMINISTRATOR OF THE PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, in her official capacity, | |
|      Defendant, | |
| and | |
| ENBRIDGE ENERGY, Limited Partnership, | |
|      Defendant-Intervenor. | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This Memorandum is submitted by Defendant Secretary of Transportation in Case No. 15-cv-13535 in opposition to Plaintiff National Wildlife Federation's motion for summary judgment (ECF No. 31) ["Mot. Summ. J."] and in support of the Secretary's cross-motion for summary judgment. This Memorandum is also submitted by Defendant Administrator of the Pipeline and Hazardous Materials Safety Administration in Case No. 16-cv-11727 in opposition to Plaintiff National Wildlife Federation's motion for partial summary judgment (ECF No. 20) ["Mot. Part. Summ. J."] and in support of the Administrator's cross-motion for partial summary judgment.

## ISSUES PRESENTED IN CASE NO. 15-CV-13535

1. Whether the ratification by the Secretary of Transportation (the "Secretary") of the prior review and approval of spill response plans by the Pipeline and Hazardous Materials Safety Administration ("PHMSA") and its predecessor moots the National Wildlife Federation's claim that the Secretary has unlawfully withheld or unreasonably delayed his personal review and approval of the plans.

2. Whether the National Wildlife Federation ("NWF") possesses standing to challenge the Secretary's alleged failure to personally review and approve spill response plans under the Clean Water Act, when NWF's members cannot show injury or causation because the allegedly unaddressed spill response plans have been reviewed and approved by PHMSA,  or its predecessor, within the Department of Transportation (the "Department"), and NWF does not allege that the plans are substantively deficient in any way.

3. Whether the Department reasonably interpreted the definition of "onshore facility" in the Clean Water Act to include all segments of oil pipelines landward of the coast line, including those segments that cross navigable waters, and therefore spill response plans for such onshore pipelines have been properly reviewed and approved by PHMSA.

4. Whether the Secretary has failed to review and approve any spill response plans, when all of the plans submitted to the Department have been submitted to PHMSA or its predecessor (and not the Secretary personally), and when PHMSA and its predecessor have reviewed and (when appropriate) approved all such plans.

## ISSUES PRESENTED IN CASE NO. 16-CV-11727

1. Whether the Secretary's ratification of PHMSA's review and approval of the spill response plan covering the Enbridge Line 5 pipeline moots NWF's claim that PHMSA lacked authority to review and approve the spill response plan.

2. Whether NWF possesses standing to challenge PHMSA's review and approval of the spill response plan covering the Enbridge Line 5 pipeline under the Clean Water Act, when NWF's members cannot show injury or causation due to the spill response plan not having been personally reviewed and approved by the Secretary and NWF does not allege that the plan is deficient in any way.

3. Whether the Department reasonably interpreted the definition of "onshore facility" in the Clean Water Act to include all segments of oil pipelines landward of the coast line, including those segments that cross navigable waters, and therefore spill response plans for Enbridge Line 5 have been properly reviewed and approved by PHMSA.

# TABLE OF CONTENTS

COUNTER-STATEMENT OF MATERIAL FACTS
(Case No. 15-cv-13535) ................................................................1

COUNTER-STATEMENT OF MATERIAL FACTS
(Case No. 16-cv-11727) ................................................................3

STATEMENT OF ADDITIONAL MATERIAL FACTS .......................................4

INTRODUCTION ..............................................................................5

BACKGROUND ...............................................................................7

   A. The Oil Pollution Act ...............................................................7

   B. Executive Order 12,777 .............................................................9

   C. Ratification .........................................................................12

STANDARD OF REVIEW ..................................................................12

ARGUMENT ................................................................................14

  I. This Court Lacks Subject Matter Jurisdiction over NWF's Clean
     Water Act Claims ................................................................. 16

    A. The Secretary Has Ratified the Prior Review and Approval of
       Spill Response Plans by PHMSA and RSPA, so the Clean Air
       Act Claims are Now Moot ...................................................... 16

    B. NWF Lacks Standing to Challenge the Secretary's Alleged
       Failure to Review and Approve Spill Response Plans that
       Have Been Reviewed and Approved by PHMSA ...................................... 19

      1. NWF Lacks standing because it fails to establish injury-in-
         fact ......................................................................... 21

        a. NWF fails to allege injury-in-fact because each facility
           complained about is operating with a plan determined to
           meet the requirements of the Clean Water Act ................................. 21

      b. NWF members' concern about the effects of PHMSA's, rather than the Secretary's, approval of plans is not a cognizable injury giving rise to standing ........................................... 22

      c. NWF's assertion that it has been injured because plans approved by PHMSA are not binding is conjectural and hypothetical and thus does not constitute an injury-in-fact .............................................................................................. 24

    2. NWF fails to demonstrate causation because it does not allege specific facts showing that plans reviewed and approved by the Secretary would differ from the plans currently in place ..................................................................... 25

II. The Department Has Reasonably Interpreted the Clean Water Act's Definitions to Include, as Part of RSPA's and PHMSA's Authority over Onshore Pipeline Facilities, the Entirety of a Covered Pipeline, Including Segments That Cross Navigable Waters ............................................................................................ 28

  A. The Definitions in the Clean Water Act and Oil Pollution Act Create an Ambiguity Regarding Inland Pipelines that Cross Navigable Waters ............................................................................ 28

  B. The Department Has Reasonably Interpreted the Definition of "Onshore Facility" to Include Segments Located in, on, or Under Navigable Waters .............................................................. 32

  C. The 1994 Memorandum of Understanding Is Not Inconsistent with the Department's Interpretation of Onshore Facilities ..................... 39

III. The Secretary is Also Entitled to Summary Judgment on NWF's Claim of Failure to Personally Review and Approve Plans Because the Secretary Never Personally Received Any Plans ............................................................................................ 42

IV. Neither the Secretary nor PHMSA Has Violated Executive Order 12,777 ..................................................................... 42

CONCLUSION .......................................................................... 43

# TABLE OF AUTHORITIES

## <u>FEDERAL CASES:</u>

*Advanced Mgmt. Technology, Inc. v. F.A.A.*,
   211 F.3d 633 (D.C. Cir. 2000)............................................................28

*Am. Healthcare Mgmt., Inc.  v. Bowen*,
   1987 WL 8532 (D.D.C. Mar. 4, 1987) ...............................................18

*Auer v. Robbins*,
   519 U.S. 452 (1997)...........................................................................14

*Century Exploration New Orleans, LLC v. United States*,
   745 F.3d 1168 (Fed. Cir. 2014) .........................................................40

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
   467 U.S. 837 (1984)................................................... 13, 14, 28, 32

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)....................................................... 22-23

*Clapper v. Amnesty Int'l USA*,
   133 S. Ct. 1138 (2013)........................................................23

*Ctr. For Biological Diversity v. Lueckel*,
   417 F.3d 532 (6th Cir. 2005) ................................... xii, 20-21, 26-27

*Dana Corp. v. ICC*,
   703 F.2d 1297 (D.C. Cir. 1983).........................................................18

*Decker v. Nw. Envtl. Def. Ctr.*,
   133 S.Ct. 1326 (2013).................................................. 16-17

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs (TOC), Inc.*,
   528 U.S. 167 (2000)...........................................................24

*General Elec. Co. v. U. S. Dep't of Commerce*,
   128 F.3d 767 (D.C. Cir. 1997)............................................................7

*Greenbaum v. EPA,*
    370 F.3d 527 (6th Cir. 2004) ................................................... 13, 38

*Gros Ventre Tribe v. United States,*
    469 F.3d 801 (9th Cir. 2006) ...................................................28

*In re Century Offshore Mgmt. Corp.,*
    111 F.3d 443 (6th Cir. 1997) ...................................................40

*Kentucky Right to Life, Inc. v. Terry,*
    108 F.3d 637 (6th Cir. 1997) ...................................................17

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)........................................... xii, 20, 21, 25

*Murray Energy Corp v. FERC,*
    629 F.3d 231 (D.C. Cir. 2011)...................................... xii, 18

*Rapanos v. United States,*
    547 U.S. 715 (2006)..............................................................30

*Spokeo Inc. v. Robins,*
    136 S. Ct. 1540 (2016)................................................. 20, 23

*Steel Co. v. Citizens for a Better Env't.,*
    523 U.S. 83 (1998)................................................................16

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)...................................................... xii, 20

*Union Petroleum Corp. v. United States,*
    651 F.2d 734 (Ct. Cl. 1981) ...................................................36

*United States v. City of Detroit,*
    401 F.3d 448 (6th Cir. 2005) ...................................................17

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ...................................................... 13, 14

*White v. United States,*
    601 F.3d 545 (6th Cir. 2010) ...................................................23

