UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONAL WILDLIFE
FEDERATION,

       Plaintiff,                     Case No. 15-cv-13535

vs.                                       HON. MARK A. GOLDSMITH

SECRETARY OF THE UNITED
STATES DEPARTMENT OF
TRANSPORTATION,

       Defendant.
_____/

**OPINION & ORDER
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 51)
AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
(Dkt. 52)**

Plaintiff National Wildlife Federation ("NWF") seeks a ruling that Defendant Secretary of the United States Department of Transportation ("the Secretary") has failed — for some two decades — to fulfill responsibilities under the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1321(j)(5), to review spill response plans for certain oil facilities: namely, inter-connected pipelines that traverse both land and navigable waters, landward of the Nation's coasts. The essence of NWF's claims is that neither the Secretary nor the sub-agencies to which authority was delegated reviewed plans for the water segments using criteria mandated by the CWA, and instead used regulations that can only apply to the land segments of such pipelines. As explained below, the Court agrees with the Secretary that NWF has failed to establish standing to raise its claims, as it cannot show how any alleged procedural error affected agency

1

action. Thus, the Secretary's cross motion for summary judgment (Dkt. 52) must be granted, and NWF's summary judgment motion (Dkt. 51) must be denied.

## I. BACKGROUND

A review of the applicable legislative and regulatory history puts NWF's claims in focus. A year after the 1989 Exxon Valdez spill, Congress enacted the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701, et seq., which amended § 311 of the CWA, with the goal of preventing another such tragedy by prohibiting owners and operators of certain oil facilities from transporting oil unless they had a spill response plan approved by the President. See 33 U.S.C. § 1321(j)(5)(F)(i)-(ii).

The OPA broadly defines the term "facility," which unquestionably includes a pipeline.[1] The OPA makes the response plan requirement applicable to owners and operators of "offshore" facilities and certain "onshore" facilities. 33 U.S.C. § 1321(j)(5)(F)(i)-(ii). The former are defined as facilities located under navigable waters of the United States, while "onshore" facilities are defined as "any facility . . . of any kind located in, on, or under, any land within the United States other than submerged land." 33 U.S.C. § 1321(a)(10)-(11). While response plans are required for all offshore facilities, the same is not true for onshore facilities. Regarding onshore facilities, the response plan requirement applies only to "an onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters." 33 U.S.C. § 1321 (j)(5)(C)(iii)-(iv).

---

[1] See 33 U.S.C. § 2701 (defining "facility" as "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil" and "includes any motor vehicle, rolling stock, or pipeline used for one or more of these purposes").

The statute does not expressly address whether inter-connected pipelines over both land and water should be viewed as embracing a single facility — and characterized as solely offshore or onshore — or whether they should be viewed as a compendium of different facilities with separate land and water segments. According to NWF, interconnected pipelines consist of two kinds of facilities; the land portion is an onshore facility, while the portion in or over water is offshore. The Secretary contends that the entire network of pipelines is an onshore facility, both the portion that traverses land and the portion that traverses water. This fundamental disagreement informs the parties' respective views of the post-enactment regulatory history and their legal positions in this case.

The President delegated his authority under the statute — to issue regulations and review and approve response plans — to different executive branch departments. See Executive Order No. 127777, 56 Fed. Reg. 54,757 (Oct. 18, 1991). He delegated to the Department of Transportation ("DOT") his responsibilities regarding "transportation-related onshore facilities." Id. The President delegated to the Department of the Interior ("DOI") his responsibilities regarding "offshore facilities." Id.

In 1993, the Secretary re-delegated authority for onshore facilities to an agency within DOT, the Research and Special Programs Administration ("RSPA"). This authority was delegated once again, in 2005, to RSPA's successor within DOT, the Pipeline and Hazardous Materials Safety Administration ("PHMSA"). See 49 C.F.R. § 1.97. In 1993, upon being granted authority, RSPA issued regulations denominated as "onshore" regulations. 58 Fed. Reg. 244 (codified at 49 C.F.R. Part 194). In addition to addressing land segments of oil pipelines, the regulations include references to those segments of pipelines that cross inland waters. See, e.g., 49 C.F.R. § 194.115.

3

At the same time, DOI issued an Interim Final Rule, 58 Fed. Reg. 7489-01 (February 8, 1993), which established "requirements for spill-response plans for offshore facilities including associated pipelines." The rule was meant to provide guidance to pipeline operators who were soon required to submit certain spill response plans to DOI. The interim final rule included proposed regulations, which defined the term "offshore" as "the area seaward of the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the area seaward of the line marking the limit of inland waters." Id.