*Wirtz v. Atl. States Const. Co.*,
   357 F.2d 442 (5th Cir. 1966) ..............................................................................18


## U.S. CONSTITUTION:

U.S. Const. art. III ............................................................................................16


## FEDERAL STATUTES:

Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 (1990)....................7

5 U.S.C. § 706(1) .............................................................................................12

5 U.S.C. § 706(2) .............................................................................................12

33 U.S.C. § 1321(a)(10).......................................................................... xii, 8, 29

33 U.S.C. § 1321(a)(11).......................................................................... xii, 8, 29

33 U.S.C. § 1321(j) ..............................................................................................8

33 U.S.C. § 1321(j)(5) .........................................................................................4

33 U.S.C. § 1321(j)(5)(A) ............................................................................. 8, 14

33 U.S.C. § 1321(j)(5)(C) ...................................................................................31

33 U.S.C. § 1321(j)(5)(D)......................................................................... 1, 27, 38

33 U.S.C. § 1321(j)(5)(E) .............................................................................. 8, 31

33 U.S.C. § 1362(7) ...........................................................................................30

33 U.S.C. § 2701(9) ............................................................................... xii, 9, 29

33 U.S.C. § 2701(22) ............................................................................... 8, 29

33 U.S.C. § 2701(24) ............................................................................... 8, 29

## FEDERAL RULES:

Fed. R. Civ. P. 56(a) ................................................................12

## FEDERAL REGULATIONS:

40 C.F.R. Part 112, Appendix B ................................................ 11, 39, 41

49 C.F.R. Part 194 ................................................................ 2, 4, 10

49 C.F.R. Part 194, Appendix B ................................................ xii, 11

49 C.F.R. § 194.5 ................................................................ xii, 10, 34, 38

49 C.F.R. § 194.115 ................................................................ xii

49 C.F.R. § 194.119 ................................................................1, 2

## FEDERAL REGISTER NOTICES:

Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991) ... 9-10, 11, 39, 40, 42

57 Fed. Reg. 62,483 (Dec. 31, 1992) ................................................ 10, 14

58 Fed. Reg. 244 (Jan. 5, 1993) ......................................... xii, 1, 2, 10, 14, 33-35, 35

58 Fed. Reg. 7,489 (Feb. 8, 1993) ................................................ 11, 40

70 Fed. Reg. 8,299 (Feb. 18, 2005) ................................................10

70 Fed. Reg. 8,734 (Feb. 23, 2005) ................................................ 10, 14, 35, 36

79 Fed. Reg. 4,532 (Jan. 28, 2014) ................................................ 35, 37

79 Fed. Reg. 49,206 (Aug. 19, 2014) ................................................37

80 Fed. Reg. 19,114 (Apr. 9, 2015) ................................................ 35, 38

## LEGISLATIVE HISTORY:

135 Cong. Rec. 18,366 (1989) ................................................37

135 Cong. Rec. 18,371 (1989) ................................................................37

S. Rep. No. 101-94, at 2-3 (1989), *as reprinted in* 1990 U.S.C.C.A.N.
   722, 723-24 ..........................................................................................7

H. R. Conf. Rep. No. 101-653, at 1 (1990), *as reprinted in* 1990 U.S.C.C.A.N.
   779, 780................................................................................................32

## MOST PERTINENT AUTHORITY

A. *Murray Energy Corp v. FERC,* 629 F.3d 231 (D.C. Cir. 2011)

B. *Lujan v. Defs. of Wildlife,* 504 U.S. 555 (1992)

C. *Ctr. For Biological Diversity v. Lueckel*, 417 F.3d 532 (6th Cir. 2005)

D. *Summers v Earth Island Inst.,* 555 U.S. 488 (2009)

E.  33 U.S.C. § 1321(a)(10), (a)(11)

F.  33 U.S.C. § 2701(9)

G. 49 C.F.R. § 194.5

H. 49 C.F.R. § 194.115

I.  49 C.F.R. Part 194, Appendix B

J.  58 Fed. Reg. 244 (Jan. 5, 1993)

**COUNTER-STATEMENT OF MATERIAL FACTS**
**(Case No. 15-cv-13535)**

1.  The Secretary of Transportation admits Statement 1.

2.  The Secretary of Transportation admits that, beginning in 1993, the owners or operators of transportation-related oil pipelines located landward of the coast line have submitted oil spill response plans to PHMSA and its predecessor, and that these plans have covered the entirety of the relevant pipelines, including segments located in, on, or under navigable waters.  58 Fed. Reg. 244 (Jan. 5, 1993); ECF No. 16, Case NO. 15-cv-13535, at 4-5.  The Secretary of Transportation admits that the plans, among other things, ensure the availability of resources necessary both to mitigate or prevent a substantial threat of a worst case discharge of oil and to remove, to the maximum extent practicable, a worst case discharge of oil.   33 U.S.C. § 1321(j)(5)(D).  The Secretary of Transportation denies that, beginning in 1993, any plans were submitted to the Secretary, and states that the plans were submitted to the Research and Special Programs Administration ("RSPA") until 2005, and to PHMSA since 2005.  58 Fed. Reg. at 256, § 194.119 (requiring response plans to be submitted to the Pipeline Response Plans Officer, RSPA); 49 C.F.R. § 194.119 (requiring response plans to be submitted to the Office of Pipeline Safety, PHMSA).

3. The Secretary of Transportation admits that, beginning in 1993, response plans for transportation-related onshore oil pipelines, including the segments that cross rivers, lakes, and other inland waters of the United States, submitted by the operators of such pipelines have been reviewed and approved pursuant to regulations codified at 49 C.F.R. Part 194, which is titled "Response Plans for Onshore Oil Pipelines."  58 Fed. Reg. 244.  The Secretary of Transportation denies that, beginning in 1993, any response plans were submitted to the Secretary.  58 Fed. Reg. at 256, § 194.119 (requiring response plans to be submitted to the Pipeline Response Plans Officer, RSPA); 49 C.F.R. § 194.119 (requiring response plans to be submitted to the Office of Pipeline Safety, PHMSA).  The Secretary of Transportation denies that owners or operators of offshore pipelines have submitted plans to the Secretary, RSPA, or PHMSA. *Id.*

4. The Secretary of Transportation admits statement 4.

5. The Secretary of Transportation admits that he has not personally reviewed or approved response plans for transportation-related onshore oil pipelines, including the segments that cross rivers, lakes, and other inland waters of the United States.  The Secretary of Transportation states that he lacks knowledge regarding whether any of his predecessors personally reviewed response plans for transportation-related onshore oil pipelines, including the segments that

cross rivers, lakes, and other inland waters of the United States.  The Secretary
of Transportation states that RSPA and PHMSA have reviewed and approved
response plans for transportation-related onshore oil pipelines, including the
segments that cross, rivers, lakes, and other inland waters of the United States,
and that the Department has kept records of RSPA's and PHMSA's review and
approval of plans.

## COUNTER-STATEMENT OF MATERIAL FACTS
### (Case No. 16-cv- 11727)

1. The Administrator of PHMSA admits that Enbridge (U.S.) Inc. ("Enbridge")
   submitted to PHMSA an "Integrated Contingency Plan," including annexes for
   the Superior Region and Chicago Region.

2. The Administrator of PHMSA admits Statement 2.

3. The Administrator of PHMSA admits Statement 3.

4. The Administrator of PHMSA admits Statement 4.

5. The Administrator of PHMSA admits Statement 5.

6. The Administrator of PHMSA admits that its approval of Enbridge's plan on
   July 11, 2013, constituted an approval of response plans for all segments of
   Line 5 landward of the coast line, including those segments located in, on, or
   under navigable waters.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

6. The oil spill response plans required by the Clean Water Act, 33 U.S.C. § 1321(j)(5), that cover the Enbridge Line 5 pipeline have been reviewed and approved by PHMSA. *See* Declaration of Linda Daugherty, Exhibit A, ¶ 3.

7. The oil spill response plan required by the Clean Water Act, 33 U.S.C. § 1321(j)(5), that covers the Olympic Pipeline have been reviewed and approved by PHMSA. *Id.* ¶ 4.b.

8. The oil spill response plan required by the Clean Water Act, 33 U.S.C. § 1321(j)(5), that covers the West Coast Terminal Pipeline have been reviewed and approved by PHMSA. *Id.* ¶ 4.a.

9. The oil spill response plan required by the Clean Water Act, 33 U.S.C. § 1321(j)(5), that covers the Colonial Pipeline have been reviewed and approved by PHMSA. *Id.* ¶ 4.c.

10. The Secretary of Transportation has ratified RSPA's and PHMSA's prior and current approvals of oil spill response plans submitted pursuant to 49 C.F.R. Part 194 by owners and operators of pipelines located landward of the coast line, including plans covering pipeline segments located in, on, or under inland waters. Memorandum from the Secretary, Exhibit B.