Because Executive Order 12777 had expanded DOI's traditional role of regulating facilities on the Outer Continental Shelf, the department subsequently delegated its responsibilities regarding spill prevention to DOT and the Environmental Protection Agency ("EPA"). In a 1994 memorandum of understanding, DOI delegated to EPA "responsibility for non-transportation-related offshore facilities located landward of the coast line," and delegated to DOT "responsibility for transportation-related facilities, including pipelines, located landward of the coast line." 40 C.F.R. § Pt. 112, App. B.

Since that time, both RSPA and PHMSA have reviewed response plans for pipelines situated landward of the Nation's coasts, without challenge to their authority or the propriety of their actions until this lawsuit was filed. After this suit was initiated, the Secretary ratified RSPA's and PHMSA's approvals, including plans "covering pipeline segments located in, on, or under inland waters . . ." See Letter from Sec'y, Ex. B. to Def. Mot. at 1 (Dkt. 52-3). The Secretary also delegated to PHMSA "any and all pipeline-related authority" previously delegated to DOT either through the Executive Order or the Memorandum of Understanding. Id.

NWF notes that RSPA and PHMSA reviewed the entirety of the inter-connected pipelines under regulations promulgated for "onshore" facilities, rather than reviewing separately the

4

portions that traverse land under onshore regulations and the portions that traverse water under offshore regulations. Pl. Mot. at 21. NWF claims that this means that no review was done for the water segments, which it views as offshore facilities. NWF also contends that the review and approval process was deficient in that the Secretary only considered whether the plans conformed to regulations, rather than to requirements of the CWA.[2] Id. As a consequence, NWF filed this action, asserting claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), contending that the Secretary has failed to perform the nondiscretionary duty under both the CWA and the Executive Order to review and approve response plans for offshore facilities, or unreasonably delayed in performing that duty. See Am. Compl. ¶ 9, Prayer for Relief.

According to the Secretary, the entire network of pipelines is an "onshore" facility, both the portion that traverses land and the portion that traverses water, such that approval of the response plans for the entire pipeline under "onshore" regulations for over two decades has been appropriate. Def. Resp. at 21. She notes that nothing in the statutory provisions expressly addresses inter-connected pipelines over both land and water. Id. at 23. The Secretary further argues that the CWA sets forth a single set of requirements for response plans — without distinguishing between onshore and offshore facilities — making it substantively irrelevant that regulations that by their terms apply to "onshore" facilities were utilized for portions traversing water, even if such water-crossing segments should theoretically be reviewed under criteria designated specially for offshore facilities. Id. at 30. Further supporting the Secretary's argument is the fact that no party has identified any "offshore" regulations for facilities landward of the

---

[2] A typical approval letter states that PHMSA had received and reviewed the plan and had concluded that "the Plan complies with PHMSA's regulations concerning onshore oil pipelines found at 49 Code of Federal Regulations." See PHMSA approval letter, Ex. 9 to Pl. Mot., at 1 (cm/ecf page) (Dkt. 51-10).

5

coast, suggesting that none have ever been promulgated. Taking all these factors into account, the Secretary argues that the decision to approve inter-connected pipelines under onshore regulations is entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Id. at 21. The Secretary also argues that the agency's review for compliance with the regulations is equivalent to review for compliance with the CWA, since the regulations track the statute and were designed to implement the safeguards mandated by the statute. Id. at 15.

The Court need not, and may not, wade into the merits of the respective claims and defenses. As explained below, the threshold doctrine of standing requires dismissal.

## II. STANDARD OF REVIEW

When standing is challenged by way of a summary judgment motion, the factual predicates of all aspects of standing must be established by the plaintiff through proper evidence of specific facts. Ctr. for Biological Diversity v. Lueckel, 417 F.3d 532, 537 (6th Cir. 2005) ("The plaintiffs cannot carry their burden by generalized allegations. Because the plaintiffs' standing was challenged in a motion for summary judgment, the plaintiffs must . . . 'set forth specific facts,' in affidavits or through other evidence, demonstrating that each element of standing is satisfied.") (quoting Fed. R. Civ. P. 56).