## INTRODUCTION

NWF asserts violations of the Administrative Procedure Act and the Clean Water Act based on the erroneous allegation that the Secretary of Transportation did not properly delegate his authority to review and approve certain oil spill response plans to the administrations within the Department that have reviewed and approved these plans.  While NWF claims that it has identified a "dereliction of duty" of "epic proportions," Mot. Summ. J., ECF No. 31, at 13, its summary judgment motions present only a narrow question regarding the division of labor within the Department of Transportation.  NWF's theory lacks any practical significance and lacks merit.

The parties do not dispute the underlying material facts.  Each of the pipelines identified by NWF and its declarants currently operates with a spill response plan reviewed and approved by PHMSA, the federal agency generally charged with enforcing pipeline safety requirements.  For more than 20 years, operators of oil pipelines located landward of the coast line have submitted spill response plans to one of two Department operating administrations: PHMSA, or its predecessor, RSPA.  These approved plans have covered the entirety of the relevant pipelines, including segments that cross rivers, lakes, and other inland waters.

Significantly, NWF does not allege in either of its lawsuits that the spill response plans approved by RSPA and PHMSA do not meet the substantive requirements of the Clean Water Act and the governing regulations.  Instead, NWF merely contends that the plans – to the extent they cover pipeline segments crossing inland waters – should have been reviewed and approved by the Secretary of Transportation, rather than RSPA or PHMSA.  NWF asserts two mirror-image claims based on this theory.  In Case No. 15-cv-13535, NWF claims that the Secretary has failed to exercise his alleged duty to personally review and approve the plans.  In Case No. 16-cv-11727, NWF claims PHMSA lacked authority to approve the plan for the Enbridge Line 5 pipeline.

This Court lacks subject matter jurisdiction over the claims in Case No. 15-cv-013535 and the first claim in Case No. 16-cv-11727 (collectively, the "Clean Water Act claims") for two reasons. First, although the Department believes that RSPA's and PHMSA's approvals were valid exercises of authority delegated long ago, the Secretary has recently ratified those approvals in order to eliminate any issue about whether the approvals were duly-authorized. This ratification renders NWF's claims moot.

Second, NWF lacks Article III standing to assert these claims because it fails to identify any injury that it or its members have suffered as a result of plans being reviewed and approved by RSPA and PHMSA, rather than the Secretary himself.

NWF does not allege that the plans approved by RSPA and PHMSA were substantively deficient in any way, and points to no harm that its members have suffered as a result of the alleged procedural impropriety.

If the Court finds that it has jurisdiction, the Secretary is entitled to summary judgment on the merits. NWF acknowledges that the Secretary has validly delegated to RSPA and PHMSA the authority to review and approve plans covering any pipeline that is located in, on, or under land. The Department has reasonably reconciled the ambiguities in the statutory definitions to include within a single "onshore facility" the entirety of a land-based pipeline, even when segments of the pipeline cross inland waters. The Department's reasonable interpretation of the statute is entitled to deference and should be upheld.

## BACKGROUND

### A. The Oil Pollution Act

Congress enacted the Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. (1990), in the wake of the Exxon Valdez oil spill in Prince William Sound, Alaska, in order to minimize the future potential for such accidents and provide for an improved response if such accidents occur. S. Rep. No. 101-94 at 2-3 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 722, 723-24; *see General Elec. Co. v. U. S. Dep't of Commerce*, 128 F.3d 767, 769 (D.C. Cir. 1997). Congress required the President to issue regulations to require owners and operators of certain facilities to

prepare and submit plans for responding, to the maximum extent practicable, to a

worst case discharge, and to a substantial threat of such a discharge, of oil or a

hazardous substance.  Oil Pollution Act, § 4202(a)(6) (amending the Clean Water

Act, codified at 33 U.S.C. § 1321(j)(5)(A)(i)).  Congress also required the

President to review certain response plans submitted in accordance with these

regulations, and approve them if they meet certain listed criteria.  *Id.* (codified at

33 U.S.C. § 1321(j)(5)(E)).[1]

Of particular relevance to NWF's claims, these provisions apply to certain

"onshore facilities" and "offshore facilities."  An "onshore facility" means any

facility of any kind "located in, on, or under, any land within the United States

other than submerged land."  33 U.S.C. § 1321(a)(10); *see* 33 U.S.C. § 2701(24).

An "offshore facility" includes any facility of any kind "located in, on, or under,

any of the navigable waters of the United States" and certain other facilities subject

to the jurisdiction of the United States located in, on, or under any other waters.  33

U.S.C. § 1321(a)(11); *see* 33 U.S.C. § 2701(22).   Both of these definitions use the

---

[1]     The sections of the Oil Pollution Act relevant to this case amended the Clean Water Act.  *See* Oil Pollution Act, § 4202(a) (amending subsection 1321(j) of the Clean Water Act); 33 U.S.C. § 1321(j).  Therefore, this brief refers to NWF's "Clean Water Act claims," even though the claims are brought under the Administrative Procedure Act seeking review of agency action allegedly at odds with provisions of the Clean Water Act and Oil Pollution Act.

term "facility," which is defined for purposes of the Oil Pollution Act to include any pipeline used for transporting oil.  33 U.S.C. § 2701(9).

The Clean Water Act does not treat "onshore facilities" and "offshore facilities" differently with respect to the content of oil spill response plans:  the required content is the same for all plans.  *Id.* § 1321(j)(5)(D).  But the two types of facilities are subject to the Act's requirements to different degrees.  All "offshore facilities" must submit plans, and the President must review all such plans.  *Id.* §§ 1321(j)(5)(C)(iii), 1321(j)(5)(E).  In contrast, an "onshore facility" need only submit a plan if it "could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters, adjoining shorelines, or the exclusive economic zone."  *Id.* § 1321(j)(5)(C)(iv).

### B. Executive Order No. 12,777

The President delegated by an executive order his responsibilities to issue regulations addressing spill response plans, and to review and approve the associated response plans, to several executive departments.  Executive Order No. 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991).  Under this Executive Order, the President delegated to the Secretary of Transportation the authority to issue regulations requiring the owners or operators of transportation-related onshore facilities to prepare and submit response plans, and the authority to review and approve such response plans.  *Id.* at 54,761.  Corresponding responsibilities were

delegated to the Administrator of the Environmental Protection Agency for non-transportation-related onshore facilities, and to the Secretary of the Interior for offshore facilities. *Id.*

The Secretary subsequently delegated to RSPA his authority with respect to onshore oil pipeline facilities; the delegation was transferred to PHMSA upon its creation in 2005. *See* 57 Fed. Reg. 62,483 (Dec. 31, 1992); 70 Fed. Reg. 8,299 (Feb. 18, 2005). On January 5, 1993, RSPA promulgated an interim final rule establishing regulations that required operators of onshore oil pipelines to prepare and submit spill response plans. 58 Fed. Reg. 244 (codified at 49 C.F.R. Part 194).[2] These regulations governing onshore pipelines include within their scope the entirety of oil pipelines located landward of the coast line, including the segments that cross rivers, lakes, and other inland waters of the United States. For example, the regulations define "high volume areas" as those areas where certain pipelines cross a major river or other navigable water, which because of the velocity of the river flow and vessel traffic on the navigable water requires a more rapid response. 49 C.F.R. § 194.5. The regulation lists in an appendix – by way of

---

[2]     The Department issued the regulations as an interim final rule that became effective on publication because of the need for timely implementation of requirements under the Oil Pollution Act. *See* 58 Fed. Reg. at 245. The Department also solicited comments on the interim final rule, and subsequently responded to those comments and published a final rule in 2005. 70 Fed. Reg. 8,734 (Feb. 23, 2005).

example – over 75 high volume areas, such as segments of the Mississippi and Ohio Rivers.  49 C.F.R. Part 194, Appendix B.

At the same time that RSPA issued regulations governing the entirety of oil pipelines located landward of the coast line, the Department of the Interior – which had been delegated authority over "offshore facilities" – issued an Interim Final Rule that only covered facilities located seaward of the coast line.  *See* 58 Fed. Reg. 7,489, 7491 (§ 254.1) (Feb. 8, 1993).

In 1994, the Departments of Transportation and the Interior, along with the Environmental Protection Agency, entered into a Memorandum of Understanding that affirmed this jurisdictional division.  40 C.F.R. Pt. 112, App. B.  The Memorandum of Understanding recognized that Executive Order 12,777 expanded the Department of the Interior's traditional role of regulating facilities seaward of the coast line, to include facilities in "inland waters" covered by the statutory definition of "offshore facility." *Id.*  The Memorandum of Understanding eliminated any uncertainty associated with the agencies' approach, by re-delegating to the Department of Transportation responsibility for transportation-related facilities "landward of the coast line." *Id.* ¶ 2.  Because the Memorandum of Understanding codified existing practice, neither Department changed its regulations upon the Memorandum of Understanding coming into effect.