## III. ANALYSIS

Jurisdictional issues must be addressed first, because if jurisdiction is lacking, a district court may not proceed to address the merits of the case. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (quoting Ex parte McCardle,

74 U.S. 506, 514 (1868)); see also Children's Hosp. Med. Ctr. of Akron v. Youngstown Assocs. in Radiology, Inc., 612 F. App'x 836, 837 (6th Cir. 2015) ("If a federal court does not have such jurisdiction, according to the doctrine adopted in the Steel Co. case, it may not decide the merits, and hence it must decide such standing questions first. This order-of-decision doctrine is now well established."). Jurisdiction encompasses standing. See Steel Co., 523 U.S. at 86.

To establish constitutional standing under Article III, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-181 (2000).

The APA, 5 U.S.C. § 701, et seq., provides two additional requirements for standing, referred to as "prudential standing." "First, the plaintiff's complaint must relate to agency action, which is defined to include failure to act . . . Second, the plaintiff must have suffered either legal wrong or an injury falling within the zone of interests sought to be protected by the statute on which his complaint is based." Lueckel, 417 F.3d at 536.

Furthermore, where an association invokes standing as a representative of its members — as NWF does here — it must demonstrate that "its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." Friends of the Earth, 528 U.S. at 181.

Regarding the APA's prudential standing requirements, NWF's complaint satisfies the first factor, because it alleges what is unquestionably agency action — the Secretary's alleged failure

to review spill response plans for pipeline segments that NWF claims are "offshore" facilities. Am. Compl. ¶ 1 (Dkt. 14). In regard to the second factor, NWF has alleged injuries "to their members' enjoyment of the aesthetic, recreational, and scientific values" of the bodies of water through which the pipelines in question run. Am. Compl. ¶ 15-19. These values fall within the "zone of interests" that the CWA was designed to protect. See 33 U.S.C. § 1251 ("The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."). As a result, NWF has established prudential standing under the APA.

Regarding the requirements for organizational standing, an organization like NWF "can establish standing through two routes: on behalf of its members, in what we have called 'representational standing,' or on its own behalf if directly injured." Club v. U.S. E.P.A., 793 F.3d 656, 661 (6th Cir. 2015). NWF brings this action on behalf of its members and thus must demonstrate "representational standing." As noted above, NWF must demonstrate that its members would have standing to sue on their own, the interests at stake in the litigation are germane to NWF's purpose, and none of the claims asserted or relief requested in each case would require the individual members' participation. Friends of the Earth, 528 U.S. at 181.

There is no dispute in regard to the second and third factors. NWF states that its purpose "includes inspiring Americans to protect wildlife and natural resources for our children's future. NWF's mission includes protecting wildlife and natural resources from the impacts of spills of oil or hazardous substances." Am. Compl. ¶ 10. There also is no need for individual participation by NWF's members, as NWF members are not necessary to resolve the question whether the Secretary properly reviewed response plans. Therefore, the remaining and critical issue is whether the individual members, and thus NWF, have standing to bring these claims.

NWF's members must first establish that they have suffered "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Friends of the Earth, 528 U.S. at 180. NWF argues that its members have suffered an injury in fact because "[t]he use of offshore pipelines without adequate plans constantly exposes the interests of NWF's members both to a substantial threat of a worst case discharge and to a worst-case discharge that will not be removed to the maximum extent practicable." Pl. Mot. at 14.

In regard to actual or imminent harm, NWF argues that "[t]hese risks diminish the members' use and enjoyment of specific natural resources or their property . . . Property ownership and the use of natural resources for recreation and aesthetic enjoyment fall within the zone of interests that the CWA is meant to protect." Id. at 16. The injury suffered by NWF's members is analogous to the harm suffered by the plaintiffs in Kelley v. Selin, 42 F.3d 1501 (6th Cir. 1995). In that case, the Nuclear Regulatory Commission ("NRC") approved a rule permitting the storage of nuclear waste at any nuclear reactor site in the United States. Id. at 1506. The plaintiffs in that case, owners of land adjacent to a nuclear power plant, alleged that the NRC failed to comply with the National Environmental Policy Act by refusing to prepare an environmental impact statement. Id. at 1507. The Sixth Circuit held that the plaintiffs had established injury in fact, noting that "not only do petitioners assert harm to their aesthetic interests and their physical health, but each also asserts that the value of his or her property will be diminished by the storage of nuclear waste in the VSC-24 casks." Id. at 1509.