### C. Ratification

On August 18, 2016, the Secretary of Transportation executed a ratification and delegation, a copy of which is attached as Exhibit B.  The Secretary confirmed that RSPA's and PHMSA's reviews and approvals of response plans submitted for pipelines located landward of the coast line – including plans covering segments located in, on, or under inland waters – have been and are fully valid exercises of authority delegated to the Secretary.  In order to eliminate any perceived uncertainty, the Secretary ratified RSPA's and PHMSA's prior approvals, and clarified the scope of the delegation to PHMSA with respect to future approvals.

## STANDARD OF REVIEW

A court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  NWF's claims are reviewed under the Administrative Procedure Act ("APA") and do not raise any disputed material facts.  *See* Mot. Summ. J., ECF No. 31, at 10-11; Mot. Part. Summ J., ECF No. 20, at 11.  Rather, NWF's claims present legal questions that include the reasonableness of the Department's interpretation of statutory definitions.

Under the APA, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).   It may also set aside agency action found to be not in accordance with law.  *Id.* § 706(2).

This Court should defer to the agency's interpretation of a statute it administers, in this case provisions of the Clean Water Act addressing spill response plans for onshore facilities.  *See United States v. Mead Corp.*, 533 U.S. 218, 227-31 (2001).  Questions of statutory interpretation are governed by the familiar two-step test set forth in *Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837, 842-45 (1984).  Under *Chevron's* first step, if Congress has "directly spoken to the precise question at issue," then that intent must be given effect.  *Chevron,* 467 U.S. at 842-43.  However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843; *Greenbaum v. EPA,* 370 F.3d 527, 533-34 (6th Cir. 2004).  To uphold the Department's interpretation of the Act, the Court need not find that the Department's interpretation is the only permissible construction that the Department might have adopted, or even the reading the Court would have reached, but only that the Department's interpretation is sufficiently rational to preclude the court from substituting its judgment for that of the Department.  *Greenbaum,* 370 F.3d at 534.

The Department's statutory interpretations of the definitions of "onshore facility" and "facility" in the Clean Water Act and Oil Pollution Act are entitled to *Chevron* deference.  Congress delegated to the President, who delegated to the Secretary, who delegated to RSPA and PHMSA, the obligation to issue regulations

13

that require certain operators of transportation-related onshore facilities to prepare and submit response plans for responding to a worst case discharge of oil or a hazardous substance. *See* 33 U.S.C. § 1321(j)(5)(A)(i); 56 Fed. Reg. 54,757 (delegation to Secretary); 57 Fed. Reg. 62,483 (Dec. 31, 1992) (delegation to RSPA). The Department exercised that authority through a notice-and-comment rulemaking. 58 Fed. Reg. 244 (interim final rule with request for comments); 70 Fed. Reg. 8,734 (final rule). Therefore, the Department's statutory interpretations set forth in the Interim Final Rule and the Final Rule qualify for *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. at 227-30.

The Department's interpretation of its own regulations is controlling unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

## ARGUMENT

The Court should deny NWF's motions for summary judgment and grant the Secretary's and the Administrator's cross-motions for summary judgment because no live case or controversy exists, and therefore this Court lacks subject matter jurisdiction over the Clean Water Act claims. A live case or controversy is missing for two reasons. First, the Secretary's recent ratification of RSPA's and PHMSA's prior review and approval of spill response plans moots both NWF's claims of unreasonable delay and its claim that PHMSA lacked authority to approved the

spill response plan covering Enbridge Line 5.  Second, NWF lacks standing to assert its Clean Water Act claims, as it does not show that its members have been injured by the Secretary's lack of personal review of the spill response plans reviewed and approved by PHMSA.

Even if the Court finds that it possesses jurisdiction over NWF's claims, the Court should still grant summary judgment to the Secretary and to the Administrator because the Secretary properly delegated authority to RSPA and PHMSA to review and approve the spill response plans identified by NWF. Response plans submitted by operators of onshore oil pipelines, including those pipelines that have segments crossing navigable waters, have been reviewed and approved by PHMSA and RSPA for decades.  This practice reflects the Department's reasonable statutory interpretation that the term "onshore facility" should encompass the entirety of a pipeline landward of the coast line, including any pipeline segments that cross navigable waters.  As a result, the Secretary has not unlawfully withheld or unreasonably delayed the review and approval of such spill response plans, and PHMSA properly reviewed and approved the plan for Enbridge Line 5, including its segments that cross the Straits of Mackinac and other inland waters.

The Secretary is entitled to summary judgment on the claims in Case No. 15-cv-13535 for an additional reason.  NWF concedes that the Secretary only has

an obligation to review and approve plans that he actually receives.  If RSPA's and PHMSA's *receipt* of plans could be imputed to the Secretary (as NWF apparently suggests), then RSPA's and PHMSA's *approvals* of plans would need to be imputed to the Secretary as well.  There is no logical way to conclude that the Secretary has received plans, without also concluding that he has approved them.

## I.  This Court Lacks Subject Matter Jurisdiction over NWF's Clean Water Act Claims.

Federal court jurisdiction extends only to cases and controversies.  U.S. Const. art. III § 2.  This Court must first determine, before it reaches the merits, whether NWF's Clean Water Act claims are now moot and whether NWF has standing to bring these claims.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

### A.  The Secretary Has Ratified the Prior Review and Approval of Spill Response Plans by PHMSA and RSPA, so the Clean Water Act Claims are Now Moot.

On August 18, 2016, the Secretary reaffirmed the delegation of authority to PHMSA and RSPA by ratifying those administrations' review and approval of response plans under the Part 194 regulations.  *See* Ex. B.  This ratification resolves any issues regarding proper delegation of authority, and moots the Clean Water Act claims.

A justiciable controversy must remain present at all stages of a case, not merely at the time the complaint is filed.  *Decker v. Nw. Envtl. Def. Ctr.*, 133 S.Ct.

1326, 1335 (2013).  A case becomes moot when "the issues presented are no longer live or parties lack a legally cognizable interest in the outcome." *United States v. City of Detroit*, 401 F.3d 448, 450 (6th Cir. 2005).   Further, a case becomes moot "when it is impossible for a court to grant any effectual relief to the prevailing party." *Decker*, 133 S.Ct. at 1335.  When claims become moot, a court ceases to have subject matter jurisdiction over them.  *See Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997) (mootness doctrine is one of the Article III justiciability requirements).

The Secretary's ratification completely disposes of NWF's Clean Water Act claims.  NWF concedes that the Secretary has the authority to review and approve response plans covering pipeline segments that cross inland waters.  *See* Mot. Summ. J., ECF No. 31, at 18.  NWF admits that the Secretary has the ability to delegate that authority to the Department's operating administrations, and therefore is not required to personally exercise that authority.  *See id.*  NWF's only contention is that the Secretary never actually made a delegation for plans covering inland waters.  The Department, of course, disagrees, because it believes that the Secretary's prior delegation of authority over plans for "onshore facilities" covers those portions of pipelines crossing inland waters.  However, even if NWF were right, the Secretary's recent ratification would retroactively solve any delegation problem.

An agency may ratify the acts of a decision-maker who is alleged not to have the authority to act at the time of the challenged decision.  For example, when a company claimed that a staff member of the Federal Energy Regulatory Commission lacked delegated authority to issue an order, the full Commission responded by "affirm[ing] the practice of delegating authority to Commission staff," and "adopt[ing] the . . . action . . . as its own."  *Murray Energy Corp. v F.E.R.C.*, 629 F.3d 231, 236 (D.C. Cir. 2011).  When the company raised the same delegation argument in court, the D.C. Circuit found that any issue had been resolved:

> Whatever the merits of Murray's arguments here, they cannot succeed in light of a simple fact: the Commission ratified the [order] . . . .  Given that the Commission had authority to issue the [order], the Commission's subsequent ratification resolved any potential delegation problems.

*Id.*; *see also Dana Corp. v. ICC*, 703 F.2d 1297, 1301 (D.C. Cir. 1983) (agency's ratification of official's decision would eliminate even "serious problems of authorization"); *Wirtz v. Atl. States Const. Co*. 357 F.2d 442, 446 (5th Cir. 1966) (rejecting challenge to regional attorney's commencement of lawsuit, when Secretary filed an affidavit ratifying the decision); *Am. Healthcare Mgmt., Inc.  v. Bowen*, 1987 WL 8532, at *1 (D.D.C. Mar. 4, 1987) (rejecting challenge to official's authority to act, when he was delegated that authority after making the decision).