Some NWF members have alleged harm in the form of risk to their aesthetic and recreational interests. See generally Decl. of Bruce T. Wallace, Ex. 3 to Pl. Mot. (Dkt. 51-4); Decl. of Norman E. Ritchie, Ex. 4 to Pl. Mot. (Dkt. 51-5); Decl. of Charles W. Borgsdorf, Ex. 5 to Pl. Mot. (Dkt. 51-6); Decl. of David J. Schwab, Ex. 6 to Pl. Mot. (Dkt. 51-7). The Supreme Court has

9

long recognized that harm to these interests is sufficient to establish injury in fact. See Friends of the Earth, 528 U.S. at 183. Because the spill response plans have already been approved, there is also a continuing risk to the members' aesthetic and recreational interests. See Ctr. for Biological Diversity v. U.S. Dep't of Interior, 563 F.3d 466 (D.C. Cir. 2009). Furthermore, like the petitioners in Kelley, one NWF member, Bruce Wallace, has alleged a diminution in his property's value due to the alleged procedural violations. Wallace Decl. ¶ 32. As a result, NWF has properly alleged injury in fact.

While NWF has satisfied the harm requirement, it cannot satisfy the special causation and redressability requirements applicable to challenges to agency action based on alleged procedural errors. "[A]n adequate causal chain in a case involving an agency's non-compliance with procedural requirements must contain at least two links: a link between the plaintiff's injury and some substantive decision of the agency, and a link between that substantive decision and the agency's procedural omissions." Lueckel, 417 F.3d at 538.[3]

The first link is not problematic for NWF. That is established, because NWF sufficiently alleges that its members' actual or threatened impairment of aesthetic, recreational, and property interests have resulted from the agency decision to allow oil pipelines to be operated with spill responses plans that allegedly do not comply with the CWA.

It is the second link that is NWF's standing Waterloo, as illustrated by Lueckel. In that case, the plaintiffs were environmental groups that challenged the U.S. Forest Service's decision to authorize logging activity in certain environmentally sensitive areas without complying with certain standards set out in the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271, et seq. The Sixth

---

[3] This analysis also implicates redressability. The Court in Lueckel found "substantial equivalence" in the two issues, observing that "[t]he question of the second causal link…is hard to distinguish from the question of redressability." Lueckel, 417 F.3d at 538.

Circuit affirmed summary judgment based on a lack of standing, reasoning that there was no evidence that the Forest Service decision was made more likely by the failure to develop a comprehensive management plan, in contravention of the Act, especially since the existing management plans were essentially equivalent to the plans required under the Act. Id. at 539-540.

In reaching this conclusion, the Sixth Circuit acknowledged that a plaintiff does not have to establish with "any certainty" that the agency's decision would have been different had the agency not failed to comply with procedural requirements. Id. at 539. Still, there is a hurdle that must be surmounted, even if "the strength of the necessary showing may be open to debate." Id. The standard accepted in that case was that the plaintiff present "evidence that their injuries 'reasonably could have been avoided' had the [agency] complied with its statutory duties." Id. (quoting Citizens for Better Forestry v. U.S. Dep't of Agric., 341 F.3d 961, 976 (9th Cir. 2003)).

That is a standard that NWF cannot satisfy. It makes no plausible case that a review without the claimed errors might have led to a different result in the approval process. Although NWF claims the agencies considered whether the plans conformed to regulations, rather than to the CWA itself, that is entirely without significance. The regulations faithfully track the statute. All of the requirements for spill response plans contained in the CWA are present in the regulations. Both the CWA and onshore regulations require the following for approval of a spill response plan:

- The plan must be consistent with the National Contingency Plan and Area Contingency Plans.
- It must identify the qualified individual having full authority to implement removal actions and how that person will communicate with federal officials.
- The plan must identify private personnel and equipment necessary to remove or mitigate a worst case discharge.
- It must describe the necessary training and testing to be done by operators.

11

- Finally, the plan must be updated periodically and be resubmitted for approval of each significant change.[4]