Similarly, because the Secretary has the authority to review and approve spill response plans, his ratification of RSPA's and PHMSA's review and approval of plans resolves any potential issue about whether those actions were properly authorized.  No live controversy between NWF and the Defendants remains. There is now no dispute that the plans NWF alleges the Secretary has failed to review and approve have been approved pursuant to duly-delegated authority, and PHMSA's review and approval of the spill response plan covering Enbridge's Line 5 was authorized. The Court cannot grant any effectual relief, because the plans have been approved under duly-delegated authority.  Regardless of whether there was any merit to NWF's Clean Water Act claims, the Secretary's ratification moots those claims, and the Secretary and PHMSA should be granted summary judgment on this basis alone.

**B.    NWF Lacks Standing to Challenge the Secretary's Alleged Failure to Review and Approve Spill Response Plans that Have Been Reviewed and Approved by PHMSA.**

Even if the claims were not moot, the Court would still lack subject matter jurisdiction, because NWF lacks Article III standing.   NWF claims that its members' use and enjoyment of certain waters has been harmed because pipelines crossing those waters are not covered by validly-approved spill response plans. But those pipelines are covered by approved plans; NWF just claims the plans were approved by the wrong part of the Department.  Mot. Summ. J., ECF No. 31,

at 2-3; Mot. Part. Summ. J., ECF No. 20, at 3-4.  NWF does not identify any *substantive* deficiencies with the plans, and does not provide any evidence that the purported *procedural* deficiency has inflicted any injury on its members at all.

The "irreducible constitutional minimum of standing" requires that (1) plaintiffs "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) there is a "causal connection between the injury and the conduct complained of," in that the injury is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court," and (3) it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  To demonstrate a case or controversy, at the summary judgment stage NWF must set forth "specific facts" to establish that it has met all the requirements of Article III standing.  *Id.* at 561.

Critically, environmental plaintiffs alleging procedural injuries cannot establish standing based on a procedural violation alone; a concrete injury resulting from the disregarded procedural requirement is also necessary.  *See Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("a bare procedural violation, divorced from any concrete harm," does not satisfy the injury-in-fact requirement); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *Center for Biological Diversity v.*

*Lueckel*, 417 F.3d 532, 537-38 (6th Cir. 2005).  While a plaintiff need not establish with "certainty" that an agency's substantive decision would be affected by correction of an alleged procedural flaw, *Defs. of Wildlife*, 504 U.S. at 572 n.7, it still must put forward some evidence that the alleged procedural flaw caused its injuries, and that correction of the flaw would redress those injuries.  *Lueckel*, 417 F.3d at 539.  Furthermore, because NWF complains of an injury caused by the Secretary's regulation of the pipeline operators in its members' areas, more is needed to demonstrate standing than if the plaintiff were challenging government regulation of its own behavior. *Defs. of Wildlife*, 504 U.S. at 562.

1. **NWF lacks standing because it fails to establish injury-in-fact.**

    a. **NWF fails to allege injury-in-fact because each facility complained about is operating with a plan determined to meet the requirements of the Clean Water Act.**

In its Motions for Summary Judgment, NWF claims that its members have standing because "as the oil flows, their property, recreational activities, or aesthetic appreciation of natural resources (1) are more exposed to a worst case discharge of oil and (2) would be more impacted by a worst case discharge than they would be *if the pipelines were operating with plans determined to meet the requirements of the OPA*."  Mot. Summ. J., ECF No. 31, at 3 (emphasis added); *see also* Mot. Part. Summ. J., ECF No. 20, at 4 (stating same with respect to Line 5). This claim of injury rests upon a false assumption.  In fact, each of the pipelines in

question *is* operating under a plan determined by PMHSA to meet the requirements of the Clean Water Act.  NWF contends that the determinations were made by the wrong part of the Department, but does not challenge the substance of the determinations.  Nothing in the declarations submitted by NWF's members suggests any reason to believe that any risks they face from potential oil discharges are increased in any way by the fact that spill response plans have been approved by PHMSA rather than the Secretary.  Accordingly, NWF has failed to allege any cognizable injury-in-fact.

> **b.    NWF members' concern about the effects of PHMSA's, rather than the Secretary's, approval of plans is not a cognizable injury giving rise to standing.**

NWF contends that because the Secretary has not personally approved spill response plans, its members feel heightened concern about the threat of a spill from nearby pipelines, which allegedly reduces their use and enjoyment of the environment. *See, e.g.,* Wallace Decl., ECF No. 31-4, ¶ 26; Declaration of Norman E. Ritchie, ECF No. 31-5, ¶ 37, Declaration of David L. Hargett, ECF No. 31-6, ¶ 31; Declaration of Charles W. Borgsdorf, ECF No. 31-7, ¶ 25. However, such concern is not a concrete and particularized, actual or imminent injury sufficient to grant NWF standing.  Courts require more than a plaintiff's "subjective apprehensions" of future harm to establish standing. *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("It is the *reality* of the threat of repeated injury that is

22

relevant to the standing inquiry, not the plaintiff's subjective apprehensions."); *cf.*

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146-47 (2013) (holding that

"threatened injury must be *certainly impending* to constitute injury in fact"); *White*

*v. United States*, 601 F.3d 545, 553-54 (6th Cir. 2010) (same).[3]

This Court should follow its holding in *White* and determine that the NWF

members' fears do not constitute an injury-in-fact. The declarations support

nothing more than its members' subjective apprehensions that the risk of a worst

case discharge of oil is heightened in the absence of the Secretary's personal

approval.  The declarants allege no facts that indicate that a discharge is more

likely – let alone certainly impending – because PHMSA, rather than the Secretary,

approved the pipeline response plans.  Moreover, the fear that the risk of

discharges is increased by approval of response plans by PHMSA, rather than the

Secretary, would be unreasonable given the fact that each pipeline is operating

under an approved plan found to meet the Clean Water Act's requirements, and

that NWF has not challenged the substance of those plans.

---

[3] NWF relies upon *Spokeo, Inc. v. Robins*, 136 S. Ct. at 1549-50, for the proposition that "risk of real harm can satisfy the requirement that an injury be concrete," Mot. Summ. J., ECF No. 31, at 4. However, the Supreme Court in *Spokeo* cited *Clapper* when making that statement, *id.* at 1549, equating real risk with one that is certainly impending.

Nor may NWF rely on *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167 (2000).  There, the plaintiffs demonstrated injury-in-fact by showing that they discontinued their normal recreational and economic activities because they were concerned about the effect of Laidlaw's toxic discharges into a river.  *Id.* at 181-82.  In *Laidlaw*, the discharges were occurring, and the Court held that the plaintiffs' resulting fears were reasonable.  In contrast, NWF has not shown that approval of spill response plans by PHMSA rather than the Secretary harms its members, or that any of its members have changed their behavior in response to their alleged fear.  Unlike the *Laidlaw* plaintiffs, NWF's members have alleged only their subjective apprehensions about increased risk, which are insufficient to establish an injury-in-fact.

> **c.    NWF's assertion that it has been injured because plans approved by PHMSA are not binding is conjectural and hypothetical and thus does not constitute an injury-in-fact.**

NWF appears to allege that its members are injured because it believes that owners and operators of pipeline segments crossing inland waters are not required to comply with response plans that have been approved by PHMSA, rather than by the Secretary.  *See, e.g.*, Wallace Decl., ECF No. 31-4, ¶ 36. Wallace Decl., ECF No. 20-7, ¶ 38; Borgsdorf Decl., ECF No. 20-8, ¶ 22.  If this is the basis for NWF's standing argument, it must fail as too conjectural and attenuated to meet the requirements of Article III.  Standing is not "an ingenious academic exercise in

the conceivable, but . . . requires, at the summary judgment stage, a factual showing of perceptible harm." *Defs. of Wildlife*, 504 U.S. at 566 (internal citations omitted).  The Department, of course, believes that operators are absolutely required to comply with all plans approved by PHMSA.  NWF has presented no evidence that any of the pipeline owners or operators in its members' areas are currently disregarding, or have ever disregarded, one of its plans based on the premise that such a plan was not binding because it was approved by PHMSA, rather than the Secretary.  Indeed, evidence before this Court indicates that pipeline operators rely upon, and advocate for the lawfulness and enforceability of, PHMSA-approved plans.  *See* Declaration of Bradley Shamla, ECF No. 13-2, Case No. 16-cv-11727, ¶ 10 (submitted in support of Enbridge's motion to intervene); Declaration of Andrew J. Black, ECF No 10-4, Case No. 15-cv-13535, ¶ 6, 7 (submitted in support of Association of Oil Pipe Lines' Motion to Intervene). NWF and its members may speculate that the plans are unenforceable, but that speculation does not establish standing.