The following chart demonstrates the pertinent similarities between the CWA and onshore regulations:

| **Clean Water Act, 33 U.S.C. § 1321(j)(5)(D)** | **Onshore Regulations, 49 C.F.R. Pt. 194** |
|---|---|
| (i) response plan shall "be consistent with the requirements of the National Contingency Plan and Area Contingency Plans." | § 194.107(b): "An operator must certify in the response plan that it reviewed the NCP and each applicable ACP and that its response plan is consistent with the NCP and each applicable ACP." |
| (ii) "identify the qualified individual having full authority to implement removal actions, and require immediate communications between that individual and the appropriate Federal official and the persons providing personnel and equipment." | § 194.113: "The information summary for the core plan must include . . . The name and address of the operator . . . The names or titles and 24-hour telephone numbers of the qualified individual(s) and at least one alternate qualified individual(s)." |
| (iii) "identify, and ensure by contract or other means approved by the President the availability of, private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge (including a discharge resulting from fire or explosion), and to mitigate or prevent a substantial threat of such a discharge." | § 194.115: "Each operator shall identify and ensure, by contract or other approved means, the resources necessary to remove, to the maximum extent practicable, a worst case discharge and to mitigate or prevent a substantial threat of a worst case discharge." |
| (iv) "describe the training, equipment testing, periodic unannounced drills, and response actions of persons on the vessel or at the facility, to be carried out under the plan to | § 194.117: "Each operator shall conduct training to ensure that [a]ll personnel know [t]heir responsibilities under the response plan . . . Each operator shall maintain a training |

---

[4] Compare 33 U.S.C. § 1321(5)(D)(i)-(vi) with 49 C.F.R. §§ 194.107, 194.113, 194.115, 194.117, 194.121.

| ensure the safety of the vessel or facility and to mitigate or prevent the discharge, or the substantial threat of a discharge." | record for each individual that has been trained as required by this section." |
|---|---|
| (v)-(vi): "be updated periodically; and be resubmitted for approval of each significant change." | § 194.121: "Each operator shall update its response plan to address new or different operating conditions or information. In addition, each operator shall review its response plan in full at least every 5 years from the date of the last submission or the last approval." |

NWF offers no rebuttal to what cannot be reasonably disputed: the regulations are congruent with the CWA. This means that DOT's finding that plans complied with the regulations is the equivalent of a finding that they complied with the statute. Thus, any "error" in the review process could hardly have had any impact on the decision to approve.

Equally unconvincing is NWF's other argument — that RSPA's and PHMSA's reviews and approvals were made pursuant to regulations which, by their terms, apply to onshore facilities rather than to offshore facilities. The CWA makes no distinction between the requirements for spill response plans for onshore and offshore facilities. See 33 U.S.C. § 1321(j)(5)(D) (setting forth a unitary set of response plan requirements).

Further, the onshore regulations that were utilized expressly cover navigable waters. For example, the regulations expressly account for worst-case discharges that occur from segments of a facility that cross navigable waters. The regulations state that if a discharge occurs in a "high volume area," the response time to the spill must be six hours faster than it normally would be. 49 C.F.R. § 194.115. A "high volume area" is defined as:

> an area which an oil pipeline having a nominal outside diameter of 20 inches (508 millimeters) or more crosses a major river or other navigable waters, which, because of the velocity of the river flow

> and vessel traffic on the river, would require a more rapid response in case of a worst case discharge or substantial threat of such a discharge.

49 C.F.R. § 194.5. The regulations also require operators to account for areas it deems "environmentally sensitive." Id. An "environmentally sensitive area," is defined as an "area of environmental importance which is in or adjacent to navigable waters." Id.

The agency concern for discharges into navigable waters was manifest when the regulations were promulgated over two decades ago:

> [M]ost onshore oil pipelines, because of their locations, could reasonably be expected to cause substantial harm to the environment by discharging oil into or on the navigable waters or adjoining shorelines . . . This determination is based on the volume of oil transported by pipelines and the fact that they <u>often cross</u>, or are located adjacent to, navigable waters. Thus, most onshore oil pipeline operators will be required to prepare and submit response plans.

58 Fed. Reg. at 247 (emphasis added).

Given that the onshore regulations have no gap in coverage for water segments, NWF fails to substantiate how different regulations — denominated as "offshore" or containing different provisions for water segments — may have led to denials rather than approval of the submitted plans.

Like in <u>Lueckel</u>, there is no indication that the challenged agency action would have been affected in any way had the claimed procedural errors not occurred. Because NWF cannot establish that the Secretary's alleged procedural omissions were linked to the substantive decision to approve the plans, it cannot establish causation or redressability. As a result, NWF lacks standing.

## IV. CONCLUSION

14

For the foregoing reasons, the Court denies NWF's motion for summary judgment (Dkt. 51) and grants the Secretary's cross-motion for summary judgment (Dkt. 52).

SO ORDERED.

Dated: December 12, 2017  s/Mark A. Goldsmith
Detroit, Michigan  MARK A. GOLDSMITH
United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 12, 2017.

s/Karri Sandusky
Case Manager