> **2.     NWF fails to demonstrate causation because it does not allege specific facts showing that plans reviewed and approved by the Secretary would differ from the plans currently in place.**

Even presuming that NWF could establish injury-in-fact, the organization still lack standing because it cannot establish that any such injury is caused by the

alleged procedural error it challenges (the approval of plans by PHMSA, rather than the Secretary).

This issue of causation is governed by the Sixth Circuit's decision in *Center for Biological Diversity v. Lueckel*, 417 F.3d at 537-38.  In *Lueckel*, environmental groups sued the United States Forest Service because it failed to establish detailed river corridor boundaries and comprehensive land management plans as required by statute.  *Id.* at 534. The Forest Service admitted that it did not establish these plans, but argued that the plaintiffs lacked standing because the agency's "non-compliance with the Act's 'technical requirements' had not harmed the plaintiffs." *Id.* at 534-35.  The Sixth Circuit agreed with the Forest Service, holding that because the statute established default boundaries for the river segments and because there were existing land and resource management plans in place, the Forest Service's failure to promulgate plans did not cause the plaintiff's injuries. *See id.* at 540.

The Sixth Circuit explained that "an adequate causal chain in a case involving an agency's non-compliance with procedural requirements must contain at least two links: a link between the plaintiff's injury and some substantive decision of the agency, and a link between that substantive decision and the agency's procedural omissions."  *Id.* at 538.  With respect to the second causal link, the court held that although the plaintiffs did not need to show "with any

certainty" that correction of the alleged procedural flaw would lead to alteration of the agency's decision, they failed to present *any* "specific facts" or "real evidence" at the summary judgment stage supporting their contention that the statutorily-required plans might have changed the Forest Service's logging decisions or even that those plans would have been more protective than the existing plans. *Id.* at 539-40.

The rationale in *Lueckel* with respect to the second link in the causal chain applies directly to NWF's assertions.   Even if NWF could show that its members have suffered injuries as a result of the plans approved by PHMSA, it could not provide any evidence that plans approved by the Secretary personally would be more protective than those approved by PHMSA, the expert agency.  *See id.* at 540 (holding an affiant's contention that logging might have been reduced had the plans been in place to be "too speculative to satisfy the plaintiffs' burden of presenting 'specific facts.'")  This is especially true because the pipelines are governed by plans PHMSA approved pursuant to 33 U.S.C. § 1321(j)(5)(D) – the identical statutory criteria that the plaintiff wishes to compel the Secretary to apply. Accordingly, NWF has not demonstrated that PHMSA's approval of the pipeline

plans, in lieu of the Secretary's, caused it any injury, and has thus failed to demonstrate standing to assert its Clean Water Act claims.[4]

## II. The Department Has Reasonably Interpreted the Clean Water Act's Definitions to Include, as Part of RSPA's and PHMSA's Authority over Onshore Pipeline Facilities, the Entirety of a Covered Pipeline, Including Segments That Cross Navigable Waters.

Even if the Court has subject matter jurisdiction, NWF's Clean Water Act claims fail on the merits. NWF does not dispute that the Secretary properly delegated to RSPA, and then PHMSA, authority to review and approve oil spill response plans for onshore pipeline facilities. RSPA and PHMSA have consistently interpreted this authority as extending to the entirety of a covered pipeline landward of the coast line, including any segments that cross navigable waters. This interpretation is reasonable and entitled to *Chevron* deference.

### A. The Definitions in the Clean Water Act and Oil Pollution Act Create an Ambiguity Regarding Inland Pipelines that Cross Navigable Waters.

The statutory definitions of "onshore facility," "offshore facility," and "facility," create an ambiguity regarding the regulation of pipelines transporting oil

---

[4]    NWF also lacks standing to assert its Clean Water Act claim in Case No. 16-cv-11727 because the July 11, 2013, response plan for Enbridge Line 5 challenged by NWF in that case has been superseded by response plans approved by PHMSA in 2015. *See Gros Ventre Tribe v. United States,* 469 F.3d 801, 814 (9th Cir. 2006) (party lacked standing because it could not show injury based on decision that was subsequently vacated); *Advanced Mgmt. Technology, Inc. v. F.A.A.*, 211 F.3d 633 (D.C. Cir. 2000) (when challenged action is no longer effective at time complaint is filed, jurisdictional issue is one of standing, not mootness).

located landward of the coast line with segments that cross navigable waters.  This

ambiguity affects virtually all oil pipelines in the country.

The Clean Water Act defines two kinds of facilities -- onshore and offshore

– but neither unambiguously applies to a single land-based pipeline that crosses

inland waters.  An "onshore facility" means "any facility . . . of any kind located

in, on, or under, any land within the United States other than submerged land."  33

U.S.C. § 1321(a)(10); *see also* 33 U.S.C. § 2701(24).  An "offshore facility" means

"any facility of any kind located in, on, or under any of the navigable waters of the

United States, and any facility of any kind which is subject to the jurisdiction of

the United States and is located in, on or under any other waters, other than a

vessel or a public vessel."  33 U.S.C. § 1321(a)(11); *see also* 33 U.S.C. § 2701(22).

The absence of a plain main meaning of these terms in the context of land-

based pipelines is informed by the Oil Pollution Act's definition of "facility."  Title

I of the Oil Pollution Act defines facility as:

> any structure, group of structures, equipment or device (other than a vessel)
> which is used for one or more of the following purposes: exploring for,
> drilling for, producing, storing, handling, transferring, processing, or
> transporting oil.  This term includes any motor vehicle, rolling stock, or
> pipeline used for one or more of these purposes.

33 U.S.C. § 2701(9).  Under this definition, a single pipeline is a single facility.

Even if a pipeline could be considered a "group of structures," it would still be a

single facility if collectively used for the same purposes.  Thus, a pipeline facility's

beginning and end point are defined by its function, *i.e.,* the beginning and end

point of oil transportation.  The statutes do not expressly address the proper

classification of a single pipeline facility having its beginning and end points on

land but include segments that cross water.

The ambiguity among these definitions is accentuated by the use of the term

"navigable water" in the definition of "offshore facility."  A "navigable water" in

this definition does not refer only to waters that are navigable in fact (known as

"traditional navigable waters"), but rather means "waters of the United States."

*See* 33 U.S.C. § 1362(7).  In *Rapanos v United States*, 547 U.S. 715 (2006), the

plurality of the Supreme Court interpreted the term "waters of the United States" to

include relatively permanent, standing or continuously flowing bodies of water

'forming geographic features' that are described in ordinary parlance as streams,

rivers, and lakes, and that are connected to traditional navigable waters.  *Id.* at

739.  Justice Kennedy, in his concurrence, concluded that the scope of "waters of

the United States" encompasses water bodies that have a significant nexus to

traditional navigable waters.  *Id.* at 782.

As a result, any pipeline landward of the coast line, though primarily located

in, on, or under land within the United States, will likely have numerous short

segments that cross creeks, streams, and rivers that fall within the broad definition

of "navigable waters."  Based on NWF's interpretation, such a pipeline could be

30

classified to include dozens or hundreds of separate facilities, divided each time the pipeline crosses a water of the United States, however small. Such a classification would be unusual given that a pipeline is most naturally construed as – and defined by the Oil Pollution Act as – a single "facility."

The ambiguity associated with the scope of "onshore facility" is also reflected in the Clean Water Act's provision governing oil spill planning requirements. These requirements apply to "an onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging into *or on* the navigable waters . . ." 33 U.S.C. §§ 1321(j)(5)(C)(iv); 1321(j)(5)(E) (emphasis added). If an onshore facility had to be located exclusively on land, then Congress needed only to address facilities discharging "into navigable waters" to describe a scenario where oil flows from land to water. By also including onshore facilities discharging "on the navigable waters," Congress envisioned that onshore facilities could be located in part in, on, or, under navigable waters where they could discharge "on" a navigable water.

NWF's focus on the word "any" in the definition of offshore facility offers no helpful guidance and does not establish that Congress has clearly spoken to the question. Mot. Summ. J., ECF No. 31, at 21. The definition of "offshore facility" includes "any" facility located in, on, or under navigable waters, but that does not assist in determining whether something is a facility located in, on, or under

navigable waters.  The definition of "onshore facility" also includes the word "any," and the definition of "facility" in the Oil Pollution Act includes "any . . . pipeline."  Thus, reading each of these definitions expansively to give effect to the word "any" fails to clarify the ambiguity in the definitions.  "Any" facility of "any" kind located in, on, or under "any" land with the United States would include any pipeline landward of the coast line.  Further, because "any" pipeline is most naturally construed to be a single facility, "any" pipeline could include any segments of that land-based pipeline crossing navigable waters.[5]

### B.   The Department Has Reasonably Interpreted the Definition of "Onshore Facility" to Include Segments Located in, on, or Under Navigable Waters.

 The Department resolved this ambiguity through its interpretation of the definition of "onshore facility" as including all segments of an oil pipeline landward of the coast line, including those segments that cross inland navigable waters.   The Court should give deference to and uphold the Department's reasonable interpretation *under Chevron*.

---

[5] NWF's attempt to draw a sharp distinction between onshore and offshore facilities, Mot. Summ. J., ECF No. 31, at 20-21, is at odds with Congressional intent.  The House Conference Report on the Oil Pollution Act stated that "docks, piping, wharves, piers and other similar appurtenances that rest on submerged land and that are directly or indirectly connected to a land-based terminal are deemed to be part of the onshore facility."  H.R. Conf. Rep. No. 101-653, at 1 (1990), as reprinted in 1990 U.S.C.C.A.N. 779, 780.  Thus, pipeline segments that rest on submerged land but are connected to a land-based pipeline should similarly be reasonably construed to be part of an onshore facility.

On January 5, 1993, the Department, through RSPA, promulgated regulations to govern the submission of spill response plans for onshore oil pipelines in accordance with the Clean Water Act.  Those regulations for "onshore" facilities reasonably included within their scope the portions of onshore oil pipelines located in, on or under navigable waters.  This reflected RSPA's recognition that oil pipelines "*often cross*, or are located adjacent to, navigable waters, . . . [t]thus, most oil pipeline operators will be required to prepare and submit response plans."  58 Fed. Reg. at 247 (emphasis added).  It also reflected RSPA's reasonable determination that a single pipeline is a single facility for response planning purposes and should be governed by a single spill response plan.

The Department's interpretation of "onshore facility" reflects the regulation's use of a tiered system for responding to worst case discharges.  *See* 58 Fed. Reg. at 251.  The regulations establish three tiers to allow the operator to identify appropriate response resources to satisfy its response requirements.  *Id.* This tiered approach recognizes two levels of concern based on whether or not the areas traversed by the oil pipelines are "high volume areas."  *Id.*  The rule defines "high volume areas" as "those areas where an oil pipeline having a nominal outside diameter of 20 inches or more *crosses* a major river or other navigable water, which, because of the velocity of the river flow and vessel traffic on the river, would require a more rapid response in case of a worst case discharge or

substantial threat of such a discharge." *Id.* at 251 (emphasis added); see 49 C.F.R.

§ 194.5 (definition of high volume area).  In other words, the regulations

specifically contemplate that onshore oil pipelines will cross inland waters, and

treat the water-crossing segments differently.

The scope of the regulations governing onshore oil pipelines is further

confirmed by its listing of examples of high volume areas.  Appendix B to the

regulations lists 78 rivers, representing river segments that RSPA identified as high

volumes areas as of January 5, 1993.  58 Fed. Reg. at 258.  Examples include

numerous locations on the Ohio, Missouri, and Mississippi Rivers, as well as

locations on smaller rivers throughout the country.  *Id.*  In issuing the regulations,

RSPA explained that the list of high volume areas in Appendix B may not be

complete for the purposes of the regulation, and that "[o]perators should determine,

based on their regional knowledge, if there are other areas that contain rivers or

other navigable waters which, because of their velocity or traffic, would, in case of

discharge, require a more rapid response." *Id.* at 251.

The inclusion of pipeline crossings of navigable waters within the plans for

onshore pipelines reasonably fits the overall approach to spill response regulations

for onshore pipelines implemented by RSPA.  The Department intended that, for

the vast majority of cases, the operator's response plan would "consist of a core

plan covering the entire company's pipeline facilities and separate response zone

appendices." 58 Fed. Reg. at 246. Each appendix addresses a response zone which is a geographic area along a length of pipeline. *Id.* The size of the response zone is determined by the operator after considering available spill response capability, resources and geographic characteristics, including the number and location of navigable waters. *Id.* If a plan is to cover an entire company's pipeline facilities, it would be unreasonable to exclude as a separate facility each crossing of an inland creek, stream or river.

The Department has maintained its reasonable interpretation for over 20 years. *See, e.g.,* 70 Fed. Reg. 8,734 (re-promulgating regulations with same definition of high volume area and same list of such areas); 80 Fed. Reg. 19,114 (Apr. 9, 2015) (Advisory Bulletin addressing flooding risks posed to pipelines crossing river beds and citing to the Part 194 regulations governing plans for onshore pipelines as relevant to addressing these risks); 79 Fed. Reg. 4,532, 4,533-34 (Jan. 28, 2014) (Advisory Bulletin reminding operators that they must comply with faster response times in high volume areas).[6] When PHMSA issued its Final Rule in 2005, PHMSA responded to comments seeking clarification of high

---

[6] Over the same 20 years, the regulated community apparently has similarly understood this interpretation of the Act. For example, with regard to Enbridge's Line 5, Enbridge's spill response plan reviewed and approved by PHMSA includes the segment of Line 5 that crosses the Straits of Mackinac as a distinct pipeline section covered by its response plan. *See* Mot. Summ. J., Exhibit 9, ECF No. 31-10, at 3 (noting coverage of an 8.2 mile segment called "Straits of Mackinac East and West").

volume areas by stating that "the list of specific high-volume rivers in Appendix B of 49 CFR Part 194 provides sufficient guidance to pipeline operators.  The list includes areas that not only have high vessel traffic and high river velocity but also have concentrations of pipelines."  70 Fed. Reg. at 8,736.

The Department's reasonable interpretation is also consistent with judicial interpretations of the term "onshore facility."  In *Union Petroleum Corp. v United States*, 651 F.2d 734 (Ct. Cl. 1981), the court concluded that there "is no doubt that under this definition  . . . of an 'onshore facility' that an onshore facility includes not only a land-based oil distribution terminal but also its dock extending into a navigable water.  *Id*. at 742.  Further, the court questioned the validity of a "hypertechnical approach" to the statutory definitions of the Act.  *Id.* at 744. Although the court's concern with a hypertechnical approach in *Union Petroleum* was intended to avoid delay of cleanup operations and arguments over responsibility, *id.* at 744, the same concern is similarly present where the disagreement involves which agency and which official reviews and approves a spill response plan that no one has challenged as failing to meet the requirements of the Clean Water Act.

NWF's arguments based on liability limits under the Clean Water Act do not undercut the reasonableness of the Department's interpretation.  Mot. Summ. J., ECF No. 31, at 22-24.  Congress set different liability limits for onshore and

offshore facilities, but that does not mean that an onshore facility should be interpreted to be an offshore facility simply to increase liability exposure.  For example, NWF highlights the 2010 spill of oil from the Enbridge Line 6B pipeline into the Kalamazoo River.  *See, e.g.,* Second Amended Complaint, ECF #28 at ¶ 42. The Coast Guard, responsible for adjusting the limits of liability pursuant to Section 1004(d) of the Oil Pollution Act, 33 USC 2704(d), classified the Enbridge Pipeline as an onshore facility even though the spill occurred into a wetland tributary to the Kalamazoo River, both navigable waters.  *See* 79 Fed. Reg. 49,206, 49,210 & n.14 (Aug. 19, 2014) (referencing onshore facility); 79 Fed. Reg. at 4,533 (noting that oil saturated wetland that flowed into Talmadge Creek, which flowed into Kalamazoo River).  When Congress enacted the Oil Pollution Act, its concern with offshore spills focused upon events seaward of the coast line, such as oil spills attributable to the Exxon Valdez and the oil rig Ixtop I in the Gulf of Mexico.  135 Cong. Rec. 18,366 (1989) (Senator Wilson); see also 135 Cong. Rec. 18,371 (1989).  NWF's organizational interests may be served by classifying as many facilities as possible in a manner to maximize liability in the event of a spill, but Congress established a bifurcated system that set different limits for onshore and offshore facilities.

Finally, the Department's classification of pipelines landward of the coast line as onshore does not result in more lax spill response plans.  Under the Clean

Water Act, all spill response plans, whether for onshore or offshore facilities, must identify the resources necessary to respond to a worst case discharge. 33 U.S.C. § 1321(j)(5)(D). NWF specifically focuses on risks attributable to ice, currents, and flood events. *See* Mot. Summ. J., ECF No. 31, at 28. Yet PHMSA's current regulations for onshore pipelines require that response plans expressly consider these types of events. A PHMSA Advisory Bulletin issued last year specifically addresses flood risks. *See* 80 Fed. Reg. 19,114. High volume areas are identified in part based on velocity of currents. 49 C.F.R. § 194.5. The Part 194 regulations require plans to address risks associated with ice cover, wave height and weather-related visibility.[7]

NWF's proffering of an alternative interpretation of the statutory definitions does not entitle it to summary judgment. The Court need not find that the Department's interpretation is the only permissible construction that it might have adopted, or even the reading the Court would have reached, but only that the Department's interpretation is sufficiently rational to preclude the Court from substituting its judgment for that of the Department. *Greenbaum*, 370 F.3d at 534.

---

[7]   When calculating the worst case discharge amount, pipeline operators must consider "adverse weather conditions." 49 C.F.R. § 194.5 "Adverse weather conditions" includes "ice conditions, temperature ranges, weather-related visibility, [and] significant wave height." 49 C.F.R. § 194.5.

The Department's interpretation is reasonable, and Defendants are therefore entitled to summary judgment.

### C.  The 1994 Memorandum of Understanding Is Not Inconsistent with the Department's Interpretation of Onshore Facilities.

In 1994, the Department of the Interior, the Department of Transportation and the EPA entered into a Memorandum of Understanding that revised the division of responsibility for the review and approval of response plans under the Oil Pollution Act that was established by Executive Order No. 12,777.  40 C.F.R. Part 112, Appendix B.  The Memorandum of Understanding shifted to the Department of Transportation any responsibility that the Department of Interior had been given for regulating transportation-related facilities landward of the coast line, thus confirming and supporting the Department of Transportation's original interpretation of "onshore facility" as it relates to oil pipelines.

In 1991, the President, through Executive Order No. 12,777, delegated to the Secretary of Transportation the President's authority to regulate spill response plan for transportation-related onshore facilities, which would include oil pipelines.  56 Fed. Reg. at 54,759.  At the same time, the President delegated to the Department of Interior the responsibility for spill response plans for "offshore facilities."  56 Fed. Reg. at 54,762.

The delegation to the Department of Interior of "offshore facilities" was prompted by the traditional regulatory authority of the Department of Interior.  The

Department of Interior historically regulated oil facilities on the Outer Continental

Shelf. *See Century Exploration New Orleans, LLC v United States*, 745 F.3d 1168,

1172 (Fed. Cir. 2014). The Secretary of the Department of Interior delegated his

authority under Executive Order No. 12,777 to the Mineral Management Service,

the agency within the Department of Interior responsible for activities in the Outer

Continental Shelf. 58 Fed. Reg. 7,489; *see In re Century Offshore Mgmt. Corp*.,

111 F.3d 443, 445 (6th Cir. 1997). This traditional scope of its regulatory

authority would not have included pipelines landward of the coast line.

Accordingly, the regulations promulgated by the Department of Interior

under its authority delegated by the Executive Order to require the submission of

spill response plans by operators of offshore facilities defined "offshore facilities"

to mean "the area seaward of the line of ordinary low water along that portion of

the coast which is in direct contact with the open sea and the area seaward of the

line marking the limit of inland waters. . . ." 58 Fed. Reg. at 7,491 (Section 254.1,

Definitions). Thus, the Department of Interior did not promulgate regulations for

facilities landward of the coast line. With respect to oil pipelines, the Department

of Transportation reasonably interpreted "onshore facility" to include those

segments of pipelines landward of the coast line that cross navigable waters.

The Memorandum of Understanding in 1994 represented the Department of

Interior's and Department of Transportation's confirmation of their interpretation

of onshore and offshore reflected in each of their 1993 regulations.  The
Memorandum of Understanding was prompted, in part, by the definition of
"offshore facilities" contained in the Clean Water Act.  As discussed in the
Background section of the Memorandum of Understanding, the definition of
"offshore facility" included "facilities of any kind located in, on or under navigable
waters of the United States."  40 C.F.R. Part 112, Appendix B.  The Memorandum
of Understanding explained that under this definition the traditional role of the
Department of the Interior to regulate facilities on the Outer Continental Shelf was
expanded to include inland lakes, rivers and streams.  *Id.*  To address this issue, the
Department of Interior re-delegated to the Department of Transportation
responsibility for "transportation-related facilities, including pipelines, located
landward of the coast line." *Id.* ¶ 2.  Significantly, and in sharp contrast to the re-
delegation of non-transportation-related facilities to EPA, the re-delegation of
transportation-related facilities to the Department of Transportation makes no
mention of these facilities as being "offshore."  *Cf. Id.* ¶ 1 (re-delegating to EPA
the "non-transportation-related *offshore* facilities located landward of the coast
line") (emphasis added).  Thus, the Memorandum of Understanding recognized the
Department's interpretation that transportation-related facilities landward of the
coast line were not "offshore" facilities, but also recognized that the definitions in

41

the Act could create confusion, hence the need for the re-delegation to confirm the respective Departments' responsibilities.

## III. The Secretary is Also Entitled to Summary Judgment on NWF's Claim of Failure to Personally Review and Approve Plans Because the Secretary Never Personally Received Any Plans.

NWF's claims against the Secretary in Case No. 15-cv-13535 that he failed to personally review and approve plans is logically unsound.  NWF concedes that the Secretary only has an obligation to review and approve plans that he actually receives.  NWF's Sur-reply to Defendant's Motion to Dismiss, Case No. 15-cv-13535, ECF No. 20-1 at 2.  NWF attempts to surmount this hurdle by contending that the receipt of plans by RSPA and PHMSA should be imputed to the Secretary.  But if RSPA's and PHMSA's *receipt* of plans could be imputed to the Secretary, then RSPA's and PHMSA's *approvals* of plans would need to be imputed to the Secretary as well.  There is no logical way to conclude that the Secretary has received plans, without also concluding that he has approved them.

## IV. Neither the Secretary nor PHMSA Has Violated Executive Order No. 12,777.

In Case No. 15-cv-13535, NWF pleads a second claim alleging that the Secretary has violated and is violating Executive Order 12,777.  ECF No. 28 at 22-23.  For the same reasons explained above, *supra* at 16-28, this Court lacks jurisdiction over this claim because the Secretary's ratification has mooted the claim and NWF lacks standing to assert the claims.  If the Court finds it has

jurisdiction over this claim, then the claim fails on the merits because the Secretary properly delegated his authority with respect to the review and approval of response plans for onshore facilities, including all segments of oil pipelines landward of the coast line. *See supra* at 28-42.

## CONCLUSION

For the foregoing reasons, the Court should deny NWF's motion for summary judgment and grant the Secretary's cross-motion for summary judgment in Case No. 15-cv-13535, and should deny NWF's motion for partial summary judgment and grant the Secretary's cross-motion for partial summary judgment in Case No. 16-cv-11727.

Respectfully submitted this 22nd day of August 2016.

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources
 Division

/s/ Alan D. Greenberg
 _____
ALAN D. GREENBERG
Environmental Defense Section
U.S. Department of Justice
999 18th St., Suite 370
Denver, Colorado  80202
Phone: (303) 844-1366
E-mail:  alan.greenberg@usdoj.gov
Colorado Bar No. 14110

Of Counsel:

PAUL M. GEIER
  Assistant General Counsel
CHARLES E. ENLOE
  Trial Attorney
*U.S. Department of Transportation*

TERESA GONSALVES
  Chief Counsel
AMELIA SAMARAS
  Senior Attorney
*Pipeline and Hazardous Materials*
  *Safety Administration*

## CERTIFICATE OF SERVICE AND
## LOCAL RULE CERTIFICATION

I hereby certify that on this 22nd day of August 2016, I electronically filed the foregoing Defendants' Motion for Summary Judgment and accompanying Defendants' Memorandum in Opposition to Plaintiff's Motions for Summary Judgment and in Support of Defendants' Cross-Motions for Summary Judgment and with the Clerk of the Court using the electronic filing system, which will send notification of such filing to the registered CM/ECF user at the following e-mail address:

| | |
|---|---|
| Neil S. Kagan | Joshua Runyan |
| kagan@nwf.org | jrunyan@steptoe.com |
| | |
| David Coburn | Kathleen A. Lang |
| dcoburn@steptoe.com | klang@dickinsonwright.com |
| | |
| Bill Rastetter | Aaron Schlehuber |
| bill@envlaw.com | ASchlehuber@saulttribe.net |

**LOCAL RULE CERTIFICATION**:  I, Alan D. Greenberg, certify that this Memorandum complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 14 point (for proportional fonts). I also certify that the brief does not exceed 43 pages, which is the length to which the parties stipulated, subject to Court approval, in a stipulation lodged with the Court on August 18, 2016.

/s/ Alan D. Greenberg

Alan D. Greenberg
U.S. Department of Justice
999 18th Street, Suite 370
Denver, Colorado  80202
Phone: (303) 844-1366
Fax: (303) 844-1350
E-mail:  alan.greenberg@usdoj.gov

45